

JAN - 6 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MICHELE BURKE CRADDOCK

        Plaintiff,

v.

LeCLAIRRYAN, a Professional Corporation,

        Defendants

Civil Action No: 3:16 CV 011

## COMPLAINT

COMES NOW Plaintiff Michele Burke Craddock, by counsel, and states the following as her Complaint against Defendant LeClairRyan, a Professional Corporation:

### NATURE OF THE ACTION

1.    This is an action for gender based employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including the Lilly Ledbetter Fair Pay Act of 2009, and the Equal Pay Act, 29 U.S.C. § 206(d), *et seq.*  While employed as an attorney with LeClairRyan, a Professional Corporation ("LeClairRyan" or "Firm"), Plaintiff, Michele Burke Craddock ("Plaintiff" or "Craddock"), was subjected to gender based discrimination in compensation and other privileges, terms or conditions of employment and, when she opposed her selective treatment, was retaliated against in further violation of the aforementioned statutes.

2.    Plaintiff has suffered gender-based selective treatment and the adverse gender based impact of policies and practices regarding compensation, promotional opportunities, and other terms and conditions of her employment.  While Plaintiff suffered generalized disparate

gender based treatment similar to other female attorneys during her twelve year tenure at the Firm, the disparate treatment directed toward Plaintiff increased dramatically as her performance and fee generation exceeded many of the Firm's male attorneys, ultimately forcing Plaintiff from the Firm.

3.      This Complaint arises out of the illegal pattern and practice of gender based discrimination and the retaliation that followed after Plaintiff complained of the discrimination. Plaintiff seeks declaratory and injunctive relief, compensatory and exemplary damages for employment discrimination on the basis of her gender and related retaliation, in violation of Title VII to the 1964 Civil Rights Act, as amended, 42 U.S.C. §§2000e *et seq.* ("Title VII"), including the Lilly Ledbetter Fair Pay Act of 2009, and for wage damages, liquidated damages and related retaliation damages, pursuant to the Equal Pay Act, 29 U.S.C. §206(d) ("EPA").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343 and 42 U.S.C. §2000(e)-(5)(f), 29 U.S.C. §206(d).  The declaratory and injunctive relief sought is authorized by 28 U.S.C. Sections 2201 and 2202, 42 U.S.C. §2000e *et seq.*, 29 U.S.C. § 217 and Rule 57 of the Federal Rules of Civil Procedure.

5.      Venue is proper in this District under 28 U.S.C. §1391(b) and (e) and 42 U.S.C. §2000(e)-(5)(f)(3) as the actions and unlawful employment practices alleged herein were committed in the Eastern District of Virginia.

6.      Plaintiff has exhausted all required administrative procedures for the filing of her Title VII action, having filed a timely formal complaint with the Equal Employment Opportunity Commission on or about January 20, 2015, which was amended on or about January 21, 2015 and March 5, 2015.  The EEOC issued a Notice of Right to Sue on December 4, 2015.  Suit has

been brought within 90 days of plaintiff's receipt of the Notice of Right to Sue, consistent with Title VII of the Civil Rights Act of 1964, as amended. No administrative exhaustion is required for the EPA claims.

## PARTIES

7.      Plaintiff, Michele Burke Craddock, is a citizen of the Commonwealth of Virginia and a resident of Richmond, Virginia.

8.      Defendant, LeClairRyan, is an employer within the definitions of Title VII to the 1964 Civil Rights Act and the EPA and an enterprise subject to the EPA. The Firm employs in excess of 700 employees and has done so at all times pertinent to this action.

## FACTS

### LeClairRyan's History of Male Dominated Decision-making and Gender Discrimination

9.      LeClairRyan is a national law firm with 25 offices nationwide. Between 2003 and 2015, the Firm consistently employed between 350 and 373 attorneys. The National Law Journal now lists it as the 128th largest firm in the United States.

10.      The Firm employs more experienced attorneys as non-equity partners ("officers") and equity partners ("shareholders"). Craddock was employed by LeClairRyan from 2003 until her March 4, 2015 constructive discharge. She is a 49-year old female and, although eligible for promotion earlier, attained shareholder status in 2012. Plaintiff does not serve on the Firm's Board of Directors, executive or compensation committees and is an employee subject to the protections of Title VII and the EPA.

11.      LeClairRyan has a demonstrated history of gender-based discrimination toward its female attorneys in terms of compensation, leadership, selection, advancement and other terms and conditions of employment. This is most apparent in its treatment of female attorneys

3

who have attained shareholder status, who have been denied terms of employment enjoyed by the Firm's male shareholders.  Plaintiff and other female shareholders have also suffered the impact of Firm policies and practices described herein which have favored the Firm's male attorneys in selection for shareholder status, compensation and the opportunities for the levels of compensation allowed male Shareholders.  In 2015, of the Firm's 157 Shareholders, only 31, or 19.7% were female.

12.     During the Firm's existence, Firm decisions have been controlled by a small group of male shareholder/directors.  At all times relevant to this Complaint, the top senior management positions were exclusively held by male shareholders, Gary LeClair ("LeClair") Michael Hern ("Hern") and David Freinberg ("Freinberg").

13.     The Firm's 14 member Board of Directors ("Board") consisted of 3 female shareholders.  The lead Director was male.  The Firm's compensation and executive committees have historically been predominately male and the executive leadership and governance of the Firm have been controlled by a Chair, Vice-Chair, CEO, Secretary and Heads of Litigation and Corporate, all of whom were male.  LeClair and Hern have tightly controlled the process of appointment to these positions, the Directors, and other individuals who hold position by virtue of appointment by the male dominated management group.  Likewise, Firm policies are recommended and controlled by this group.

14.     From the Firm's inception, its Chair, Gary LeClair, has historically made or directed the bulk of all policy, compensation and governance decisions for the Firm, ostensibly with the input of other male executive leadership, including Michael Hern.  On information and belief, Messrs. LeClair, Hern and other senior male managers are under long term employment contracts in amounts not disclosed to the Firm shareholders.  On November 17, 2015, LeClair

4

Ryan announced that, effective December 31, 2015, Mr. LeClair would conclude a twenty-eight (28) year tenure as Firm Chairman. In 2014, Freinberg and Hern shared more active roles in the Firm's management.

15. The senior management group has significant financial interests in maintaining the status quo, and is by no means disinterested, allowing for perpetuation of promotion and compensation policies and practices. As such, compensation and promotions recommendations have come from within this group.

16. For example, promotion and compensation recommendations are made by the heads of Litigation or Corporate to Freinberg. On information and belief, the supposed "check" on the system, Chief Legal Officer Bruce Matson ("Matson") (a male), has a substantial "soft landing" contract, guaranteeing him significant annual compensation upon separation from his position with the Firm, similar to compensation guarantees held by LeClair, Hern and Freinberg.

17. A few females have served on Firm committees, but generally are subject to political control of the senior male leadership and/or non-lawyer administrators who are not female shareholders. For example, when Craddock was recommended for promotion in the fall of 2012, the promotions committee was comprised of five Shareholders from the male executive ranks, including Hern, Freinberg, the male heads of the Corporate and Litigation Departments, and 4 females - but only one was a shareholder, the balance of female representation being non-lawyer administrator appointees.

**LeClairRyan's Gender-Based Manipulation of Promotion and Compensation Decisions**

18. Since well prior to January, 2003, female attorneys of the Firm have been subjected to compensation practices that have discriminatorily treated and impacted females. This includes the processes in place for delaying female elevation to shareholder and, for those

females who persevere to obtain shareholder status, how their shareholder compensation is determined, including decisions on "origination credits," which the Firm management uses to determine compensation.

19.     In accordance with Firm policy, an Originating Attorney is "the attorney who initially brings in the client and often the attorney who gets the telephone call. As a general rule, once an attorney brings in a client, he/she will forever be the [originating attorney] for all matters for that client." Disputes regarding the designations of Originating Attorney were to be determined by Freinberg, in his sole discretion, based on input from Hern.

20.     Hern and Freinberg have controlled decisions that impacted origination credit, which in turn drives compensation and promotion decisions. Repeatedly, origination decisions were made in favor of male shareholders and against female shareholders. This subjective application of origination decisions has systematically been applied so as to favor male shareholders, and disfavor female shareholders, and/or has had such adverse effect on female shareholders. Under this subjective system, female shareholders who met objective measures have consistently been denied compensation, resources and support that male shareholders, *even with lesser objective achievements*, have received.

21.     Origination credits have been subjectively used to compensate senior male shareholders, many with longstanding client relationships but without regard to work performed, or male shareholders to whom internal referrals are directed from senior male shareholders, to the disadvantage of female attorneys or shareholders servicing the clients as working attorneys.

22.     These practices are perpetuated by the Firm's internal referral practices. Internal referral of work between male shareholders, and not to female shareholders, perpetuates the lack of origination, working attorney or other credits for compensation and promotion purposes.

Justification for such action has included stereotyped concerns over a male attorney's need to support a family.

23.     However, the stereotype did not apply to Plaintiff when she was the breadwinner in her family, despite her children's educational expenses and similar economic needs. Craddock has been denied internal referrals from male shareholders on matters for which she was qualified (and recommended by other (male) shareholders) because the originating male shareholder elected not to send the work to Craddock. Plaintiff has also been denied working attorney credits on matters where she performed key work leading to a successful resolution at another shareholder business litigator's request - but the male shareholder elected not to give Craddock the credit, keeping it for himself.

24.     Additionally, originating attorneys decide what attorneys may work on their matters. This "self-selection" practice perpetuates the male shareholders' ability to reward other male attorneys, officers and shareholders, and determine the rates at which such lawyers are billed to the case, further widening the gender-based compensation disparities. Male originating attorneys often maintain high hourly rates, but charge working attorneys servicing the client at lower rates. Often, the *lowest* rates are assigned to female working attorneys. As such, a female working attorney being billed at low rates is required to work more hours to reach the same billing goals, with less time to market for her own client originations.

25.     On information and belief, these practices have infected compensation and female officers and shareholders of the Firm are consistently paid less than comparably situated male officers and shareholders, including in 2014, when the Firm's male officers were reportedly compensated substantially more than the female officers. This pay disparity is not limited to the Richmond office but, on information and belief, is systemic and firm-wide.

26.     Male shareholders and officers are consistently shown favoritism in compensation and other terms and conditions of employment over female shareholders.  Subjective decisions and gender stereotyping by Firm management regularly favor male shareholders over female shareholders.

**LeClairRyan Maintains Practices Which Depress Female Attorney Compensation**

27.     The Firm has a practice of using efforts to coerce female lawyers, including shareholders, to "agree" to compensation reductions. As indicated below, Craddock was coerced to sign such an agreement, but refused.  On information and belief, at least one female attorney resigned when she was approached by Firm management to substantially reduce her salary when male attorneys were not.  The single mother of two and primary breadwinner refused to sign the document purporting to acknowledge her agreement to the salary reduction.

28.     Although the Firm prides itself on allowing lawyers to work part time, female attorneys with children, family or medical care obligations are often forced to "buy" such "flexibility" by going "part time" (e.g. a 20% reduction in billable hour and collection requirements with commensurate 20% reduction in compensation.)  By comparison, male shareholders with medical or family care issues, or less productive years, are regularly "carried" and not pressured to take a part time status, or any reduction of compensation.

29.     Such reductions in compensation also make shareholder buy-in more difficult for female attorneys seeking shareholder status. This practice has a disparate impact on the ability of females to become shareholders as well as the time it takes to attain shareholder status, impediments not presented for male attorneys seeking shareholder status.  At least one female shareholder has been pressured to go part time (with compensation reduction), unlike male attorneys with medical or family care obligations.  Another female shareholder who left the Firm

8

was unable to afford the $100,000 buy-in because of the compensation reduction associated with part-time status. Moreover, part-time status is by no means a protected status. When one female shareholder went part time, she was de-equitized.

30.     Time taken by female attorneys for maternity leave, the resulting "ramp up" time in obtaining work upon return, and the resulting lag in collections upon a return to work after going "part time" have had a severe impact on female associates' ability to be promoted to officer, because Firm policy requires at least 10,000 hours of billable work before an associate is eligible for promotion. The lag in obtaining work and resulting lag in collections affect the 3-year performance metrics that are the major component in promotion decisions. The Firm does not prorate these requirements to account for maternity leave or 'part time' status not pressed for male attorneys.

31.     A recent example includes a female attorney who, though graduating from law school the same year as a male attorney, was promoted two (2) years later than her male attorney peer. Another female attorney was terminated approximately one year after her return from maternity leave because, in the post-leave "ramp up" described above, she was considered "slow." Male attorneys with slow periods in work or collections, family needs or medical issues, are not pressed to take leave on the same frequency as female attorneys and do not experience similar impediments to compensation or promotion.

32.     Promotional opportunities are likewise skewed to favor male shareholders. Where credits are to be shared among several, male and female, shareholders, female shareholders have been excluded from "rainmaking" opportunities or given proportionately less share of the credit for successful proposals or work. The Firm has expended tens of thousands of dollars a year to participate in legal networks that result in substantial originations, all of which

are reserved for male shareholders. These networks include the USLAW Network and International Law Firm Network.

33. Moreover, when lawyers and law firms recruited from such networks to join the Firm, their fees generated are also considered originations of the senior male shareholders awarded such credits for compensation purposes. When lawyers and law firms recruited from such networks join the Firm, the same male attorneys receive substantial recruiting bonuses.

**Despite Exceptional Results, LeClairRyan<br>Attempts to Reduce Craddock's Compensation**

34. Craddock's practice at LeClair involved complex business litigation, including fiduciary litigation such as shareholder derivative suits. Towards the end of Craddock's tenure with LeClair there were 177 business litigation lawyers in the firm, 80 of whom were shareholders (72 male and only 8 female shareholders). Of the 11 shareholder business litigators in the Richmond, Virginia office, Craddock was the only female shareholder. Despite excellent performance and exceptional results under objective standards, Craddock was denied compensation which similarly situated male shareholders and officers were provided.

35. In 2013, Craddock met the Firm's stated standards for top performer status. However, in November 2014, contrary to Firm policies and the normal shareholder review process, the Litigation Department Leader and CEO, both male, tried to coerce Craddock into taking a salary reduction. In doing so, the Firm deliberately failed to follow its policies and practice as it had with male shareholders, which would have resulted in an increase, rather than a decrease, to Craddock's compensation.

36. By Firm policy, officer and shareholder compensation is to be determined by: (1) objective criteria, including 3-year average numbers for collections from hours worked, originations, matter management, compliance with billing and time entry deadlines and team

10

leadership, and (2) subjective criteria, including a shareholder's/ officer's self-evaluation and the recommendation from the male CEO, Freinberg, with input from the male Department Team leaders.

37.     Although the criteria appear to provide a transparent process, the application of the policy is cloaked in secrecy.  As in any organization, however, information leaks out revealing subjective application of Firm compensation policy, including unreported back-office deals favoring the Firm's male shareholders, including the subjective origination credits practice described above.

38.     The Firm does not have a seniority-based compensation system.  Compensation is to be determined by annual collections ("working attorney collections") and collections of work originated ("origination collections"), with 3 year averages to off-set off years or take into consideration exceptional years, and with top performers paid over market rates.  Pursuant to Firm policy, exceptional performance in a given year is rewarded through an Extraordinary Bonus Plan, if the Firm makes its budget.  Material differences in contributions should result in material differences in compensation, or per stated policy the Firm's "Stars" are to be rewarded. Although Firm policy dictates that the Firm's top performers are to be paid in excess of market rates, the Firm has implemented the policy to benefit only the top performing male shareholders.

39.     On information and belief, based on objective metrics described by Firm compensation policy, the Firm's top performing female shareholders have been compensated far less than its top performing male shareholders, resulting from the subjective influence of the male Firm leadership and impact of Firm policies and practices favoring male shareholders.

40.     Under the metrics by which performance was measured by the Firm, Plaintiff outperformed most male Richmond shareholders, including those in her shareholder class.  Due

to LeClair Ryan's policy of pay for performance rather than seniority and Plaintiff's objective metrics and qualification a top performer, Plaintiff's compensation should have been at the levels of her top performing male shareholder comparators with more seniority with the Firm, such as Vern Inge, Steven Faraci, Charles Sims, Charlie Meyer, Doug Sbertoli, Grant Grayson, Mike Hern, Jim Guy, Steve Brown, George Whitley, Tom Coulter and Bruce Matson, or her own team members John Craddock or Tom Wolf.

### Gender-Based Compensation and Promotion Discrimination Affecting Craddock: the *Colgate v. Disthene* Case and Other Significant Litigation

41.     Although Craddock performed at, and above, levels that are generously rewarded for male shareholders, she has not been compensated at levels similar to her male shareholder peers.  Craddock played a significant role in some of the Firm's most prominent cases, in addition to contributions to the legal profession through service as an Adjunct Professor at Washington & Lee University School of Law, *pro bono* work, and community service as a Director of a prominent Richmond cultural organization.

42.     Craddock's fiscal year 2012 contributions included the extraordinary result of a $20+ million fee recovery to the Firm in a highly publicized case, *Colgate v. Disthene*, where she served as co-lead counsel.  The case, which involved a 3-week trial with over 30 witnesses and some 1420 exhibits, and subsequent derivative and trust litigation, settled just prior to argument at the Virginia Supreme Court, and included the judicial dissolution of a company on behalf of minority shareholders, resulting in removal of two trustees and the buy-out of Craddock's minority shareholder clients for $77 million.  The case was identified by Virginia Lawyer's Weekly as Virginia's largest civil settlement in 2013 – the approximately $23.5 million in fees received from 2010-2013 was also the largest fee recovery in the Firm's history.

12

43. Craddock was denied origination credit on this case, although it was only through her efforts that the Firm was permitted to represent the client and pursue the case. The client had become dissatisfied with the LeClair originating partner working on the case and had terminated the Firm and its originating attorney, requesting return of the case files - it was only through Craddock's efforts that a new client relationship was created. Nevertheless, when the fees were collected, Hern and Freinberg denied Plaintiff the origination credit on the $3.5 million fee in favor of the male partner who the client had terminated. The Firm ignored the fact that the client had ended the previous relationship, favoring the supposed "origination" from the terminated relationship and denying Craddock re-origination of the client for the Firm. At receipt of the case funds, Hern and Freinberg refused to apply a clearly applicable policy exception that dictated that Craddock should receive the credit.

44. The case had also generated hourly fees of approximately $3.5 million during the first two years of the case, before the Firm accepted a contingency fee arrangement; however, the Firm attempted to deny Craddock credit for the hourly fees generated and avoid proper credits by denying her role in salvaging the client relationship, and origination credit, and mischaracterizing the recovery so as to deny her compensation.

45. Craddock's team's efforts were key to propping the Firm's sagging financial condition in years that it struggled to make budget. On July 29, 2011, when she went to see a client to obtain a $523,000 check the client was prepared to provide, she was asked by the Firm CFO (at the direction of Chairman LeClair) to additionally have the client write a second post-dated check for the balance of a $1.15 million fee due. Craddock explained the issue to the client and also obtained the second check. Receipt of the check made a key Firm goal for management and shareholder compensation for the year. Within minutes of sending Plaintiff an email

13

"You're my hero Michele... thank you very much," the Firm CEO Freinberg sent another email announcing that the Firm had "exceeded its collection goal." Fees from this case, and Craddock's role in client interfacing, played prominent roles in the Firm's financial success toward goals in 2011-2013.

46.     As a consolation, Freinberg told Craddock that the Firm would give her a pay raise and bonus and said she would be eligible for promotion "a year early" in 2012. Craddock responded that, per established Firm promotion policy, her business generation excellence entitled her to be promoted in 2011. Freinberg refused.

47.     Plaintiff consistently exceeded 2,000 billable hours per year, had excellent evaluations, obtained objectively proven results and met the Firm's "WOW! Business Generation Excellence" exception to the 10-year practice requirement. The failure to promote Craddock in 2011 disregarded her fiscal year 2011 file originations of over $2.5 million, working attorney fees of over $600,000, with a 3-year average of over $1 million originations and over $550,000 working attorney fees. Without explanation, Freiberg refused to accept the objective metrics entitling Plaintiff to promotion in 2011.

48.     Freinberg's unilateral decision to deny Plaintiff promotion was also contrary to the Firm's promotion policy, which requires a committee to review applications for promotion and to make recommendations to the CEO. Freinberg side-stepped the promotion committees to deny Craddock promotion in 2011, which additionally resulted in an longer term effect on her compensation.

49.     Had Craddock received the origination credit and promotion, she would have been eligible for (and under compensation policy entitled to) a large raise each year for the

following three (3) years.  She would have been eligible for an Extraordinary Bonus in 2011 and, if promoted per policy, a Shareholder Allocation of the *Colgate* case fees.

50.     Objective factors and policy dictated that Craddock receive promotion and the attendant compensation as, aside from her work on the *Colgate* case, she was the attorney responsible for bringing in the case, analyzing the merits and selecting the team.

51.     Moreover, Craddock had to overcome internal opposition to the case.  She initially involved the male shareholder in charge of the Firm's business litigation team, because he and she had successfully tried a previous trust dispute for the same client.  However, he removed himself from the case before it was filed because he disagreed with the way Craddock proposed handling the case, remarking that he thought that the clients were greedy and "should be thankful" for what the Firm had obtained in the last case.

52.     The anger the male shareholder displayed toward Craddock would not have been displayed toward a male shareholder with differing views on how to proceed in a case.  When she disagreed with him on the merits of the case, he advised her that she would be lucky to get the clients $200 per share.  The Court's approved settlement resulted in nearly *$2,000 per share* for the clients ($50 million) plus payment of their legal fees – a $20 million contingency fee for the Firm for 2 years of work, the first several years having been paid on an hourly basis.

53.     In addition to the *Colgate v. Disthene* cases, Craddock had been involved in many other successful complex cases, including cases involving antitrust, business conspiracy, maritime litigation and ownership interest litigation. During her 11 year tenure with the Firm, she consistently worked in excess of 2,000 billable hours per year, generated $7.9 million in revenue for the Firm from her working attorney collections, originated over $24 million in business for the Firm, and received excellent performance evaluations.  Male shareholders with this level of

success would be rewarded and valued in compensation decisions, as "Stars" under Firm policy. As indicated below, Craddock was punished and marginalized and her accomplishments largely ignored as it related to compensation decisions under Firm policies.

54.     After the male shareholder whom the *Colgate* clients had fired resigned from the Firm in 2013, Craddock was told that she would receive the origination credit for the contingent fee part of the case if the Firm won, but would still not receive any credit for the $3.5 million in hourly fees paid by the client after she convinced them to allow her and the Firm to handle the case.  While the $20 million contingency fee should have resulted in a huge adjustment to her 2013 compensation (beginning in 2014), it did not.

55.     After the Firm received the $20+ million fee, it changed the Extraordinary Bonus policy from an objective point-based system to a subjective, discretionary system under which it denied Craddock much of what she would have received under the policy in effect when the fee was received.  Craddock's Extraordinary Bonus was $40,000 – the only bonus she received for her $20,418,000 fee origination.

56.     While she did receive a bonus under a separate contract between the Firm and her team, she, John Craddock and Tom Wolf ("Wolf"), this was for their management of the *Colgate* case and was not for case origination, which was compensated and due separately under Firm policy.  This case management bonus was shared with 2 associates and a paralegal who worked on the case.

57.     The Firm then changed the policy on such contingency fees case management contracts.  Due to their shareholder status, John Craddock, Plaintiff's co-lead counsel, and Tom Wolf actually received more than Plaintiff because (1) their salaries were each over double Plaintiff's, and (2) they each received a shareholder allocation of more than $75,000 for the case.

58.     Craddock was finally elected as a shareholder effective January, 2013; however, the Firm refused to waive her shareholder buy-in, as it had for several male partners with lesser proven performance. The disparate treatment against Craddock affected her ability to pay the $100,000 shareholder buy-in, as it was 63% of her salary.

59.     After becoming a shareholder, Craddock learned that the firm had a goal of having each attorney invest 30% of base salary in Firm common stock and preferred stock, but most did not. Most shareholders (who are predominantly male) earn at least $300,000 per year salary, almost double what Craddock made, and could more easily afford the $100,000 buy-in.

60.     The Firm has a banking arrangement with Wells Fargo to provide shareholder buy-in loans to new shareholders. When Craddock applied for promotion, it was with the understanding that officers were given raises in an amount that would cover the loan payments to Wells Fargo. When Craddock received her new compensation sheet for 2013, it showed that she would be making *less* in 2013 than 2012, because more salary was "held back" as contingent salary, meaning that if the Firm did not make budget, she would not receive this contingent portion of her salary.

61.     In that Craddock was the breadwinner of her family, had two sons in college, and was having difficulty qualifying for the buy-in loan, she asked the Firm, through the head of Litigation, for assistance and offered to pledge her year-end salary directly to the Firm to satisfy the buy-in loan, rather than undertake the Wells Fargo loan obligation, but was refused. The Firm had previously accommodated male shareholders by waiving the buy-in or allowing the buy-in to be paid over a period of years, paying such shareholders additional compensation to cover the payments each year.

62.     In two letters supporting Plaintiff's loan application to fund the buy-in, the Firm advised Wells Fargo of Craddock's 2012 compensation and projected 2013 compensation levels – the first at levels that would not allow her to qualify for the loan, and the second at levels under which she qualified - but the information provided to Wells Fargo appeared to indicate that these were *guaranteed* amounts rather than the year-end contingent salary.  Craddock questioned the information provided as "compensation" to support the loan.

63.     When Craddock refused to sign loan documents - because she could only pay the loan if she received the contingent portion listed as salary - Hern came to Craddock's office and insisted that she sign the loan document.  At the time, her team had won the *Colgate* case but it was on appeal.  While Plaintiff and the Firm felt confident they would win, and obtain the $20 million contingent fee, Hern still refused to guarantee the year end compensation figure the Firm had provided Wells Fargo.

64.     Hern told Craddock that any guaranteed year end salary would need to be voted on by the shareholders, to which Craddock immediately offered to present it to the shareholders for a vote.  But Hern refused to take the matter to the shareholders, insisting that she sign the loan documents.  The conversation became heated, ending with Hern stating that "we would see what the Supreme Court of Virginia did" with the *Colgate* appeal.

65.     Craddock later learned that it would only have taken a Board vote (not a vote of all shareholders) to guarantee her year-end salary.  Hern had acted unilaterally and without authority when he refused Craddock's request, and gave Plaintiff the impression that it would require a vote of all shareholders in an effort to intimidate her into signing the loan document.

66.     However, when the *Colgate* case settled before arguments to the Supreme Court of Virginia, and the Firm was assured of a $20+ million fee, Hern and Freinberg still refused to

18

assist Craddock with her shareholder buy-in loan or to waive her buy-in, as they had done for other male shareholders.

67.     After the *Colgate* fee was received and deposited in the Firm accounts, Craddock received a one sentence email from Hern that the Firm would deduct $100,000 from the amount it owed her under the contingency fee bonus contract with the Firm.  The Firm still refused to waive her buy-in or guarantee her 2013 compensation.

68.     While the $20.7 million origination credit and Craddock's working attorney collections in the *Colgate* case ($4.7 million the Firm collected for her hours worked) in 2013 should have resulted in a huge Extraordinary Bonus in 2013 with commensurate raises in 2014 and 2015, the Firm acted to try to force Craddock to accept a salary *reduction*.

### Gender-Based Discrimination Furthered by Limiting Access to LeClairRyan's Supplemental Retirement Plan

69.     The Firm's supplemental retirement plan is also administered in ways that favor male shareholders.  The lucrative supplemental retirement plan takes priority over funding the Firm's regular 401K contribution.  Until 2015, the supplemental retirement plan, which has been matched 100% by the Firm, was available only to attorneys making $350,000 per year for two consecutive years.

70.     Upon information and belief, few female attorneys were compensated at this level, the result being that the gap between male and female shareholders' compensation was increased even more by the Firm's contributions to the supplemental retirement plan.  The Firm contributes little to the retirement of other Shareholders and employees.  By contrast, in 2014 the Firm contributed less than $2,500 to Craddock's retirement for her contribution to the Firm in 2013.

71.     Moreover, the Firm has allowed Shareholders participating in the supplemental retirement plan (primarily, if not exclusively, males) to use the Firm's contribution to purchase preferred stock, which pays an 8% dividend. The Firm does not pay dividends on common stock.

72.     The (mostly) male shareholders participating in the supplemental retirement plan were, therefore, able to use the Firm contribution "money" to purchase their preferred shares. By comparison, most female shareholders that purchased preferred stock were required to pay for shares through payroll deductions.

73.     The impact of the Firm's compensation decisions, and reserved benefits to the male shareholders that benefit from such decisions or practices, has resulted in lesser compensation to female shareholders.

**Gender-Based Discrimination of Craddock as a LeClairRyan Shareholder**

74.     In 2013-2014, Craddock actively marketed and originated new cases, including a contingent fee claim for unpaid royalties against a gas company and an arbitration matter against an international mining company for failure to pay royalties. LeClair actively encouraged Craddock to pursue contingent mineral royalty dispute cases and attended a marketing meeting regarding such cases with Craddock and a trust company. Craddock also pursued a marketing plan of marketing to institutional trustees for repeat billable work. The Head of Litigation never raised any issue with respect to Craddock's work or her marketing efforts. Craddock was under the clear impression that he approved of her plan and was in full agreement – until November, 2014.

75.     When Craddock prevailed in the arbitration matter, an hourly case for a major trust company, and it was on appeal, Firm Chairman Gary LeClair heard about the favorable

20

result in the arbitration and asked Craddock if it had been a contingent fee case. When told that it was hourly, LeClair encouraged Craddock to accept more gas royalty cases, but on a contingent basis. He did not disclose to Craddock that he, or the Firm, would later take a position that the Firm planned to use her work on contingency fee work as a basis for the Firm to reduce or deny Plaintiff compensation paid to similarly situated male shareholders.

76. In fact, Craddock had an excellent track record with contingency fee cases, which the Firm encouraged its attorneys to accept and pursue.

77. Under Firm policy, contingency cases may be accepted after an attorney submits a contingency fee case approval form to the Litigation Department Leader, who forwards the form to the CEO for final approval. The CEO has discretion to approve the case, which decision is final and non-appealable. Business litigators are encouraged to take contingency fee cases and the Firm strives to handle 5-7% of its litigation on a contingent fee or bonus basis. Under Firm policy, the business litigation team is specifically authorized to accept intra-corporate disputes.

78. In November, 2014, Craddock followed Firm policy in attempting to obtain approval for a contingency case involving an intra-corporate dispute. Craddock obtained approval from the Litigation Team Head, Erik Gustafson ("Gustafson"), but CEO Freinberg decided that in order for him to approve the case, Craddock must agree to *reduce her compensation.*

79. Freinberg said that since she *only* worked on contingent cases (which was untrue), the Firm had no place in its budget for such a lawyer and she should come up with a proposal on compensation reduction. Craddock refuted the notion that she only worked on contingency fee cases and provided specific examples of her billable hourly work and collections.

21

80.     She also noted to Gustafson that she was not getting internal referral work, to which he responded that he had internal work he could send her, *but was not going to do so.* This is the second time that Gustafson had told Craddock this. He had previously told her that if any business litigation work comes to Richmond internally, she would never get it – "it will go to Sims, Wolf or John Craddock," who are male business shareholder litigators in the Richmond office. Plaintiff relayed this exchange to Freinberg and explained all of the billable work she did, but he ignored this and repeated the script that she did only contingency work and had to take a salary reduction.

81.     Gustafson did not similarly tell Wolf, the (male) attorney who originated the proposed contingency case and would get that credit, or tell John Craddock, who would also work on the case, that under Firm policy, *they* must take reduced compensation before Freinberg would approve the case. Craddock refused to take a salary reduction and told Freinberg that she should receive a huge pay *raise* rather than a *reduction.*

82.     Although all of the litigators who reviewed Craddock's analysis of the case (Wolf, Gustafson, and Matson) had agreed that it was a very good case and had recommended that Freinberg approve it, and Firm policy places that responsibility for this decision on Freinberg, he placed the matter before the Firm Board for a vote. This resulted in further delay to the prospective client, contrary to Firm policy to act with urgency with respect to client matters.

83.     Over a month later, Freinberg obtained a Board vote to not accept the case. On information and belief, the Board has never before been asked to vote on the Firm's decision whether to take a contingency case.

22

84.     Freinberg's demand that Craddock reduce her salary in order for him to approve the case was unprecedented and violated Firm policies, including the compensation review process.   It additionally ignored Craddock's 3-year performance metrics, including her originations, which largely drives the high compensation male shareholders had historically received.  By comparison, Craddock's compensation was far below market.

85.     Craddock was not given the adjustments called for in the shareholder (or officers) compensation policy – based on merit, not seniority, with top performers compensated above market.  Compared to high performing male shareholders, Plaintiff was treated differently and less favorably based on her gender.

86.     By demanding that she take a pay reduction, the Firm placed undue restrictions on Craddock's ability to accept certain cases, restrictions not applied to male shareholders.  Male shareholders, such as Wolf, were not held to the written policies when making decisions regarding acceptance of a case.   Moreover, the Firm selectively made the contingent case approval process more stringent for Craddock than for its male shareholders.

**Retaliation for Opposition and Participation in EEOC Processes**

87.     When Craddock complained about the selective and gender discriminatory basis for compensation, she was asked to accept a reduction in compensation and it has been suggested to her that she could be terminated.

88.     Craddock discussed her concerns with Bruce Matson, the Firm's Chief Legal Officer, Erik Gustafson, the Firm's Litigation Group Leader and met with David Freinberg, the Firm's CEO, to discuss the continued gender based hostility toward her. Thereafter, she was asked by Michael Hern, the Firm's Vice Chair, to sign Firm agreements, but was denied the

opportunity to review requested related documents which, according to the agreements, are made available to other shareholders for review at their request.

89.     The Firm twice threatened Craddock by telling her it would take "appropriate action" against her (suggesting she would be terminated) if she did not sign the documents by a given deadline – the first by close of business the Monday before Christmas, 2014; the second by noon the Monday after Christmas, 2014.  These documents Defendant sought to have signed through intimidation contained statements the Firm knew to be false.  Craddock refused to sign them as written.

90.     This selective treatment, in approval of cases, efforts to force compensation reductions, and threats regarding her employment were directly related to Plaintiff having opposed selectively negative gender-based treatment and having filed an internal claim of gender-based discrimination.

91.     On January 21, 2015, Craddock received a memo from Freinberg dated January 19, 2015, copied also to Gustafson, outlining her compensation plan for 2015.  The compensation outlined reduced her expected compensation by approximately 25% and is a complete departure from the Firm's shareholder compensation plan in that it fails to provide Craddock credits due under her 3-year averages, deprives her of origination, managing attorney, and working attorney credits awarded male shareholders and includes other terms which are not applicable to male shareholders.

92.     Under the existing shareholder compensation policies, which consider originations, managing attorney and working attorney credits, Craddock's 2015 compensation should have been much larger than her 2014 compensation.  The Firm further made significant

portions of Craddock's compensation contingent on events that did not likewise limit compensation for male shareholders.

93.     Comparing the Firm's proposed 2015 compensation plan for Craddock and the compensation of a male shareholder she regularly worked, Craddock would continue to make less than half what a male shareholder made.

94.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on January 20, 2015 asserting gender based discrimination, as set forth herein.

95.     In the fall of 2014 it had come to Craddock's team's attention that the Firm had an issue in a case they were litigating which could potentially require them to withdraw from the engagement. Craddock raised the issue with Matson, who is responsible for the Firm's decisions on such matters, as required by Firm policy. Matson led Craddock to believe he had analyzed the issue. Craddock later learned he did not do so.

96.     Upon information and belief, in early January 2015, the issue arose again. Craddock had made numerous attempts to raise the issue internally with the appropriate Firm leadership, Matson, Gustafson, and others, but was repeatedly told that she and her team would need to continue to represent the client. Unbeknownst to Craddock, due to the issue, one of the male lawyers on the team refused to work on the case unless the Firm adjusted his compensation due to the increased case risk. The Firm refused because, due to the EEOC charge of discrimination filed by Craddock, it could not explain the failure to also upwardly adjust Craddock's compensation (although, on information and belief, such arrangements had been selectively made for male shareholders previously). During this time Matson attempted to undercut Craddock's relationship with the clients. When LeClair's internal counsel refused to act

on the issue, Craddock contacted the Virginia State Bar for an advisory opinion – the State Bar confirmed that Craddock must withdraw from the representation.  Still, the Firm refused to act.

97.     Craddock obtained independent counsel to advise her on her obligations.  However, the Firm continued to ignore the issue and despite her attempts to withdraw from the case due.

98.     The Firm's position placed Craddock in an untenable ethical situation, which the Firm apparently was content to allow to continue by refusing to act or support her in the matter, putting her at professional risk and, on information and belief, acting to force her resignation.

**Plaintiff's Constructive Discharge**

99.     On or about February 2, 2015, Craddock submitted notice of her resignation from employment and to withdraw as a shareholder, effective March 4, 2015. Given the continued reductions in her compensation, the continued retaliation in the terms and conditions of her employment, and ultimately, the Firm's stance on the withdrawal issue, which put Craddock's good standing with the Virginia State Bar and bar license in jeopardy. Craddock felt that she could no longer continue to take positions demanded by the Firm and at the same time comply with the Professional Rules of Conduct.  Craddock was forced to resign as she had no reasonable choice but to tender her resignation resulting in her constructive discharge.

100.    After Craddock resigned, Matson  continued to oppose Craddock's efforts to withdraw from the case.  Eventually, the Firm hired outside counsel, who conferred extensively with Craddock's counsel and determined the Firm must withdrw from the case.  The Firm and Craddock then filed a joint motion to withdrawal.

101.    Based on the issue the Firm had refused to acknowledge before Craddock resigned from the Firm, the Court granted the motion.

102.   Contrary to Firm policy, the Firm has refused to reimburse Plaintiff the cost of her independent counsel – who advanced the legal argument later adopted by the Firm.

103.   Plaintiff has suffered damages as a result of the discriminatory treatment, and the impact of the Firm's promotion and compensation policies.   Plaintiff has been damaged professionally, emotionally, and in other terms and conditions of her employment resulting from the Firm's repeated instances of gender based disparate treatment and retaliation.

## COUNT ONE

### Title VII, 42 U.S.C. § 2000e, *et seq.* as amended, including Lilly Ledbetter Fair Pay Act Gender-Based Discrimination

104.   Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

105.   LeClairRyan, by and through the actions of its agents and representatives, which it ratified and condoned, and its failures to act, discriminated against Plaintiff in the terms, conditions and privileges of her employment on the basis of her gender, including compensation, in violation of 42 U.S.C. § 2000e-2(a), and have denied Plaintiff the rights guaranteed to her pursuant to 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, as amended by the Lilly Ledbetter Fair Pay Act of 2009.

106.   LeClairRyan unlawfully forced Plaintiff's resignation, constructively terminating Plaintiff's employment, in violation of 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, on the basis of her gender.

107.   As a consequence of LeClairRyan's discrimination, Plaintiff has suffered, continues to suffer and will in the future suffer emotional distress, anxiety, stress, embarrassment, humiliation, pain, and suffering.

27

108.   As a consequence of LeClairRyan's actions, Plaintiff has suffered economic losses, including lost wages and other financial incidents and benefits of employment, and will continue to suffer such losses.

109.   As a consequence of the acts and omissions of LeClairRyan, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

## COUNT TWO

### Equal Pay Act, 29 U.S.C. §§ 206(d), *et seq.*
### Gender-Based Pay Disparities

110.   Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

111.   LeClairRyan, by and through the actions of its agents and representatives, which it ratified and condoned, and its failures to act, has discriminated against Plaintiff in her compensation on the basis of her gender, in violation of 29 U.S.C. § 206(d), the Equal Pay Act, by paying Plaintiff a rate less than the rate at which it pays wages to male employees for equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions.   These male shareholders, based on financial results in fees collected, include Vern Inge, Steven Faraci, Charles Sims, Charlie Meyer, Doug Sbertoli, Grant Grayson, Mike Hern, Jim Guy, Steve Brown,  George Whitley, Tom Coulter and Bruce Matson.

112.   Though centrally determined by senior Firm management, the salary differentials are not administered in a systematic and uniform manner and rely on subjective impressions rather than merit.

28

113.    As a consequence of LeClairRyan's actions, Plaintiff has suffered economic losses, including lost wages and other financial incidents and benefits of employment, and will continue to suffer such losses.

114.    As a consequence of the acts and omissions of LeClairRyan, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

## COUNT THREE

**Title VII, 42 U.S.C. § 2000e, *et seq.* (as amended)**
**Retaliation**

115.    Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

116.    Plaintiff opposed and challenged her gender-based selective treatment through internal meetings with Firm leadership.

117.    Plaintiff participated through EEOC processes with the filing of a charge of employment discrimination with the EEOC on January 20, 2015 and amended her charge of discrimination on or about January 21, 2015 and March 5, 2015.

118.    LeClairRyan, through its agents, acted to dissuade Plaintiff from opposing or challenging disparate gender based treatment through threats and actions designed to force Plaintiff from abandoning her challenges.

119.    LeClairRyan unlawfully forced Plaintiff's resignation, constructively terminating Plaintiff's employment, in violation of 42 U.S.C. § 2000(e), *et seq.*, on the basis of her challenges to gender-based compensation disparities.

120.    As a consequence of this retaliation, Plaintiff has suffered emotional distress, anxiety, stress, embarrassment, humiliation, pain, and suffering.

121.    As a consequence of this retaliation, Plaintiff has suffered economic losses, including loss of promotional opportunities and increased levels of compensation and benefits and other financial incidents and benefits of employment.

122.    As a consequence of this retaliation, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

## COUNT FOUR

### Equal Pay Act, 29 U.S.C. §215(a)(3)
### Retaliation

123.    Plaintiff incorporates by reference and realleges the preceding paragraphs as though set forth fully herein.

124.    Plaintiff opposed and challenged her gender-based disparate pay in internal meetings with Firm leadership.

125.    LeClairRyan, through its agents, acted to dissuade Plaintiff from opposing or challenging disparate gender based treatment through threats and actions designed to force Plaintiff from abandoning her challenges.

126.    LeClairRyan unlawfully retaliated against Plaintiff, including forcing Plaintiff's resignation, constructively terminating Plaintiff's employment, in violation of 29 U.S.C. § 215(a)(3) on the basis of her challenges to gender-based compensation disparities.

127.    As a consequence of this retaliation, Plaintiff has incurred and will continue to incur attorneys' fees, costs and other incidental expenses.

**WHEREFORE,** Plaintiff Michele Burke Craddock prays that judgment be entered in her favor and against LeClairRyan, a Professional Corporation; and requests in addition that this Court enter an Order, as follows:

(a)     Declaring that the acts and practices complained of herein are in violation of Plaintiff's rights as secured by 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), as amended by the Lilly Ledbetter Fair Pay Act of 2009, and 29 U.S.C. § 206(d) *et seq.*, the Equal Pay Act;

(b)     Awarding equitable relief in the form of front pay in lieu of reinstatement;

(c)     Issuing a permanent injunction enjoining Defendant from continuing or maintaining a policy, practice or custom of denying, abridging, withholding or conditioning the rights of employees on the basis of gender, which rights are secured by 42 U.S.C. § 2000e-2(a), as amended;

(d)     Awarding Plaintiff back pay, prejudgment interest, and other appropriate equitable relief for her lost employment benefits, and such other affirmative relief as may be appropriate, and for all other wages and benefits lost or denied, against Defendant, for violations of 42 U.S.C. § 2000e, as amended, including the Lilly Ledbetter Fair Pay Act;

(e)     Awarding Plaintiff compensatory damages under 42 U.S.C. § 2000e, *et seq.*, against Defendant, in an amount to be determined by the jury at trial but not less than $300,000 per Title VII Count;

(g)     Awarding Plaintiff punitive damages under 42 U.S.C. § 2000e, *et seq.*, against Defendant, in an amount to be determined by the jury at trial but not less than $300,000 per Title VII Count;

(i)     Awarding Plaintiff actual damages, liquidated damages and other relief for willful violations of the Equal Pay Act, 29 U.S.C. §206(d), *et seq.* for each EPA Count;

(j)     Awarding Plaintiff a separate amount to offset the adverse tax effects of lump sum payments of damages and/or back or front pay;

(k)     Awarding Plaintiff's attorneys' fees and costs incurred in this action, together with expert witness fees and expenses, against Defendant; and

(l)     Ordering such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

**MICHELE BURKE CRADDOCK**

By: _____

Harris D. Butler, III (VSB No. 26483)
Paul Falabella (VSB No. 81199)
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia  23219
(804) 648-4848 (telephone)
(804) 237-0413 (facsimile)
harrris.butler@butlerroyals.com
paul.falabella@butlerroyals.com
*Counsel for Plaintiffs*