IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MICHELE BURKE CRADDOCK,<br><br>    Plaintiff,<br><br>v.<br><br>LECLAIRRYAN, A PROFESSIONAL CORPORATION,<br><br>    Defendant. | CIVIL ACTION NO. 3:16-cv-11 |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AND TO COMPEL ARBITRATION, AND OPPOSITION
TO PLAINTIFF'S MOTION TO STAY ARBITRATION**

Defendant LeClairRyan, a Professional Corporation ("LeClairRyan") respectfully submits this Memorandum of Law (i) in support of its Motion to Dismiss and to Compel Arbitration, and (ii) in Opposition to the Motion to Stay Arbitration previously filed by Plaintiff Michele Burke Craddock.

**INTRODUCTION AND SUMMARY**

This dispute should be in arbitration. And it is. An arbitration under the auspices of the American Arbitration Association was initiated by LeClairRyan on December 11, 2015. This was about a month before Ms. Craddock filed her reactive court case.[1] Ms. Craddock is able to obtain complete and final relief in that first-filed arbitration, either in the context of opposing LeClairRyan's request for declaratory relief or by filing a counterclaim.

---

[1] The Complaint in this case was filed on January 6, 2016 and served on January 14th.

Many large law firms require disputes with their partners, members, or shareholders to be resolved by binding arbitration, and LeClairRyan is no different. The LeClairRyan Shareholder Agreement requires Shareholders like Ms. Craddock to resolve "any dispute or controversy arising out of, relating to, or in connection with [her] relationship with [LeClairRyan]" by binding arbitration. Adherence to the Shareholder Agreement, including the arbitration provision, was a necessary prerequisite to Ms. Craddock becoming a Shareholder at LeClairRyan. Accordingly, LeClairRyan initiated arbitration with the AAA when Ms. Craddock's Charge of Discrimination was dismissed by the U.S. Equal Employment Opportunity Commission ("EEOC").

The bottom line is this: although Ms. Craddock admittedly never signed the Shareholder Agreement or the subscription and joinder agreements, she <u>accepted</u> the terms of these agreements through her words and her conduct over the course of almost two years. She accepted all of the benefits of the agreements. She consistently represented herself as a signatory of the agreements – a Shareholder. Once this single principle is established, arbitration is compulsory. Ms. Craddock's motion should be denied, and LeClairRyan's motion should be granted.

**PROCEDURAL BACKGROUND**

1. Ms. Craddock filed a Charge of Discrimination with the EEOC on January 20, 2015 and subsequently amended her Charge on January 21, 2015 and March 5, 2015. In her Charge, Ms. Craddock alleges that she was discriminated against because of her gender and retaliated against by LeClairRyan with respect to her compensation and her promotion opportunities, in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

2. On or about December 4, 2015, the EEOC issued a right-to-sue notice to Ms. Craddock without making any determination of whether Ms. Craddock, as a Shareholder and owner, is a covered "employee" under Title VII, or whether Ms. Craddock was subjected to unlawful discrimination or retaliation as alleged in her Charge of Discrimination.

3. On December 11, 2015, LeClairRyan filed a Demand for Arbitration with the American Arbitration Association ("AAA"). The next day, the AAA accepted and docketed the Demand for Arbitration.

4. Ms. Craddock's counsel sent a letter to the AAA on December 14, 2015, arguing that the firm's filing was "inappropriate" and declining to participate. The AAA responded as follows:

> The issue before the American Arbitration Association ("AAA") is whether the filing requirements contained in the AAA's Rules have been met by the Claimant. After review of the file, the AAA has made an administrative determination that Claimant has met the minimum filing requirements by filing a demand for arbitration providing for administration by the AAA under its Rules. Accordingly, in the absence of an agreement by the parties or a court order staying this matter, the AAA will proceed with the administration of the arbitration.
>
> However, the parties' contentions have been made a part of the file and will be forwarded to the arbitrator upon appointment, at which time the parties may submit their jurisdictional or arbitrability arguments to the arbitrator for determination.[2]

5. On January 4, 2016, Ms. Craddock's counsel again sent a letter to the AAA, arguing that the Association had no "jurisdiction" and declining to participate in the process of selecting an arbitrator.

---

[2] The AAA rules for employment arbitration provide that Ms. Craddock may present her arguments as to arbitrability and the existence of an agreement to arbitrate to the arbitrator for decision. She will not be deprived of a forum to make the arguments she makes here.

3

6.  On January 6, 2016, Ms. Craddock filed her Complaint and, on the following day, filed her Motion to Stay Arbitration, although the Complaint had not yet been served. Counsel for Ms. Craddock notified the AAA of the filing of the Motion to Stay on January 7, 2016. In accordance with its procedural rules, AAA notified the parties that, as of January 8, 2016, the arbitration proceedings would be stayed for a period of up to 60 days.

7.  On January 14, 2016, LeClairRyan, through its counsel, accepted service of the Complaint. LeClairRyan requests the Court grant its motion to compel the parties to proceed with the previously-filed, and pending, AAA proceeding.

## FACTUAL BACKGROUND

LeClairRyan believes that the resolution of the issue presented by these two motions is straightforward – Ms. Craddock is bound by the agreements:

1.  Ms. Craddock is a former Shareholder of LeClairRyan. *See* Complaint at ¶ 10 (alleging that Ms. Craddock "attained shareholder status").

2.  Ownership of shares in LeClairRyan by Shareholders is governed by a shareholders agreement. At the time of Ms. Craddock's promotion to Shareholder in 2013, the Second Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation was the operative agreement governing the ownership of shares in LeClairRyan and the relationship between Shareholders and LeClairRyan. The Third Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation was adopted on February 20, 2014. Collectively, the Second Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation and the Third Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation shall be referred to as the "Shareholder Agreement."

3. The Shareholder Agreement contains a valid and binding arbitration provision, which provides in relevant part that:

> [T]he Corporation and each Shareholder agree that any dispute or controversy arising out of, relating to, or in connection with such Shareholder's relationship with the Corporation, including this Agreement, or the interpretation, validity, construction, performance, breach, or termination thereof, shall be settled by binding arbitration unless otherwise required by law, to be held in Richmond, Virginia in accordance with the applicable rules then in effect of the American Arbitration Association ….

4. Although Ms. Craddock failed to execute the Shareholder Agreement presented to her by LeClairRyan, Ms. Craddock repeatedly and consistently demonstrated and expressed her intent to be bound by the Shareholder Agreement through her conduct over a period of years.

5. Ms. Craddock, a 2003 graduate of the T.C. Williams School of Law at the University of Richmond, began employment with LeClairRyan as an Associate in 2003, remaining in this position until her resignation in July 2007. At her request, Ms. Craddock was rehired by LeClairRyan as an Associate in or around February 2008.

6. As of January 1, 2010, Ms. Craddock was promoted to Officer. As such, under LeClairRyan's policies, Ms. Craddock was not eligible for promotion to Shareholder until January 1, 2014, as she was required to complete three full fiscal years as an Officer before being considered for Shareholder. However, Micheal Hern, LeClairRyan's COO, met with Ms. Craddock in 2011 and told her that, due to her efforts on a large contingent fee matter originally brought to LeClairRyan by another attorney (and conditioned upon her continued "Firm-first" performance), Ms. Craddock would be eligible for promotion to Shareholder on January 1, 2013 – a full year earlier than she would have been eligible under LeClairRyan's normal promotion procedures. LeClairRyan made an exception to its normal promotion policies in favor of Ms. Craddock.

5

7. Ms. Craddock was well-compensated by LeClairRyan both before and after she applied for and accepted Shareholder status. LeClairRyan paid Ms. Craddock a special bonus of $75,000 for 2011 and gave her a substantial salary increase for 2012.

8. In addition to her eligibility for an Officer Incentive Payment under LeClairRyan's incentive payment plan, in 2012, LeClairRyan entered into an extraordinary bonus agreement proposed by Ms. Craddock and two male Shareholders. This agreement related to a contingent fee matter on which these three lawyers were working, which had been "originated" by another lawyer. The agreement called for LeClairRyan to pay Ms. Craddock and her two male colleagues a large bonus – eventually calculated as more than a million dollars for each of them – upon the conclusion of the matter. Her $1,112,796.26 bonus was paid to Ms. Craddock in August 2013. The same million-dollar-plus bonus was paid to the two male Shareholders, one of whom is now married to Ms. Craddock.[3]

9. In October 2012, Ms. Craddock submitted her application – or Promotion Portfolio – for promotion to Shareholder, to be considered by LeClairRyan's Promotion Panel.

10. Ms. Craddock's application was approved, and she was promoted to Shareholder as of January 1, 2013. *See* Exhibit A, E-mail of 11/30/2012 re: Promotions. Ms. Craddock remained in her Shareholder position until her resignation on or about March 4, 2015. *See* Exhibit B, Craddock's Resignation Letter.

---

[3] A number of documents in this case have the name of the plaintiff as "Michelle Burke," her former name. At the time of the agreement, Ms. Craddock was Ms. Burke and married to Mark Gervasoni. John Craddock was one of the male Shareholders who also signed the extraordinary bonus agreement and also received a more than $1.1 million bonus. Ms. Craddock married John Craddock in the fall of 2014.

6

11. Upon being promoted to Shareholder, Ms. Craddock was invited to attend a Newly Promoted Shareholders Meeting. On December 12, 2012, Elizabeth Bugg, LeClairRyan's Director of Executive Administration, sent an e-mail to Ms. Craddock and the five other newly elected Shareholders detailing the Newly Promoted Shareholders Meeting that would be held on December 17, 2012. With this e-mail, Ms. Bugg provided Ms. Craddock with a copy of the Shareholder Agreement, information on a Wells Fargo loan program that was available to finance her capital contribution, and information on additional benefits available only to Shareholders. Ms. Bugg also provided a copy of the agenda for the meeting, indicating that LeClairRyan would be providing training and information on the responsibilities, compensation, and benefits of Shareholders, the capital contribution required of Shareholders, and the specific provisions of the Shareholder Agreement. *See* Exhibit C, E-mail of 12/12/2012 re: Newly Promoted Shareholders Meeting. LeClairRyan holds such a meeting for all those invited to become new Shareholders, to ensure that new Shareholders like Ms. Craddock understand their obligations and the provisions of the Shareholder Agreement.

12. Pursuant to her application for Shareholder status, Ms. Craddock was awarded and accepted common shares in LeClairRyan in 2013.

13. Ms. Craddock was supposed to pay $100,000 to LeClairRyan when she was issued her shares in 2013. However, Ms. Craddock discussed with LeClairRyan her concern that she could not afford to make the capital contribution payment or finance the contribution at that time. LeClairRyan agreed to defer collecting the payment for her shares to accommodate her concerns.

14. Ms. Craddock and LeClairRyan agreed that the $100,000 payment would be deducted from the extraordinary bonus of $1,112,796.26 that was paid to Ms. Craddock. As Ms.

7

Craddock acknowledges in her Memorandum, this agreement on the payment of her capital contribution was reached in an exchange of e-mails with Micheal Hern. *See* Craddock's Mem. at p. 7, ¶ 18. The bonus was paid to her in August 2013, and the capital contribution was deducted from the extraordinary bonus, as Ms. Craddock requested. *See* Exhibit D, 8/30/2013 Earnings Statement.

15. Throughout the time she was a Shareholder, Ms. Craddock was compensated in accordance with LeClairRyan's procedures for determining Shareholder compensation. She also participated in employment benefit plans and received other benefits for which only Shareholders were eligible, including deferred compensation and supplemental retirement plans.

16. Over the course of almost two years, Ms. Craddock, in her capacity as a Shareholder, voted on 20 of a possible 25 issues put to the Shareholders for resolution.

17. Ms. Craddock consistently held herself out as and referred to herself as a Shareholder of LeClairRyan, and still refers to herself as a former Shareholder. Ms. Craddock alleges in her Complaint that she was a Shareholder. *See* Complaint at ¶ 10. Prior to that, in her submissions to the EEOC, Ms. Craddock described herself as a "female shareholder of the Firm." Ms. Craddock continues to describe herself as a former Shareholder of LeClairRyan on her LinkedIn page. *See* Exhibit E, Craddock's LinkedIn Page.

18. The first time that Ms. Craddock took issue with the Shareholder Agreement or raised any question about the arbitration provision was in late December 2014, shortly before she quit, and after she had asserted her claims against the firm through her counsel.

19. Ms. Craddock's "objection" to being bound by the standard arbitration provision was not articulated until about <u>two years after</u> she had accepted the Shareholder status, which she had applied for (and of which she consistently accepted the benefits); approximately <u>1½ years</u>

<u>after</u> Ms. Craddock made her capital contribution payment to purchase her shares of the firm; and only <u>after</u> LeClairRyan notified her that the firm had not located her signed Shareholder Agreement. By this time, Ms. Craddock had already retained counsel and notified LeClairRyan of her allegations of discrimination. And by this time, counsel for LeClairRyan had already told her lawyer about the mandatory arbitration requirement for her claims of discrimination.

20. Ms. Craddock's actions after her supposed objection to arbitration, made in December 2014, also belie her assertion that she rejected any of the provisions of the Shareholder Agreement, other than as a *post hoc* litigation-driven position. In her February 2, 2015 resignation letter, Ms. Craddock wrote that she was resigning effective March 4, 2015, "the standard 30 day notice period for departing shareholders." *See* Exhibit B, Craddock's Resignation Letter. By providing 30 days' notice of her resignation and working through the duration of her notice period, Ms. Craddock thus complied with Section 1(mm) of the Shareholder Agreement (which defines a "withdrawing shareholder" as a Shareholder providing at least 30 days' notice of departure and working through the notice period). Ms. Craddock also asked that LeClairRyan refund her "$100,000 shareholder buy-in amount." *See* Exhibit B, Craddock's Resignation Letter. In her Memorandum, Ms. Craddock describes this statement as her "demand to return her $100,000 and redeem her stock." As Ms. Craddock further acknowledges in her Memorandum, LeClairRyan informed her that it would redeem her shares in accordance with the provisions of the Shareholder Agreement. *See* Craddock's Mem. at p. 11, ¶ 34.

Although Ms. Craddock's Memorandum contains a number of alleged facts, one can scour the Memorandum thoroughly and not find any suggestion that Ms. Craddock objected to the arbitration provision at any time before December 22, 2014. *See* Craddock Mem. at p. 9, ¶

9

30. Rather, Ms. Craddock plainly and unambiguously had been conducting herself as a Shareholder in accordance with LeClairRyan's Shareholder Agreement for almost two years without any objection whatsoever.

**LeClairRyan looks forward to proving these facts and demonstrating Ms. Craddock's agreement to arbitrate her claims at an evidentiary hearing on these motions, as necessary.**

## ARGUMENT

### THROUGH HER CONDUCT AND ACTIONS, MS. CRADDOCK AGREED TO THE TERMS OF THE SHAREHOLDER AGREEMENT AND IS REQUIRED TO SUBMIT HER CLAIMS TO ARBITRATION

Agreements to submit disputes to arbitration are valid and enforceable – and favored – under the Federal Arbitration Act (the "FAA"). *See Nitro-Lift Technologies, L.L.C. v. Howard*, ___ U.S. ___, 133 S.Ct. 500, 503 (2012) (stating that the FAA declares a national policy favoring arbitration and must be followed by courts). Under the FAA,

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. When a claim is subject to an agreement to arbitrate, the FAA provides for the court, upon application of a party, to stay proceedings pending arbitration of the matter or to direct the parties to proceed to arbitration. 9 U.S.C. §§ 3-4. Alternatively, a court may compel the parties to proceed to arbitration and dismiss the lawsuit for lack of subject matter jurisdiction. *See Silkworm Screen Printers, Inc. v. Abrams*, No. 91-1631, 1992 U.S. App. LEXIS 28843 at *17 (4th Cir. Nov. 4, 1992) (advising district court of option to stay proceedings for pending arbitration or order arbitration and dismiss case).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643, 648 (1986). But when a court "is satisfied that the parties agreed to arbitrate," the dispute should be ordered into arbitration. *Lorenzo v. Prime Comm., L.P.*, 806 F.3d 777, 781 (4th Cir. 2015). The question of whether the parties agreed to arbitrate is determined by application of state contract law. *Id.* However, because of the strong policy favoring arbitration, doubts regarding arbitrability should be resolved in favor of ordering arbitration. *AT&T*, 475 U.S. at 656. *See DIRECTV, Inc. v. Imburgia* \_\_\_ U.S. \_\_\_, 136 S.Ct. 463, 471 (Dec. 14, 2015) (must "give due regard . . . to the federal policy favoring arbitration") (multiple citations omitted).

Of course, as Ms. Craddock states in her Memorandum, it is well-settled that Virginia law will find a contract only where there is "mutuality of assent – the meeting of the minds of the parties." *Lacey v. Cardwell*, 216 Va. 212, 223 (1975). There simply needs to be a proposal or offer by one party and acceptance by the other. *Id.* Yet Ms. Craddock's Memorandum omits important language from the opinion she cites. As the Virginia Supreme Court further explained:

> Both the offer and **acceptance may be by word, act or conduct** which evince the intention of the parties to contract, and that their minds have met may be shown by direct evidence of an actual agreement, or **by indirect evidence of facts from which an agreement may be implied.**

*Id.* (emphasis added). Under Virginia law, parties may create a binding contractual obligation through their actions and conduct in the absence of a signed agreement.

The principle is neither esoteric nor obscure. Courts routinely find acceptance and a valid contract where the acceptance has been "silent" and demonstrated only by performance under a clear understanding of the terms in which each party were to be bound and performance

11

or acceptance of offered benefits occurred. *See, e.g. Galloway Corp. v. S.B. Ballard Constr. Co.*, 250 Va. 493, 505 (1995) (finding that when one party "undertook to perform the contract according to its terms, an acceptance by performance resulted" even though the parties never signed a formal contract); *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 541 (1949) ("Ample authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract"). *See generally Dodge v. Trustees of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5-6 (finding that, in order to be binding, the terms of any contract "must spell out the essential commitments and agreements with respect thereto" and "obligate the contracting parties to matters that are definitely ascribed or ascertainable").

Certainly there can be no question that the matters set forth in the Shareholder Agreement were "definitely **ascribed or ascertainable**" by Ms. Craddock at all relevant times. There also can be no reasonable question but that Ms. Craddock accepted the Shareholder Agreement by her conduct. Among other things, Ms. Craddock:

- Specifically requested, and was granted, earlier eligibility for Shareholder consideration, as discussed with COO Micheal Hern in September 2011;

- Expressly applied for her promotion to Shareholder status in October 2012;

- Received a copy of the Shareholder Agreement on December 12, 2012 in conjunction with her invitation to the Newly Promoted Shareholders Meeting;

- Accepted shares in LeClairRyan after her promotion;

- Used $100,000 from the proceeds of her million-dollar bonus to LeClairRyan in August 2013 to pay for her shares, after she requested and was granted an accommodation in the time of payment;

- Received compensation and employee benefits in accordance with her status as a Shareholder, which were available to her only because she was a Shareholder;

- Cast votes on issues put forth by LeClairRyan to its Shareholders, and only to its Shareholders;

- Held herself out as and referred to herself as a Shareholder, including in submissions to this Court and the EEOC, and continues to identify herself as a former Shareholder of LeClairRyan;

- Tendered her notice of resignation in accordance with the requirements of the Shareholder Agreement; and

- Was specifically told by LeClairRyan that her shares would be redeemed in accordance with the provisions of the Shareholder Agreement.

There should be no real dispute: Ms. Craddock, through her actions and words, although neglecting to affix her signature to the paper document, clearly and unequivocally expressed her acceptance of the Shareholder Agreement over a period of years.

A number of other courts, including the Western District of Virginia and the Fourth Circuit, have recognized the validity of arbitration agreements arising under similar circumstances. For example, in *Southern Electrical Serv., Inc. v. Cornerstone Detention Prods., Inc.,* Civil Action No. 7:10cv00076, 2010 U.S. Dist. LEXIS 54313 (W.D. Va. June 3, 2010), Judge Conrad examined the arbitrability of a dispute arising from a situation very similar to the one in this case. One party provided a contract to the other that contained an arbitration provision. According to Judge Conrad, "[w]hile it is undisputed that SES received the letter of transmittal and the accompanying contract documents, SES never signed the documents or returned them to Cornerstone. Nonetheless, SES continued to perform the work requested by

Cornerstone, and acted consistently, in other respects, with its acceptance of the contract documents." *Id.* at *4. Judge Conrad concluded:

> While SES now argues that it never intended to sign or otherwise agree to the terms of the written contract, a court must ascertain whether a party assented to a contract from the party's words or acts, not from its unexpressed state of mind. (Citations omitted.) Here, the Court agrees with Cornerstone that SES's conduct during the course of the construction project reasonably created an inference of assent to the [contract], . . . and that SES's belated protestations to the contrary are insufficient to defeat the defendants' motion [to compel arbitration.]

*Id.* at *15-16. This Court could readily deny Ms. Craddock's motion and grant LeClairRyan's using the same words.

Similarly, in *Lorenzo v. Prime Communications, L.P.*, the Fourth Circuit indicated that an employee's continued employment after receipt and acknowledgment of a handbook containing an arbitration provision "could have created implied assent" to the agreement to arbitrate. The Fourth Circuit only found that arbitration was **not** required because the employee's assent was "nullified" by the statement in the acknowledgement form that the provisions of the handbook did not create binding commitments, a circumstance not at all present here. *See Lorenzo*, 806 F.3d at 781-82. In recognizing that the employee's claims would have been subject to arbitration in the absence of the nullifying language in the handbook acknowledgment form, *Lorenzo,* the most recent pronouncement from the Court of Appeals on this issue (and a case argued by Ms. Craddock's able counsel) stands squarely for the proposition that Ms. Craddock must lose her motion.[4]

---

[4] Other courts also have found and enforced agreements to arbitrate whether or not there is an actual signature on the document. *See, e.g., FirstLight Fed. Credit Union v. Loya*, 08-14-00282-CV, 2015 Tex. App. LEXIS 10393 (Tex. App. 2015) (finding that agreement was valid where employee was notified of the agreement and continued employment, but failed to sign the agreement); *Morton v. Ivey, McClellan, Gatton & Talcott, LLP*, 12 CVS 1298, 2013 NCBC LEXIS 20 (N.C. Super. Ct. 2013) (enforcing an arbitration provision in an unsigned partnership agreement based upon the conduct of the parties).

Despite her course of conduct occurring over almost two years (and despite the applicable law), Ms. Craddock now claims that the arbitration provision in the Shareholder Agreement should not apply because she neglected to sign the Shareholder Agreement. She supports that position with after-the-fact documentation created by her in December 2014. In other words, her motion seeking to stay the arbitration pending with AAA is simply about Ms. Craddock's reliance on a *post hoc,* self-serving, eleventh-hour objection to avoid arbitration of her claims. It should not be countenanced.

## **CONCLUSION**

This case should proceed in the previously initiated arbitration before AAA, and not in this Court. LeClairRyan respectfully urges this Court to grant its Motion, and deny Ms. Craddock's Motion to Stay Arbitration, dismissing or staying this case pending the conclusion of the existing AAA arbitration.

Respectfully submitted,

**LECLAIRRYAN, A PROFESSIONAL CORPORATION**

By: /s/ Randy C. Sparks, Jr. .

John M. Bredehoft (VSB No. 33602)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
Email: jmbredehoft@kaufcan.com

Randy C. Sparks, Jr. (VSB No. 40723)
KAUFMAN & CANOLES, P.C.
Two James Center
1021 East Cary Street, Suite 1400
Richmond, VA 23129
Telephone: (804) 771-5700
Facsimile: (888) 360-9092
E-mail: rcsparks@kaufcan.com

*Counsel for Defendant LeClairRyan, a Professional Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of January, 2016, a true copy of the foregoing MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND TO COMPEL ARBITRATION AND OPPOSITION TO PLAINTIFF'S MOTION TO STAY ARBITRATION, along with the accompanying EXHIBITS, were electronically filed with the Clerk of Court, which will send a notification of such filing (NEF) to the following:

Harris D. Butler, III, Esquire
Paul M. Falabella, Esquire
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, VA 23219
*Counsel for Plaintiff*

        /s/ Randy C. Sparks, Jr.
Randy C. Sparks, Jr.
Virginia Bar No. 40723
KAUFMAN & CANOLES, P.C.
Two James Center
1021 East Cary Street, Suite 1400
Richmond, Virginia 23219
Telephone: (804) 771-5700
Facsimile: (804) 771-5777
E-mail: rcsparks@kaufcan.com
*Counsel for LeClairRyan, a Professional Corporation*