IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


MICHELE BURKE CRADDOCK,
    Plaintiff

v.                        Civil Action No. 3:16-cv-11

LECLAIR RYAN, P.C.
    Defendant.


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's MOTION TO STAY ARBITRATION (Docket No. 3) and Defendant's MOTION TO DISMISS AND TO COMPEL ARBITRATION (Docket No. 7). For the reasons stated below, Plaintiff's MOTION TO STAY ARBITRATION (Docket No. 3) will be denied, and Defendant's MOTION TO DISMISS AND TO COMPEL ARBITRATION (Docket No. 7) motion will be granted.


## BACKGROUND

Michalle Burke Craddock ("Craddock") brought the current suit against her former employer, LeClairRyan, P.C. ("LeClairRyan" or "the firm"), for gender based employment discrimination in violation of Title VII of the Civil Rights Act of 1964, of the Lilly Ledbetter Fair Pay Act, and of the Equal Pay Act, alleging that LeClairRyan systemically discriminates against equal compensation and promotion of women generally, and

1

that LeClairRyan discriminated in not equally compensating or promoting her specifically. (See generally Compl., Docket No. 1).

The facts, as relevant to the motion currently before the Court, are as follows: the Shareholder Agreement governs ownership of shares in LeClairRyan.[1] (Def.'s Mem. in Supp. of Mtn. to Dismiss and to Compel Arbitration and Opp. to Pl.'s Mtn. to Stay Arbitration, Docket No. 8, 2) ("Def.'s MTD Mem."). The Shareholder Agreement contains an arbitration clause. (Def.'s MTD Mem. 2). The Agreement section dealing with arbitration states no restrictions on acceptance. (Def.'s Reply in Supp. of Mtn. to Dismiss and to Compel Arbitration, Docket No. 13, 5) ("Def.'s MTD Reply"). A general section at the end of the Agreement states that a signature constitutes acceptance of the Agreement, but does not state that a signature is the only permissible manner of acceptance. (Pl.'s Mem. in Opp. to Def.'s Mtn. to Dismiss and Compel Arbitration, Docket No. 12, 4) ("Pl.'s MTD Opp."); (Docket No. 4, Ex. 1).

In October 2012, Craddock submitted an application for promotion to Shareholder. LeClairRyan approved Craddock's application. (Def.'s MTD Mem. 6; Compl. ¶¶ 58-59). On December

---

[1] Although the Shareholder Agreement has not been reproduced in its entirety in this litigation, the portions dealing with arbitration are attached to Craddock's Memorandum in Support of Motion to Stay (Docket No. 4) at Exhibit 1.

12, 2012, a LeClairRyan administrator sent Craddock: (1) a copy of the Shareholder Agreement; (2) information on a Wells Fargo loan program available to finance her required $100,000 capital contribution; and (3) information on benefits available only to shareholders. (Def.'s MTD Mem. 7). LeClairRyan promoted Craddock to Shareholder as of January 1, 2013 and awarded shares to Craddock sometime in 2013. (Def.'s MTD Mem. 6; Compl. ¶¶ 58-68). Craddock never signed the Shareholder Agreement, and no one prompted her to do so until long after Craddock became a shareholder.

After a dispute over the financing of Craddock's buy-in, Craddock and LeClairRyan agreed in a series of emails that LeClairRyan would deduct the $100,000 for the buy-in from an extraordinary bonus what LeClairRyan was set to pay Craddock. (Pl.'s Stay Mem. 5-7; Def.'s MTD Mem. 7-8; Compl. ¶¶ 58-68). LeClairRyan paid the bonus and deducted the buy-in in August 2013. Again, LeClairRyan did not ask Craddock to sign the Shareholder Agreement. (Pl.'s Stay Mem. 7). Between January 1, 2013 and November 24, 2014, Craddock engaged in behavior typical of a shareholder: LeCLairRyan compensated her as a shareholder, she participated in benefit plans only available to shareholders, she voted on issues put to shareholders, and she referred to herself as a shareholder. (Def.'s MTD Mem. 8).

On November 7, 2014, Craddock complained of discriminatory treatment related her salary. (Compl. ¶ 19). At some unspecified point, Craddock acquired her own counsel on the discrimination matter. On November 24, 2014, Craddock's counsel and LeClairRyan's counsel discussed that Craddock had not signed the Shareholder Agreement. (Compl. ¶ 20).

On December 18, 2014, Michael Hern ("Hern"), President of LeClairRyan, sent Craddock the Agreement, stating that Craddock had "inadvertently failed" to execute the Shareholder Agreement. Hern demanded that Craddock sign the Agreement by close of business on December 22, 2014, and stated that the firm would "take appropriate steps" if Craddock did not sign and return the Agreement. (Compl. ¶ 21). "Craddock reviewed the ... agreement and learned for the first time that, before she paid her $100,000 buy-in, she was entitled to inspect LeClairRyan's financial records." (Compl. ¶ 23-27). On December 21, 2015, Craddock emailed LeClairRyan stating that she would not sign the Shareholder Agreement before she reviewed certain financial information. (Compl. ¶ 28-29). LeClairRyan did not respond to that inquiry before the December 22, 2014 deadline. (Compl. ¶ 30).

On December 22, 2014, Craddock returned a signed, modified version of the Shareholder Agreement, striking: (1) provisions stating that she had been given the opportunity to view

financial records and (2) provisions related to arbitration. (Compl. ¶ 30). Hern rejected Craddock's modified agreement and again asked Craddock to sign the unmodified Shareholder Agreement, stating that no Shareholder was permitted to modify the Agreement. (Compl. ¶ 31). Craddock never signed the unmodified Shareholder Agreement. (Compl. ¶ 32).

Craddock filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 20, 2015. (Def.'s MTD Mem. 2). On December 4, 2015, the EEOC issued a right-to-sue notice. (Def.'s MTD 3).

On December 11, 2015, LeClairRyan filed a Demand for Arbitration with the American Arbitration Association ("AAA"). On December 12, 2015, the AAA accepted and docketed the Demand for Arbitration. (Def.'s MTD Mem. 3). Craddock's counsel sent a letter to the AAA on December 14, 2015, arguing that the filing was inappropriate; the AAA disagreed. (Def.'s MTD Mem. 3).

On January 6, 2016, Craddock filed her Complaint in this Court. On January 7, 2016, Craddock filed a Motion to Stay Arbitration (Docket No. 3) in this Court, together with a Memorandum in Support of Motion to Stay Arbitration (Docket No. 4) ("Pl.'s Stay Mem."). Craddock's counsel notified the AAA of the filing of the Motion to Stay, and the AAA notified the parties that arbitration proceedings would be stayed for up to 60 days, beginning January 8, 2016. LeClairRyan accepted service

in this case on January 14, 2016. (Def.'s MTD Mem. 4). Upon service, LeClairRyan promptly filed its Motion to Dismiss and Compel Arbitration (Docket No. 7), together with its Memorandum in Support of Motion to Dismiss and to Compel Arbitration, and Opposition to Plaintiff's motion to Stay Arbitration (Docket No. 8) ("Def.'s MTD Mem."). Craddock filed a Memorandum in Opposition to Defendant's Motion to Dismiss and Compel Arbitration (Docket No. 12) ("Pl.'s MTD Opp.") and a Reply Memorandum in Support of her own Motion to Stay Arbitration (Docket No. 11) ("Pl.'s Stay Reply"). LeClairRyan filed a Reply in support of its own motion (Docket No. 13) ("Def.'s MTD Reply").

## OVERVIEW

The dispositive issue on both motions is whether Craddock entered a binding, written agreement to arbitrate disputes with LeClairRyan. This question encompasses several sub-issues:

1. Was a signature the exclusive manner of accepting the Shareholder Agreement?

2. If a signature was not the exclusive means of accepting the Shareholder Agreement, did Craddock's conduct between January 1, 2013 and late 2014 demonstrate acceptance of the Shareholder Agreement?

3.  Did Craddock's failure to review LeClairRyan financial documents before engaging in conduct characteristic of acceptance void her acceptance?

4.  Is a written, but unsigned, arbitration provision sufficient to establish "written provision ... to settle by arbitration" under the Federal Arbitration Act?

5.  Was Craddock's crossing out the arbitration provisions in the Shareholder Agreement in December 2014 a rejection of an offer?

For the reasons set forth below, the Court finds that: (1) a signature was not the exclusive manner of accepting the Shareholder Agreement; (2) Craddock's conduct demonstrates acceptance of the contract; (3) the Shareholder Agreement gave Craddock the option to examine LeClairRyan financial documents but did not require her to read those documents, and thus the fact that she did not examine these documents had no impact on her acceptance of the Shareholder Agreement; (4) a written but unsigned contract, otherwise accepted, is sufficient to invoke the Federal Arbitration Act; and (5) Craddock's crossing out the arbitration provisions in December 2014 could not be a "rejection," because she accepted and formed a contract as early as January, 2013.[2]

---

[2] If Craddock did not enter a binding, written agreement to arbitrate, there is a secondary question of whether

7

Accordingly, Plaintiff's MOTION TO STAY ARBITRATION (Docket No. 3) will be denied, and Defendant's MOTION TO DISMISS AND TO COMPEL ARBITRATION (Docket No. 7) motion will be granted.

## GOVERNING LAW

The Federal Arbitration Act requires that courts refer disputes to arbitration when a valid, written arbitration agreement exists and the dispute falls within the scope of the agreement to arbitrate. 9 U.S.C. § 2; Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 563 (4th Cir. 2015); Lorenzo v. Prime Communications, L.P., 806 F.3d 777, 781 (4th Cir. 2015).

> While the Supreme Court has acknowledged a "liberal federal policy favoring arbitration," ... it has also consistently held that § 2 of the FAA reflects the "fundamental principle that arbitration is a matter of contract[]" .... Thus, a court may order arbitration only when it "is satisfied that the parties agreed to arbitrate." ... And the question of whether the parties agreed to arbitrate is resolved by application of state contract law.

Lorenzo, 806 F.3d at 781 (internal citations omitted); see also Chorley, 807 F.3d at 563 ("At the same time, it is well-settled

---

LeClairRyan's action for a "declaratory judgment" on the employment dispute before the AAA divests the Court of jurisdiction over the employment dispute. (See generally, Pl.'s Stay Mem.). Because Craddock did enter a binding, written arbitration agreement, the Court need not reach the issues of the propriety of LeClairRyan's "preemptive strike" in front of the AAA.

that a 'party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.'") (internal citation omitted).

State law governs the question of whether the parties formed a contract with a valid arbitration clause. Chorley, 807 F.3d at 563 (relying on First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). The Shareholder Agreement contains a Virginia choice of law clause (Docket No. 4, Ex. 1), and the parties agree that Virginia choice of law governs the formation or non-formation of the contract in question. (See generally Def.'s MTD Mem.; Pl.'s MTD Reply). When confronted with uncertain state law, a federal court must predict what course the highest court in the state would take. Byelick v. Vivadelli, 79 F. Supp. 2d 610, 623 (E.D. Va. 1999). The federal court may base its prediction on "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." Wells v. Liddy, 186 F.3d 505, 528 (4th Cir. 1999).

Section Four of the FAA provides for a jury trial when there is a question of material fact related to the validity of a contract containing an arbitration provision. 9. U.S.C. § 4; Chorley, 807 F.3d at 564. However, when the parties do not

9

dispute any material facts,[3] the parties are not entitled to a jury trial, and the court determines whether the parties intended to arbitrate as a matter of law. Chorley, 807 F.3d at 564.

If a valid agreement to arbitrate exists, "Sections 3 and 4 [of the FAA] 'provide [] two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4.'" Chorley, 807 F.3d at 563 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983)).

## ANALYSIS

Applying common law principles of contract formation, it is clear that (1) Craddock accepted the LeClairRyan Shareholder Agreement by her conduct between January 1, 2013 and November 24, 2014, forming a contract which included a written and binding arbitration provision, such that (2) Craddock's purported "rejection" of the Shareholder Agreement in December 2014 had no legal effect. Because Craddock agreed to arbitrate, it is inappropriate for this Court to order a stay in the AAA

---

[3] Although Craddock's papers refer a jury trial (Pl.'s Stay Mem. 14), there do not appear to be any disputes of material fact on the arbitration issue.

proceeding or to otherwise consider the appropriateness of LeClairRyan's filing before the AAA.

## I. Craddock and LeClairRyan Formed A Contract As Early As January 1, 2013

Under Virginia law, "whether there existed between the parties an enforceable agreement to arbitrate ... depends on whether [an arbitration agreement] contained the essential elements of a valid contract at common law." Phillips v. Mazyck, 273 Va. 630, 635, 643 S.E.2d 172, 175 (2007). Where the "material facts concerning the formation of the parties' proposed arbitration agreement are not in dispute," the issue of contract formation is a question of law. Id. Mutuality of assent is required for formation of a contract to arbitrate. Id.

The analysis in this case focuses on two major issues: whether the Shareholder Agreement made a signature the exclusive means of acceptance and, if it did not, whether Craddock's silence and conduct reasonably manifested acceptance and intent to be bound.

### A. The Shareholder Agreement Did Not Make A Signature The Exclusive Manner Of Accepting The Shareholder Agreement

Craddock's position on contract formation rests on the concluding section of the Shareholder Agreement's statement that

11

"[e]ach Shareholder understands that by signing this agreement he or she agrees ... to submit any claims arising out of ... his or her relationship with the Corporation ... to binding arbitration." (Pl.'s MTD Opp. 14-15). Craddock claims that she could not have formed a contract through her actions, because the Shareholder Agreement set forth only one manner of acceptance – a signature – which she did not provide. (Pl.'s MTD Opp. 13-15).

For this proposition, Craddock relies on Restatement (Second) of Contracts, which notes that

> [a]n offer may invite or require acceptance
> to be made by an affirmative answer in
> words, or by performing or refraining from
> performing a specified act, or may empower
> the offeree to make a selection of terms in
> his acceptance.
>
> Illustration:
> 1. A sends a letter to B stating the terms
> of a proposed contract. At the end he
> writes, "You can accept this offer only by
> signing on the dotted line below my own
> signature." A replies by telegram, "I accept
> your offer. There is no contract."

Restatement (Second) of Contracts § 30 (1981) (emphasis added); accord Sport Sys., Inc. v. Kettler & Scott, Inc., No. 127886., 1994 WL 1031237, at *2 (Va. Cir. Ct. June 27, 1994).

However, when a contract lists one possible manner of acceptance, without stating that such a manner is the only permissible manner of acceptance, contract law treats the

possible manner as a suggestion, and leaves the offeree free to accept the contract in the suggested manner or in any other reasonable manner. As the second comment to the Restatement (Second) of Contracts § 30 notes, "[i]nsistence on a particular form of acceptance is unusual .... Language referring to a particular mode of acceptance is often intended and understood as suggestion rather than limitation; the suggested mode is then authorized, but other modes are not precluded." Restatement (Second) of Contracts § 30 (comment (b)); accord Jones v. Holloway, 73 Va. Cir. 46 (2007). When "an offer merely suggests a permitted place, time or manner of acceptance, another method of acceptance is not precluded." Restatement (Second) of Contracts § 60. That other method must be reasonable in light of the circumstances. Restatement (Second) of Contracts § 65; Restatement (Second) of Contracts § 30 (comments (d)-(e)); Jones, 73 Va. Cir. at 46 ("Unless otherwise indicated by the language in the writing, or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances"). The "by signing this agreement" language of the Shareholder Agreement contains no limitation on the mode of acceptance, and thus clearly operates as a "suggestion rather than limitation."

Craddock argues that interpreting the signature language as a "suggestion rather than a limitation" undermines the common

13

law anti-redundancy canon of interpretation. (Pl. MTD Mem. 14-15) (relying on Restatement (Second) of Contracts § 203 ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect)); accord PMA Capital Ins. Co. v. US Airways, Inc., 271 Va. 352, 358, 626 S.E.2d 369, 372-73 (2006) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can  be given to it, and there is a presumption that the parties have not used words needlessly."). However, the anti-redundancy canon is not applicable in this case, because reading the signature language as a suggestion does not render that language redundant or meaningless. As noted, the default rule for acceptance is that, in the absence of an exclusive means of acceptance, any reasonable means of acceptance will create a contract. Restatement (Second) of Contracts § 65 ("Unless circumstances known to the offeree indicate otherwise, a medium of acceptance is reasonable if it is the one used by the offeror or one customary in similar transactions at the time and place the offer is received."); Restatement (Second) of Contracts § 30 (comments (d)-(e)); see also Jones, 73 Va. Cir. at 46. Including a suggested form of acceptance serves to remove all debate about whether that form of acceptance qualifies as "reasonable." In other words, the suggested manner of acceptance states a means

14

by which the parties unquestionably will be bound. This gives the signature language value beyond mere surplusage. Thus, that the anti-redundancy canon does not require that the Court interpret the signature language of the Shareholder Agreement as creating an exclusive manner of acceptance.[4]

The cases Craddock cites are not to the contrary. Rather, those cases merely stand for the proposition that, when a contract suggests a manner of acceptance, performing that manner of acceptance does, in fact, constitute acceptance. (Pl.'s MTD Mem. 14) (relying on Caley v. Gulfstream Aero Corp., 428 F.3d 1359 (11th Cir. 2005); Mitchell v. Sajed, 3:13-CV-312, 2013 WL 3805041 (E.D. Va. July 22, 2013) (Spencer, J.)); accord Restatement (Second) of Contracts § 30 (comment (b)); accord Jones, 73 Va. Cir. at 46. The cases Craddock cites do not stand for the proposition that, when a contract suggests a manner of acceptance, no alternate otherwise-reasonable manner constitutes acceptance.

In conclusion, the signature language of the Shareholder Agreement is most appropriately read as suggesting an

_____

[4]  Even if the signature language would be redundant if interpreted as non-exlusive, the anti-redundancy canon is not absolute, e.g., TMW Enterprises, Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir. 2010); Verizon Virginia, LLC v. XO Commc'ns, LLC, No. 3:15-CV-171, 2015 WL 6759473, at *9 (E.D. Va. Nov. 5, 2015), and must yield to the common usage of a suggested-but-not-exclusive means of acceptance given by the Restatement and Jones, 73 Va. Cir. at 43.

unquestionably valid manner of acceptance, without excluding acceptance in any other manner reasonable under the circumstances.

> **B. Craddock's Conduct Between January 1, 2013 and November 24, 2014 Reasonably Evinced Acceptance Of The Shareholder Agreement**

Given that the Shareholder Agreement left Craddock free to accept by any manner reasonable under the circumstances, the next question is whether Craddock's behavior reasonably demonstrates acceptance and intent to be bound.

The parties concur that a court must determine acceptance through a party's words or acts. (Pl.'s MTD Opp. 12 (relying on Wells v. Weston, 220 Va. 72, 78 (1985); Lucy v. Zehmer, 196 Va. 493, 503 (1954)); Def.'s MTD Reply 7 (relying on Lacy v. Cardwell, 216 Va. 212, 223 (1975)); see also Marefield Meadows, Inc. v. Lorenz, 245 Va. 255, 260, 427 S.E.2d 363, 365 (1993) ("A meeting of the minds is essential to the formation of a contract, but 'the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts.'"); Restatement (Second) of Contracts § 19 ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."). Because Craddock did not sign the Shareholder Agreement (which

would demonstrate a clear intent to be bound through words), the Court must examine whether Craddock's silence and her behavior manifest acceptance and intent to be bound.

Silence and inaction[5] typically do not constitute acceptance of a contract and its terms. However, silence does constitute acceptance of an offer and its terms where the offeree: (1) accepts the benefits of the offer; (2) has a reasonable opportunity to reject the offer; and (3) understands that the offer is made with the expectation of compensation. Restatement (Second) of Contracts § 69(1)(a);[6] accord United States v. Hanover Ins. Co., No. 2:15-CV-127, 2015 WL 9665679, at *4 (E.D. Va. Dec. 8, 2015) (surveying Supreme Court of Virginia cases) report and recommendation adopted, No. 2:15CV127, 2016 WL 79931

---

[5] "Inaction" here refers to Craddock not taking action to affirmatively reject the Shareholder Agreement between January 1, 2013 and November 24, 2014. Although everyday usage of "action" easily encompasses Craddock buying in to LeClairRyan, receiving stock, voting as a shareholder, and receiving shareholder-only employment benefits, the Restatement instead characterizes these as "accepting the benefit of the offer" rather than "actions."

[6] Virginia law is that "[s]ilence alone, without some other objective manifestation of assent, will not serve as acceptance of a contract." Odyssey Imaging, LLC v. Cardiology Associates of Johnston, LLC, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010) (relying on Phillips, 273 Va. at 638, 643 S.E.2d at 176)). Craddock did not, however, offer "mere silence": she offered silence and inaction, while at the same time accepting benefits, having an opportunity to reject, and knowing that compensation was expected. This is the "other objective manifestation of assent" that makes it appropriate to impute acceptance from Craddock's behavior.

(E.D. Va. Jan. 6, 2016) (relying on <u>Galloway Corp. v. S.B. Ballard Const. Co.</u>, 250 Va. 493, 505, 464 S.E.2d 349, 356 (1995); <u>Hercules Powder Co. v. Brookfield</u>, 189 Va. 531, 541, 53 S.E.2d 804, 808 (1949)).[7] Moreover,

> when the recipient knows or has reason to know that the services are being rendered with an expectation of compensation, and by a word could prevent the mistake, his privilege of inaction gives way ... he is held to an acceptance if he fails to speak. The resulting duty is not merely a duty to pay fair value, but a duty to pay or perform <u>according to the terms of the offer</u>.

Restatement (Second) of Contracts § 69 (comment (b)) (emphasis added).

---

[7] Virginia law is essentially in line with the Restatement on this point. Magistrate Judge Leonard noted that:
> acceptance by silence is an exception and not the general rule. <u>Klein v. Verizon Commc'ns, Inc.</u>, 920 F.Supp.2d 670, 680 (E.D. Va. 2013) …. In cases where courts have found that silent acceptance occurred, there was a clear understanding of the terms in which each party were to be bound and performance or acceptance of offered benefits occured. <u>See</u>, <u>e.g.</u> <u>Galloway Corp. v. S.B. Ballard Const. Co.</u>, 250 Va. 493, 505, 464 S.E.2d 349, 356 (1995) (finding that when one party "undertook to perform the contract according to its terms, an acceptance by performance resulted" even though the parties never signed a formal contract); <u>Hercules Powder Co. v. Brookfield</u>, 189 Va. 531, 541, 53 S.E.2d 804, 808 (1949) ("Ample authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract.").

<u>Hanover</u>, 2015 WL 9665679, at *4.

In this case, Craddock met all the requirements for the acceptance-by-silence rule as expressed in the Restatement § 69 and in Hanover. First, Craddock accepted the benefits of the offer. Craddock was promoted to Shareholder on January 1, 2013 and held herself out a shareholder, was compensated as a shareholder, participated in employment benefit plans only available to shareholders, and voted on issues put to shareholders. (Def.'s MTD Mem. 6-8). Second, Craddock had a reasonable opportunity to reject the offer. Craddock received a copy of the Shareholder Agreement on December 12, 2012, and was promoted to Shareholder as of January 1, 2013. This is a more than reasonable period in which Craddock might have communicated a rejection of the Shareholder Agreement to any appropriate officer. Third, the record before the Court reasonably supports an inference that Craddock understood that the offer expected compensation. Most obviously, Craddock knew that LeClairRyan expected a $100,000 buy-in, which Craddock agreed in writing to pay out of her August 2013 bonus. (Def.'s MTD Mem. 7-8).

In addition to the monetary compensation, excerpts from the Shareholder Agreement show that Craddock accepted fiduciary duties and accepted binding arbitration (giving up her default right to recourse in court). (Docket No. 4, Ex. 1, 12). These are less self-evidently types of "compensation" than money. However, common law gives a broad definition to "compensation"

19

as required for exchange of value in the context of contract formation. E.g., Restatement (Second) of Contracts § 79 (comment (b)) ("a 'legal detriment' is sufficient [as consideration] even though there is no economic detriment or other actual loss."); Restatement (Second) of Contracts § 73 noting that performance of a pre-existing legal duty does not constitute consideration, and thus implicitly recognizing that performance of a new legal duty constitutes consideration); see also GSHH-Richmond, Inc. v. Imperial Assocs., 253 Va. 98, 101, 480 S.E.2d 482, 484 (1997) (noting that consideration may come as "a benefit to the party promising or a detriment to the party to whom the promise is made.").

Further, the Shareholder Agreement and the business arrangement it established contemplated that the benefits were of the type not given without an expectation of an exchange of value – or, in other words, of compensation. Craddock was compensated as a shareholder and accepted the premium benefits of the Shareholder Agreement. She also voted as a shareholder, accepted all benefits of shareholder status, and held herself out as a shareholder. Craddock does not claim to have understood otherwise.

Because Craddock (1) accepted benefits of the Shareholder Agreement; (2) had an opportunity to reject the Shareholder Agreement in November 2012 but did not reject the Shareholder

Agreement; (3) knew that the Shareholder Agreement expected both monetary compensation ($100,000) and compensation in the broader sense of legal detriment (fiduciary duties, commitment to arbitration); an (4) accepted compensation of benefits only available under the Shareholder Agreement.

Hanover provides a useful comparison. In that case, defendant argued that Hanover accepted by silence under Restatement § 69. Hanover, 2015 WL 9665679, at *4. However, contrary to Restatement § 69, defendant failed to "establish[] that Hanover took any offered benefits pursuant to the purported settlement agreement." Id. Additionally, "Hanover's silence and inaction gives the Court no guidance as to what terms Hanover might have assented to." Id. By contrast, Craddock took offered benefits, and the emailed Settlement Agreement clearly lays out the terms to which Craddock assented.

At the margins, Craddock's request for promotion to partnership also supports finding that Craddock accepted the offer embodied in the Shareholder Agreement. As the Restatement notes, either "[e]xplicit statement by the offeree [or] usage of trade ... may give the offeror reason to understand that silence will constitute acceptance." Restatement (Second) of Contracts § 69 (comment (d)).[8] Craddock's October 2012 request for promotion

---

[8] Even further at the margins, "usage of trade" also supports finding acceptance, in that it is extremely unlikely that any

to shareholder is an "explicit statement by the offeree" suggesting that Craddock intended to accept the Shareholder Agreement governing promotion to shareholder. Craddock's request tends to make it even more reasonable to infer acceptance from Craddock's conduct.

Craddock argues, contrary to Restatement § 69 and the cases cited in Hanover, that acceptance of an arbitration clause cannot be implied through silence or conduct at Virginia law. (Pl.'s MTD Opp. 18-20) (relying on Phillips v. Mazyck, 273 Va. 630, 636-37, 643 S.E.2d 172, 176 (2007); Brooks & Co. General Contractors, Inc. v. Randy Robinson Contracting, Inc., 257 Va. 240, 513 S.E.2d 858 (1999)). The cases which Craddock cites, however, do not actually support her position. In Brooks,

> a general contractor sent to a subcontractor an unsigned form contract containing an arbitration provision that the parties had not previously discussed and that was not included in the subcontractor's bid documents .... The subcontractor testified that he did not agree with the terms of the form contract and that he purposefully refused to sign it, although he never communicated his disagreement to the contractor .... The subcontractor began work on the project ... but the subcontractor left the work unfinished ... The general

---

law firm would read Craddock calling herself a shareholder and accepting shareholder benefits as anything but acceptance, even in the face of silence and a failure to explicitly reject the promotion. Because evidence of this does not appear in the record, however, the Court does not place weight on "usage of trade" in assessing whether Craddock's behavior reasonably demonstrated acceptance.

22

> contractor completed the unfinished work and
> demanded arbitration .... We ... upheld the
> trial court's finding that the parties did
> not mutually assent to a modification of
> their original oral contract ... In doing
> so, we noted the lack of any evidence that
> the general contractor, i.e., the party
> seeking enforcement of the purported
> contract, objectively manifested its
> intention to be bound by the form contract
> ... In fact, the evidence showed that the
> general contractor did not sign the form
> contract before sending it to the
> subcontractor precisely because it expected
> that the subcontractor would make changes to
> the document.

Phillips, 273 Va. 636-37. The reason that the Brooks contract

(including the arbitration provision) was not binding is that

the party seeking to enforce the contract did not manifest an

intent to be bound by the contract as drafted at the time of

alleged contract formation. Phillips likewise involved a case in

which to enforce the arbitration provision never objectively

manifested its assent to the terms of the contract containing an

arbitration provision. Phillips, 273 Va. 173-74, 176. In this

case, however, the actions of the party seeking enforcement

demonstrate intent to be bound by the Shareholder Agreement:

LeClairRyan assigned shares to Craddock; granted shareholder

voting rights to Craddock; and granted shareholder benefits to

Craddock. (Def.'s MTD Mem. 6-8). Additionally, the evidence in

the record shows that, unlike the general contractor in Brooks,

LeClairRyan did not expect Craddock to modify the Shareholder

23

Agreement. (Pl.'s Stay Mem. 10) (noting that all shareholders were expected to adhere to the Shareholder Agreement as drafted). To reiterate: the contracts in <u>Brooks</u> and <u>Phillips</u> were unenforceable because the party seeking to enforce the contract did not demonstrate an intent to be bound; however, in this case, LeClairRyan's conduct beginning on January 1, 2013 demonstrates a clear intent to be bound by the terms of the Shareholder Agreement.[9] To the extent that <u>Brooks</u> and <u>Phillips</u> are relevant to this case, it is merely to underscore that parties must objectively manifest their acceptance and intent to be bound by a contract – and both parties to this dispute did objectively manifest their acceptance and intent to be bound from January 1, 2013 onward.

### C.   Craddock's Failure To Review LeClairRyan Financial Documents Before Engaging in Conduct Characteristic Of Acceptance Did Not Void Her Acceptance

Craddock's memorandum notes that the subscription agreement required Craddock to warrant that she had been

> given access to and an opportunity to examine such documents, materials, and information concerning the Corporation as I deem necessary or advisable in order to reach an informed decision as to making an investment in the corporation, and I have carefully reviewed and understand these

---

[9] If LeClairRyan did not adhere to all the terms of the contract, as Craddock claims, that proves that LeClairRyan <u>breached</u> the contract, not that LeClairRyan never intended to be bound by the contract.

> materials and I have received answers to my
> full satisfaction ... I have made such in
> dependent investigation ... as ... I deem
> necessary.

(Pl.'s Stay Mem. 8). Craddock never explicitly argues that her failure to review financial documents means that she did not form a contract. It is worth noting, however, that the most reasonable reading of the Shareholder Agreement is that it afforded Craddock an opportunity to read any financial information she deemed advisable. Craddock received a copy of the Shareholder Agreement by email on December 12, 2012. She was advised of her right, but did not exercise it before manifesting acceptance by conduct (receiving and paying for shares, voting, accepting shareholder benefits) in 2013. On LeClairRyan's side of this contract, when Craddock began manifesting acceptance by conduct, it was reasonable for LeClairRyan to presume that Craddock had decided she did not need to review the financial information that she was given the opportunity to review.

### D.   The FAA Requires A Written Arbitration Agreement, But Not A Signed Arbitration Agreement

The FAA only requires arbitration where the parties entered a written arbitration agreement. 9 U.S.C. § 2. This district and two circuit courts have, however, determined that "[t]he FAA does not require an arbitration agreement be _signed_ by the a parties entering into the agreement." Mitchell, 2013 WL 3805041 at *3 (emphasis added) (relying on Seawright v. Am. Gen. Fin.

25

Servs., Inc., 507 F.3d 967, 978 (6th Cir. 2007); Caley v. Gulfstream Areospace Corp., 428 F.3d 1359, 1369 (11th Cir. 2005)). Craddock's argument that there is no "written to arbitrate signed by the parties" (Pl.'s MTD Opp. 11) is, accordingly, unavailing.

In sum: on December 12, 2012, LeClairRyan made a written offer: the Shareholder Agreement. (Def.'s MTD Mem. 7). The Shareholder Agreement contained a written arbitration provision. (Docket No. 4, Ex. 1, 11). The Shareholder Agreement suggested, but did not require, acceptance by signature. (Docket No. 4, Ex. 1, 11-12). By suggesting, but not requiring, acceptance, the Shareholder Agreement left Craddock free to accept the Shareholder Agreement in any reasonable or customary manner. Restatement (Second) of Contracts § 65. Craddock accepted the offer and its terms by (1) accepting the benefits of the offer between January 1, 2013 and November 24, 2014 after (2) being given a reasonable opportunity to reject the offer and (3) understanding that the offer was made with the expectation of compensation. (Def.'s MTD 6-8); Restatement (Second) of Contracts § 69; Restatement (Second) of Contracts § 69 (comment (b)). Thus, Craddock accepted the Shareholder Agreement and its written, binding, FAA-enforceable arbitration provision by her conduct between January 1, 2013 and November 24, 2014.

## II. Craddock's "Rejection" In December, 2014 Had No Legal Effect

Craddock argues that, when she was asked to sign the Shareholder Agreement, she rejected the arbitration provision. (Def.'s MTD Mem. 12, 15-17, 19-20). It is correct that, at common law, a counteroffer (such as Craddock striking the arbitration provisions) constitutes a rejection and a new offer. E.g., Chittum v. Potter, 216 Va. 463, 467, 219 S.E.2d 859, 863 (1975). However, issues of rejection and counteroffer are questions of contract formation. If the contract has already been formed (offered and accepted), a party's subsequent decision to cross out portions of the contract is an offer to modify a contract at most (an offer which LeClairRyan clearly did not accept) and a nullity at worst. In other words, Craddock's alleged "rejection" almost two years after the contract was formed is legally irrelevant.

### CONCLUSION

For the reasons stated above, Plaintiff's MOTION TO STAY ARBITRATION (Docket No. 3) will be denied, and Defendant's MOTION TO DISMISS AND TO COMPEL ARBITRATION (Docket No. 7) motion will be granted.

It is so ORDERED.

_____/s/_____ REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 12, 2016

27