# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**
**Case No. 01-15-0005-9561**

**LECLAIR RYAN, P.C.**

    **Claimant,**

    **v.**

**MICHELE BURKE CRADDOCK,**

    **Respondent**

<u>**FINAL AWARD**</u>

**1.**     <u>**The parties are represented by:**</u>

Burt H. Whitt, Esq.
Kaufman & Canoles, PC
150 West Main Street, Suite 2100
Norfolk, Va. 23514-3037
<u>bhwhitt@kaufcan.com</u>
Tel: (804) 648-4848
Fax: (804) 237-0413

John M. Bredehoft, Esq.
Kaufman & Canoles
150 West Main Street, Suite 2100
Norfolk, Va. 23514-3037
<u>jmbredehoft@kaufcan.com</u>
Tel: (804) 648-4848
Fax: (804) 237-0413

Randy C. Sparks, Jr, Esq.
Kaufman & Canoles, Pc
1021 East Cary Street, Suite 1400
Richmond, Va. 2321 9
<u>rcsparks@kaufcan.com</u>
Tel: (804) 648-4848
Fax: (804) 237-0413

*Counsel for Claimant*

Harris D. Butler, Esq.
Butler Royals, PLC
140 Virginia Street, Suite 302
Richmond, Va. 23219
harris.butler@butlerroyals.com
Tel: (804) 648-4848
Fax: (804) 237-0413

Paul M. Falabella, Esq.
Butler Royals, PLC
140 Virginia Street, Suite 302
Richmond, Va. 23219
p.falabella@butlerroyals.com
Tel: (804) 648-4848
Fax: (804) 237-0413

*Counsel for Respondent*

2.   **The parties appointed as Arbitrators:**

Linda R. Singer, Esq.
JAMS Resolution Center
1155 F Street, NW, Suite 1150
Washington, D.C. 20004
lsinger@jamsadr.com
Tel. (202) 942- 9180
Fax. (202) 942- 9186

Hon. Jerome Friedman (ret.)
One Colley Avenue, Apt. 1602
Norfolk, Va. 23510
sanderry68@cox.net
(757) 627-7111

Hon. F. Bradford Stillman (ret.)
340 College Place
Norfolk, VA 23510
fbstillman@mac.com
(Substituted for Arbitrator Friedman on December 29, 2017.

Hon. Rosemarie Annunziata (ret.)
JAMS Resolution Center
1155 F Street, NW, Suite 1150
Washington, D.C. 20004
rannunziata@jamsadr.com
Tel. (202) 942-9180
Fax. (202) 942-9186

**3.**   **Governing Law and Rules**

The Arbitration process is governed by both the Federal Arbitration Act and the Virginia Arbitration Act, to the extent that the Virginia statute does not conflict with the federal statute, and by the American Arbitration Association's National Rules for the Resolution of Employment Disputes, as amended and in effect November 1, 2009, Virginia state and federal substantive law govern the merits of the Virginia and federal claims and defenses, respectively.

**4.**   **Pleadings**

The matter before this Tribunal was initiated by a Demand for Arbitration filed by Claimant, LeClair Ryan, P.C. ("The Firm," "LR,") on December 11, 2015.  In its Demand, Claimant sought a Declaratory Judgment seeking that the Panel declare that the provisions of Title VII to the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* including the   Lilly Ledbetter Fair Pay Act of 2009) and the Equal Pay Act of 1963, 29 U.S.C. § 209(d), ct seq ("EPA"), as well as the retaliation claim,  are not applicable to Respondent Michele Burke Craddock ("Craddock") and that it is not liable for the relief Respondent sought in her claims for relief pursuant to the claims she made  in her gender-based Equal Employment Opportunity Commission and retaliation class charge. When a 'right to sue' notice was issued by EEOC, the Firm asserted its claims in arbitration. Craddock filed gender discrimination claims in federal district court, which litigation was stayed by decision of the Fourth Circuit Court of Appeals pending arbitration.

Respondent's Answer and Counterclaim were filed on June 2, 2017. Craddock's Counterclaim alleges a long-standing pattern of favoritism to male attorneys in compensation and promotion, perpetuated by the same, small, centralized group of male decision-makers (Counterclaim at ¶¶ 1-3, 8-11); male dominated leadership of the Firm; (Counterclaim at ¶¶ 12-16); disparate gender based treatment and disparate impact of compensation and promotion decisions, reflected in comparative times for elevation to shareholder status and compensation, primarily through discretionary awards of "origination credits," but including internal referral practices (Counterclaim at ¶¶ 17-22, 23, 26-32); and retaliation [Counterclaim at ¶¶86-102]. Craddock's pay disparity claims are brought both under the EPA and Title VII.

Claimant further disputed the arbitrability of any claims or defenses raised in this matter and raised the related question regarding the party responsible for the fees incurred in the arbitration.

5. **Relevant Procedural History**

- Pursuant to Order No.1, the Tribunal conducted a Preliminary Conference with counsel for the parties by telephone on April 21, 2017 for the purpose of establishing appropriate procedures and schedules for the Arbitration.

- Pursuant to Order No. 2, entered on May 24, 2017, the Tribunal found Respondent bound by the Arbitration provision in the Shareholders Agreements, on the ground that Respondent was foreclosed from relitigating the issue in the arbitral forum, having sought judicial resolution of the issue in the United States District Court for the Eastern District of Virginia (Richmond Division) and the United States Court of Appeals for the Fourth Circuit District of Virginia (Richmond Division), both of which ruled in favor of Claimant.[1] Accordingly, no further consideration of the issue by the Tribunal was undertaken. Further, pursuant to AAA Administrative Rules and Rule 48 of the Employment Rules, the Tribunal determined that LeClair Ryan will be assessed the costs incurred in the arbitration proceedings, including the arbitrators' fees, on the ground that the parties' agreement, was an "employer-promulgated plan" and not one individually negotiated.

---

[1] On April 22, 2016, the District Court denied Respondent's Motion to Stay Arbitration and granted Claimant's Motion to Dismiss and to Compel Arbitration. The Court of Appeals dismissed the appeal on August 26, 2016 for lack of jurisdiction pursuant to 9 U.S.C §16 (b) (1) (2) (2012).

- Order No. 3, entered on May 30, 2017, set the conduct of discovery pursuant to an agreed Discovery plan, in which the Tribunal concurred, and scheduled the Arbitration Hearing to be held between October 23, 2017 and October 27, 2017 at the law offices of Kaufman and Canoles, PC, Two James Center, Suite 1400, Richmond Virginia, 23219.  It also set the dates when each party's list of witnesses and exhibits, together with the party's objections to the admission of the opposing party's proposed exhibits or witnesses, were to be filed.

- Order No. 4, entered on June 15, 2017, denied Counterclaimant -Respondents' Request for Leave to File a Potentially Dispositive Motion pursuant to Rule 27 of the American Arbitration on the ground that the pleadings required determinations of fact and the motion was unlikely to dispose of or narrow the issues.

- Order No. 5, entered on July 3, 2017, further addressed the conduct of discovery in the proceedings, in particular the issue of what constituted relevant "comparables."

- Order No. 6, denied of Respondents' Motion for Dispositive Relief in the Nature of a Summary Judgment under Fed. R. Civ. P. 56 and pursuant of Rule 37 of the AAA on the ground the issues raised by the parties require a determination of fact and such a motion was unlikely to dispose of or narrow the issues.

- Order No. 7, dated September 11, 2017, resolved a discovery dispute raised jointly by the parties regarding a claim of privilege.

- Order No 8 resolved the number of depositions permitted under Order No. 5, which linked the number of permitted depositions to whether they were "party" or "non-party."

- Order No. 9 resolved the permitted discovery time period and scope (such as gender, geographic locations, professional status and professional histories of Respondents' employees or shareholders.)

- Order No. 10 clarified the permitted discovery time period and scope as set forth in Order No. 9.

- Order No. 11 granted Claimant's Motion to Compel responses to Respondent's Interrogatory No. 7 and Document Request No. 5.

- Order No. 12 granted the parties' joint request to reschedule the Arbitration hearing form October 23, 2018 to an available time and date as would permit nine or ten consecutive days for hearing, setting the hearing to begin on January 15, 2018, and continuing through January 26, 2018, at the law offices of Kaufman & Canoles, PC, Two James Center 1021 Cary Street, Suite 1400, Richmond, Virginia 23219  The Panel also directed that Respondent's case be presented first, because she had the burden of proof on her claims of gender discrimination, promotion, constructive discharge, and unequal pay

6.      **The Evidentiary Hearing**

The Arbitration Hearing was conducted on January 15, 2018 through January 25, 2018 at the law offices of Kaufman & Canoles, PC, Two James Center, 1021 Cary Street, Suite 1400, Richmond, Virginia 23219 with Harris D. Butler, Esq., and Paul M. Falabella, counsel for Respondent, and John M. Bredehoft, Esq. and Randy C. Sparks, Esq, counsel for Claimant present. Michelle Burke Craddock, Lori Thompson, Esq., the firm's General Counsel, and Stacy Beaulie, were also present.

The Claimant submitted in evidence 133 exhibits and # demonstrative exhibits.

Respondent submitted in evidence 134 exhibits and # demonstrative exhibits.

The following witnesses testified:

- Steven Brown

- Curtis Colgate

- John Craddock

- Thomas Wolf

- Jennifer Mistal

- Lynn Ellen Queen

- Michael Hern

- Leslie Hailey

- Bruce Matson

- Michele Craddock

- Dr. Scott Sautter (expert)

- Erik Gustafson

- David Freinberg

- Janis Meyer

- Corey Booker

- Dr. Benjamin Carey (expert)

- Katja Hill

- Lisa Murphy

- Susan North

Before the submission of the evidence was closed, the Tribunal determined if either party sought to introduce additional material evidence. There being no additional material evidence proffered for admission by either party, the arbitration hearing was closed, with the exception of the submission of evidence establishing the attorney's fees and costs sought by Respondent were Respondent to prevail and the submission of post-hearing briefs, which were filed on April 2, 2018.

## DECISION

THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the Arbitration Agreement contained in LeClair Ryan's Second and Third Amended and Restated Shareholders Agreements and having examined the submissions, proof and allegations of the parties, find, conclude and issue this Award as follows.

## I.

## ENTITLEMENTTO PROTECTIONS AFFORDED TO EMPLOYEES UNDER THE EQUAL PAY ACT AND TITLE VII TO THE 1964 CIVIL RIGHTS ACT

LeClair Ryan PC is a national law firm that currently has approximately 344 lawyers (56 of whom are in the Richmond office) and 121 total shareholders with 27 offices in 16 states. Michele Burke first came to LR as a summer associate in 2002, upon graduation from law school,

and began work as an associate in September 2003. She voluntarily left the firm, to pursue other goals, but rejoined the Firm as an Associate in 2008. She was promoted to Officer effective January 2010, and to Shareholder effective January 2013.

Craddock alleges that the Firm is an "employer" within the meaning of Title VII and the EPA. LeClair, on the other hand, claims that Craddock is not entitled to the protections of federal employment laws because she is a shareholder, not an employee. We agree with Craddock.

In *Clackamas Gastroenterology Assoc., PC v. Wells,* 538 US 440 (2003), the Supreme Court set out the standards for determining whether a shareholder in a professional organization may be considered an employee under the discrimination statutes. Ruling that element of control is the principal guidepost to be followed in deciding whether the four director-shareholder physicians should be counted as employees, the Court listed six considerations that are relevant to such a decision:

1. whether the organization can hire or fire the individual or set the rules and regulations for her work.

2. whether and to what extent the organization supervises the individual's work

3. whether the individual reports to someone higher in the organization

4. whether, and to what extent, the individual is able to influence the organization

5. whether the parties intended that the individual be an employee, as expressed in written agreements

6. whether the individual shares in the profits, losses, and liabilities of the organization.

During the period Craddock was a Shareholder at LR, she clearly was treated as an employee. Several witnesses, including Erik Gustafson, the current CEO, testified that a small number of male leaders, primarily the CEO, controlled the firm. With some input from the small

number of departmental team leaders, the CEO determined promotions to Shareholder, Shareholders' base salaries, origination credits, buy-ins, and permission to take on contingency fee cases. (Some of these decisions later were shared with a Board of Directors on which Craddock never served.) Shareholders had no access to other shareholders' compensation, which was kept secret even from the Diversity Committee.  Craddock had no influence on any of these decisions.

Two documents, from different time periods relevant to our decision, make clear Craddock's status as an employee.  In 2012, CEO David Freinberg wrote to Craddock, then an office holder, together with John Craddock and Thomas Wolf, both of whom were Shareholders, concerning a bonus for their work on the *Colgate* matter:  "The Applicant, like the Firm's other Officers and Shareholders, will continue to be an employee at will . . . subject to termination at any time with or without Cause . . . and other terms of employment subject to change . . . ."

And on January 19, 2015, CEO Freinberg sent Craddock, then a Shareholder, a memo establishing her annual compensation, which ended as follows:
"Notwithstanding anything in this memo to the contrary, (i) you, like the Firm's other attorneys, will be an employee at will, and your employment will be subject to termination at any time, with or without cause, and (ii) the terms of your employment (including, without limitations, compensation and benefits) like those of the Firm's other attorneys, will be subject to change by the Firm from time to time."

Finally, Michael Hern, the former, long-term CEO, testified that shareholders are at-will employees, who receive W-2 income.

Five of the six standards listed by the Supreme Court (the only exception to a very minor degree being the last one) establish Craddock as an employee entitled to the protection of the Equal Pay Act and Title VII.

## II.

## GENDER DISCRIMINATIION UNDER TITLE VII TO THE 1964 CIVIL RIGHTS ACT FINDINGS OF FACT AND CONCLUSIONS OF LAW

In 2009, the Firm brought in what would become known as the *Colgate* case. The credit for originating this work went to a male partner, Douglas Sbertoli, who had brought in the client. Litigation began in 2010 and Craddock was promoted to Officer *(i.e.,* non-equity' partner) effective January l of that same year. She was promoted to Shareholder, effective January 2013. A year early relative to the three-year interval that normally followed once achieving Officer status.

In the course of the *Colgate* litigation, the client fired the Firm, but, through Craddock's efforts with the client, the work was subsequently retained for the Firm.  Notwithstanding Craddock's successful efforts to reinstate the Craddock matter with the Firm, under written Firm policy, the origination credits (including credit for an initial $3.5 million dollars paid under an hourly-fee arrangement before the case was converted to contingent fee) remained with Sbertoli. Craddock's appeal of the decision regarding the allocation of the *Colgate* origination credits was denied in the fall of 2011.

The litigation team consisted of Shareholders, Tom Wolfe and John Craddock, as well as Michele Burke, as she was known before her marriage to John Craddock. The team prepared and tried the case before Judge Jane Roush who entered judgment for the Firm's clients in August 2012. A comprehensive settlement was reached just before an appeal was heard in August 2013. The Firm was paid a contingent fee of about twenty million dollars.

As part of the Firm's efforts to address its failure to meet budget in 2012 and 2013, Sbertoli's compensation for 2013 was reduced substantially and he left the Firm that year. As a result, under Firm policy, approximately ten million dollars was credited as "origination fees" for Craddock. When the contingency fee for *Colgate* was paid to the Firm in 2013, each of the three

attorneys working on the case received a million- dollar-plus bonus. Craddock also received another more modest bonus, as did other firm attorneys, and her salary for 2014 was increased but not to the amount paid in compensation to male Shareholders. When she was also asked to accept a reduction in salary in 2015, she filed an EEOC claim based on gender discrimination and retaliation in January 20, 2018 and LeClair Ryan's Demand for Arbitration and Craddock's Counterclaim followed.

LeClair Ryan determines attorney compensation annually applying factors for evaluating Shareholder Performance as set forth in its Shareholder Compensation Policy adopted on July 12, 2012.[2]  In conducting a Shareholder's performance evaluation, the Firm applies both subjective and objective criteria; the latter, primarily, includes "rolling three-year averages for collections from (i) hours worked, (ii) originations, (iii) matter managements and (iv) team leadership.

The Firm's determination of compensation is described as a "relatocracy," --a term not defined, except to state that to achieve such a goal, a direct relationship should exist between a lawyer's contribution to [the Firm's] "Partnership 2020 Values and Goals and [the Firm's] execution of Strategy Map 2.0 and his or her compensation." The term "relatocracy" is further defined in a footnote that provides: "The aspiration is that each Shareholder will endeavor to contribute more to the Firm's Partnership 2020 Values and Goals and its execution of the Map 2.0 than he/she receives in compensation."  Moreover, the Policy provides that the relationship that should exist between a lawyer's compensation and his or her contribution to the Firm "is not determined by the rigid application of a formula.  It is determined through consideration of both

---

[2]These provisions remain essentially the same in years 2013 and 2014, the latter year being the Fiscal year in which fiscal year 2015 compensation was determined. These factors are presented to the Firm's Chief Executive Officer, who forwards a recommendation to the Board for approval. Raises and bonuses are set within constraints imposed by a yearly Firm-wide bonus pool and raise pool.

(1) objective criteria . . . and (2) subjective criteria (i.e. the Shareholder's self-evaluation and the recommendations from the CEO (which in turn should reflect the input from the appropriate Practice Area Term Leader and the appropriate Department Leader.)"

To apply the Firm's objective criteria, the focusses should be on Fiscal Review Year numbers for the last three completed Fiscal Review Years. As female Board member Katja Hill testified, the look at three-year averages is intended to "smooth out sort of minor to modest variations from year to year," but are not intended to allow a Shareholder to "coast" on one good year. Although  characterized as "objective," under the Firm's Compensation Policy, the three-year rolling averages factors were subject to an overlay of "subjective" review and evaluation. Thus, according to testimony by Hill, in the exercise of subjective evaluation, "a single instance of superlative performance, attributable to a non-repeatable event," may be discounted by the Board for salary purposes. While that type of event is rewarded by a bonus, such a bonus is not automatic; it must be applied for and approved by the Board.

To recognize contributions of unique value, the Compensation Policy also provides that, where a lawyer's "performance is crucial to the success of the Firm and its clients, the value of that contribution must be simultaneously provided to the Firm, its clients and its "stars." Finally, in testimony, but not included in the Firm's printed Policy, the subjective factors were said to include the "durability" and "profitability" of a Shareholder's work and collections.  As to subjective factors, Hill testified "[t]here's no specific place to find it.  There's no standard . . . it is subjective to whoever the decision makers, including ultimately the board of director(s)."

The Firm's Compensation Policy affirms that the Firm does not have "a seniority-based, lockstep system," "material differences in contribution to Partnership 2020 Values and Goals and execution of Strategy Map 2.0, should result in material differences in compensation."  However,

the Firm's application of origination credits is essentially "lock step," in its virtually undeviating application of the credit to the attorney "who gets the telephone call [from the client.]"  With few exceptions that attorney "will forever be the OA for all matters for that client . . . unless [the] attorney leaves the Firm. In that event, the Chief Executive Officer based on the recommendation of the applicable Department Leader (with input from the original originating attorney if possible) will designate a new originating attorney or establish the client as a "Firm origination" (to be reflected in [the Firm's] financial reports as such) after considering appropriate input from the attorneys involved."   Disputes regarding the designation of originating attorney "will be determined by the Chief Executive Officer based on the recommendation of the applicable Department Leader, in his sole and absolute discretion (if the dispute involves an Executive Officer, the Board will make the determination).

On the face of it, the Firm's culture appears propitious for the employment and success of women lawyers. The Firm has a longstanding commitment to gender diversity. It exposed itself to critical analysis, including a comprehensive outside 2003 report and another in 2007. The Firm exceeds the national averages for women partners, women equity partners, and women associates, and is ranked in or close to the top ten percent of firms nationwide for women in Law 360 Rankings. The first two attorneys hired by the Firm out of law school, as opposed to laterals, were women – women who are still with the Firm and in management positions.[3]  The Firm established and supported a Diversity Task Force, a Women's Task Force, and a more focused Women's Success Initiative. For more than a decade, the Firm has been an important member of the Partnership for Attorney Retention, now known as the Alliance for Diversity and Flexibility, a

---

[3] Susan North is the long-serving head of the Firm's Williamsburg Office, which was opened by the Firm to entice her to return. Katja Hill was prominent in the 2013 Shareholder Realignment subcommittee, was offered the lead position in the Firm's Corporate Department and has been solicited for Lead Director of the Board of Directors

national organization dedicated to promulgating best practices for a gender-neutral and diverse workplace. The Firm's CEO not only attended but spoke at the national meetings, and Firm Board member Karol Corbin Walker – an African-American female Shareholder, long-time Firm Board member, and former President of the New Jersey Bar – is also active on behalf of LeClair Ryan.

Finally, women have some presence in the meaningful positions of authority at LeClair Ryan. Jennifer Mistal is the Chief Administrative Officer and was formerly Chief of Human Resources. The firm historically has had two departments; when a third department was created, it was headed by Anne Byrd.  Katja Hill, a rough contemporary of Craddock, has been with the Firm her entire career; has been on the Board of Directors since 2011; is on the Firm Policy Committee; on the Firm Communications Committee, and is the Managing Attorney ("Office Leader") for the Richmond office of the Firm. She is on the Board of Trustees of the LeClair Ryan Foundation and past Chair of the Board. Lori Thompson became General Counsel after Craddock left, but has long been liaison to the Firm for an important nationwide referral network; Susan North is firm liaison for another national network.

However, notwithstanding this culture, the application of the Firm's compensation policy has had a demonstrable disparate effect on women lawyers. The Firm's gross compensation data produced in this matter shows that, for years 2003-2016, the highest paid female shareholder each year was paid significantly less than the highest paid male shareholder each year.  For the 5 years before the 2013 *Colgate* fee recovery, the highest paid female shareholder in each year was paid 30% (2008), 25% (2009), 26% (2010), 27% (2011), 23% (2012) 41% (2014), 53% (2015) and 57% (2016) of what the highest paid male Shareholders were paid.

Excerpted LeClair Ryan production data from October 2011, which includes data showing working attorney, managing attorney hours and originating attorney production, when compared

with the 2012 total compensation data demonstrates that female shareholders with equal or better 2011 production numbers were paid less total compensation in the following 2012 year, than male shareholders with no better, or lesser, production.[4]

Review of the compensation paid to Craddock's two male peers in her 2013 entering shareholder class, Jeff Townes ($335,000) and Scott Bermack ($360,000), demonstrates that they were compensated more than Craddock ($212,000.) Male    Shareholders    who    handled contingency fee work (including unsuccessful contingency work), were not asked to reduce their base compensation as Craddock was. Craddock's male teammates in *Colgate*, John Craddock and Tom Wolf, were not asked to reduce their base 2015 compensation.

The Firm's subjective evaluation of the objective components of the Firm's Compensation Policy, viz., Craddock's average 3-year performance metrics for working attorney collections, managing attorney collections, and originating attorney collections resulted in the Firm's discounting those factors in deciding her 2014 compensation.   In determining Craddock's compensation for 2014, the Firm also discounted Craddock's extraordinary performance in 2010-

---

[4] Examples include:

| Name | 2011 Hours | Working | Managing | Originating | Total 2012 Comp |
|---|---|---|---|---|---|
| Karol Corbin-Walker | 1,750 | 666,000 | 1.2M | 1.8M | $338,000 |
| Steve Siller | 1,126 | 410,000 | 684,000 | 1M | $365,646 |
| Charles Sims | 1,830 | 951,000 | 1.6M | 373,000 | $523,000 |
| Steven Romine | 1,804 | 598,000 | 631,000 | 1.1M | $541,253 |
| ** | | | | | |
| Leslie Spasser | 1,668 | 600,000 | 635,000 | 397,000 | $228,586 |
| Robert Fletcher | 2,008 | 662,000 | 338,000 | 338,000 | $372,837 |
| James Kosch | 1,768 | 445,000 | 329,000 | 723,000 | $418,903 |
| ** | | | | | |
| Nancy Reimer | 2,321 | 466,000 | 1.1M | 1M | $203,600 |
| William Despo | 1,362 | 571,000 | 1M | 892,000 | $299,903 |
| Steven Siller | 1,126 | 684,000 | 684,000 | 1M | $365,646 |
| John Jessee | 2,095 | 438,000 | 1M | 1.4M | $400,551 |
| Steve Romine | 1,804 | 598,000 | 631,000 | 1.1M | $541,253 |

2013 with the *Colgate* case and refused to assign the Colgate origination credit to her when the originating attorney Sbertoli was fired by the client. In 2013, when Sbertoli's compensation for the year was reduced substantially by the Firm and he left the Firm, Craddock was then given the origination credit, but only for the contingency portion of the case.

On this record, we conclude, as Craddock contends, that, had the Firm followed its compensation policy, Craddock would have received a substantial raise in 2014 and that her 2014 salary is the result of intentional discrimination based on gender.

In reaching this conclusion, we considered Craddock's claims under the *McDonnell Douglas* framework. Under that framework, the Craddock as plaintiff must first establish a *prima facie* case of discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. 2742.). Once the plaintiff establishes her *prima facie* case, the Firm must respond with evidence that it acted with a legitimate, non-discriminatory reason. *See id.* at 506–07, 113 S.Ct. 2742. If the defendant makes this showing, the plaintiff must then present evidence to prove the defendant's articulated reason was pretext for unlawful discrimination. *See id.* at 507–08, 113 S.Ct. 2742. Although the evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). As the Supreme Court has recently reiterated, the ultimate issue in any discrimination case alleging disparate treatment is whether there was intentional discrimination, *St. Mary's Honor Center, et al. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and the claimant must prove that gender was the determining factor; that "but for" the employer's intent to discriminate on the basis of sex, she

would have not been adversely affected. *Clay,* 955 F.2d at 941; *Conkwright v. Westinghouse Electric Co.,* 933 F.2d 231, 234 (4th Cir.1991). *Green v. Fairfax Cty. Sch. Bd.,* 832 F. Supp. 1032, 1036–37 (E.D. Va. 1993), *aff'd,* 23 F.3d 400 (4th Cir. 1994) *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)

Because Craddock established a *prima facie* case of gender discrimination with statistics, the burden shifts to the Firm to offer a legitimate, nondiscriminatory reason for Craddock's compensation. *Love-Lane v. Martin*, 355 F.3d 766, 786–89 (4th Cir. 2004), citing *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). See also *McDonnell Douglas, supra*.

Accordingly, in response to Craddock's *prima facie* case, the Firm proffered in defense of its 2014 decision on Craddock's compensation, the Firm's declining financial condition, the budgetary constraints it faced, and the need for "profitability," and "durability," which the Firm contends Craddock's collections and origination credits did not establish.

It pointed to the untenable results of its automatic "raise culture" years and the need to reconsider its practices. The Firm missed its budget for the first time in its history, in 2011 while the Colgate case was pending, and again in 2012, due in large but not exclusively to the large number of uncompensated hours dedicated to *Colgate.* Most Shareholders suffered the loss of some or all of their "at risk" compensation. Many Shareholders had their compensation cut by six figures, including Doug Sbertoli, who originally brought in the *Colgate* clients and who, after his compensation was cut by $200,000, left the Firm. The *Colgate* recovery allowed the Firm to pay some, but not all, of the compensation the Shareholders lost in 2012.

The Firm also pointed to issues relating the Craddock's declining productivity post *Colgate.* The Firm related that, since joining the Firm, Craddock had been a hard worker, almost

17

always billing 2,200 hours per year or more. After the *Colgate* fee was paid in the middle of 2013, and Craddock's work effort fell off significantly.  Craddock's working hours in 2013 dropped from 2,251 to 1,124 and she worked half of the hours in 2013 that she worked in 2012.

On this record, we conclude the Firm has met its burden of production, having introduced evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the Firm's action to set Craddock's 2014 compensation that she challenges as discriminatory.  Its explanation is sufficient to shift the burden to Craddock, who must show that "the legitimate reasons offered by the defendant [s] were not [their] true reasons but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. As the U.S. Supreme Court explained, the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).

To address the Firm's proof of non-discriminatory reasons, Craddock again pointed to the data that establishes the Firm's compensation policy has had an established demonstrable disparate effect on female lawyers. The Firm's gross compensation data produced in this matter shows that, for years 2003-2016, the highest paid female shareholder each year was paid less than the highest paid male shareholder each year.

Craddock continued, pointing out that the Firm's budgetary problems and continuing financial shortfalls did not curtail its continuing payment of salaries to male lawyers whose collections did not cover overhead and expenses. She points out, for example that, notwithstanding the Firm's policy to the contrary, the Firm consistently disregarded the unprofitability of Meyer's

practice while it did not credit her profitable results in Colgate. The Firm's leadership acknowledged that the "raise culture" of "paying more in compensation than [it] should be paying… resulted in (the Firm's financial) shortfalls."   Yet, Craddock's 3-year average rolling averages were discounted in favor of the subjective (yet unprofitable) durability factor in Meyer's practice, and Craddock's objective record of profitable collections was negatively compared to that of Meyer's years of $8M originations and unprofitable results.  The Firm's willingness to pay Meyer's $1M+ compensation continued even in the period after the Firm acknowledged the losses incurred in his practice and that his $8M in annual originations were not profitable.

Cradock's evidence further shows that the Firm's failure to credit Craddock's average 3-year rolling performance metrics essentially nullified the effect of her performance in the 2010-2013 Colgate matter on her salary. The failure to follow the Firm's policy on the application of the objective factors in setting compensation was a serious deviation from its accepted process. Nowhere in the Firm's Compensation policy is it stated that the 3-year rolling averages may be disregarded or discounted or under what circumstances.  Moreover, the Firm's policy that, where performance is crucial to the success of the Firm and its clients, the value of that contribution must be simultaneously provide to the Firm, its clients and its "stars," is a subjective factor that was likewise not applied in Craddock's favor.

Under Title VII, the plaintiff at all times bears the "ultimate burden of persuasion." *See, e.g., Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citing *Burdine, supra*, at 256, 101 S.Ct. at 1095).   We conclude that Craddock's evidence has met that burden and establishes that the Firm's articulated "non-gender" reason for Craddock's 2014 pay reduction are pretext for gender discrimination. The Firm's discounting of the Compensation Policy's objective factors consisting of the 3-year rolling

averages data recording working attorney, managing attorney, and origination credit collections, not only affected the Firm's determination of Craddock's 2014 compensation, they are significant in the Firm's determination of the "durability" and "predictability" of Craddock's practice, two attributes that the Firm concluded, to Craddock's detriment, that her practice did not evidence.

Other than these objective, measurable, factors, the origination credit is the only other objective factor used by the Firm to set compensation. However, the Firm's origination credit policy requires the application of origination credits to the attorney who brings in the case. As testified by one woman partner, the policy makes it difficult for a more recently employed Shareholder to meet the durability and predictability standards that the Firm deems critical to both the determination of a Shareholder's compensation and the Firm's financial planning, particularly given the historic and current law practice environment, dominated by male participants with long-established practices. Such a policy may explain some of the disparate compensation effects on women lawyers that were documented in this case. Craddock was impacted by this policy in that she was not given credit for the *Colgate* case from the time that the clients fired the firm, refused to work with Sbertoli, the initial OA, and returned only with the assurance that Craddock would be responsible for the work as lead attorney.

When the objective 3-year rolling averages, policy was not applied in her case, it follows that the evaluation of Craddock's contributions to the Firm's Values and Goals was based on ill-defined subjective predicates. Yet, the important subjective measure regarding the critical contribution she made with the results in *Colgate* was not applied in her favor. The only year the firm made its budget was the result of the huge recovery in the *Colgate* litigation and appeal.

Accordingly, from the evidence regarding the way the Firm applied the compensation policy in Craddock's case, when viewed in the context of the data of long- established disparate

impact Craddock presented in her *prima facie* case, it is reasonable to infer intentional gender discrimination in the Firm's determination of her 2014 compensation.  As stated by the Supreme Court, "*a prima facie* case and sufficient evidence of pretext may permit a trier of fact to find unlawful discrimination, without additional, independent evidence of discrimination...." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Proof that the defendant's explanation is not the actual reason for its action or is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See *St. Mary's Honor Center, et al. v. Hicks,* 509 U.S.at*,* at 517. Once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. *148 Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration").

In reaching this conclusion, we acknowledge and credit the Firm's evidence relating the beneficial treatment it accorded Craddock, pointing out that she was favored by discretionary decisions of the Firm, including her promotion to Shareholder status a year earlier than is customary in the Firm and before any payment was received from *Colgate.*  Also, when Craddock sought to return to the Firm after brief voluntary departure, she was re-hired with no loss of seniority for promotion or compensation. In addition, after Sbertoli left the Firm in 2013, Craddock received the origination credits for the contingent portion of the *Colgate* case and received her $1.1-plus million bonuses as well, an exercise of the CEO's discretion.  However, that treatment,

21

as beneficial as it was, is not more compelling than the proved disparate effect of the compensation policy at issue here and the discounting of the objective factors in setting her 2014 compensation. A system's reliance on subjective factors requires close scrutiny of a gender-neutral application of the system's provisions. *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579 (8th Cir. 2006); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827-29 (6th Cir. 2000).

Although we find intentional gender discrimination in the 2014 compensation the Firm set for Craddock, we find the evidence does not establish it intentionally discriminated against her with respect to its 2015 compensation proposal for her.  The Firm acted in consideration of its on-going budgetary problems and Craddock's deteriorating work record in the preceding three years. In 2012, Craddock had originating attorney credits of $22,719. Her originations fell by 98% from 2013 to 2014. In calendar year 2013 -- the year after the *Colgate* trial, Craddock's working hours dropped from 2,251 to 1,124. She worked half the hours in 2013 that she worked in 2012.[5] In 2014, Craddock was "rarely seen" in the office her originating attorney collections were $171,574, and her working hours dropped to 874.  Craddock's collections were $118,000, the firm's overhead per attorney was approximately $180,000 and her total compensation was about $273,000. Therefore, LR lost about $340,000 on Craddock in 2014.

The Firm missed budget again in 2014 and many Shareholders again were not paid part or all of the contingent portion of their compensation. Several attorneys, including male Shareholders whose performance was comparable to Craddock's 2014 performance, were fired. Other male Shareholders saw their compensation cut by six figures.

---

[5] Craddock and her team, including Tom Wolf and John Craddock, tried the Colgate matter during the period May - June, 2012, judgment in favor of the Colgates was entered on August 30, 2012, and final settlement completed on August 22, 2013.

In 2014, the Firm began using performance-based pay plans for Shareholders, which provided either a draw plus a percentage of collections, compensation based on hours worked, or compensation based solely on a percentage of collections. About seven to ten percent of the Firm's Shareholders, most of them male, were already on similar plans.    In Craddock's submission of her 2015 Individual Accountability for Revenue Metrics Used to Determine Revenues on October 14, 2014, Craddock estimated that she would collect $450,000 on her working attorney and originating attorney time– however, adding the caveat, "provided I have the work" and noting that it was "difficult to determine what her working attorney and origination attorney collections for Calendar year 2015 would be."  She also testified that the productivity projections she provided for 2015 were dependent on the outcome of her contingent fee cases.

Given these circumstances, to determine Shareholders' compensation for 2015, the Firm sought to address Craddock's compensation in light of the Firm's continuing financial difficulties, Craddock's collections projections and the nature of her practice, which was primarily a contingency fee-based practice at that time, as reflected in the 2014 Revenue Metrics form she submitted for the Firm's consideration.   Craddock was asked to propose a mixed compensation system that would combine a salary with a substantial upside if any of her contingent fee cases resulted in substantial remuneration or if she began billing as many hours as she had before the *Colgate* case.

Craddock never responded to the Firm's request that she make a compensation proposal. For its part, LeClair Ryan proposed in mid-January 2015, an "incentivized compensation" whereby Ms. Craddock's 2015 Shareholder compensation would comprise a base salary augmented by a percentage of all fees received as a result of her working collections and originations during 2015. The proposal would have guaranteed her over $20,000 more than she actually received in 2014,

regardless of her effort or results. All "contingent" or "at-risk" factors were removed, and she faced the possibility of a substantial upside with no limit, if she had a good year in 2015 – the provisions for "additional compensation" kicked in at a level of work that she had often exceeded pre-*Colgate* and that were less than her own predictions for 2015. The 2015 compensation proposal to Craddock provided for the same regular salary -- $177,750 -- as was paid in 2014. It also guaranteed her a retention incentive payment of $23,700 in 2015 that Craddock did not receive in 2014. The 2015 compensation proposal only removed the at-risk components of Craddock's compensation; the at-risk payments were not received by Craddock (or any other Shareholders in 2014) because the firm did not meet its budget for the year.

This approach to Craddock's 2015 compensation was suggested by her friend, Tom Wolf, who had advised the Firm in 2014 that he believed Craddock had been treated unfairly with respect to the *Colgate* origination credits and believed the Firm should make an exception to the policy because "the *Colgate* case was so big, made so much money for the firm that even if her production was way off, . . . the firm should  treat her differently than they would treat somebody else because she brought in --- she originated the fee that was twice as big as  any fee in the history of the firm." He did not support a reduction in Craddock's compensation in 2015 and, instead, recommended the Firm propose the "incentivized compensation" approach that was ultimately presented to her. Craddock eventually appealed the 2015 proposal offered by the Firm but resigned from the Firm the next day, before the Appeal could be considered.

While Craddock believed her proposed 2015 compensation should have been higher, between one third and one half the Firm's Shareholders experienced a compensation reduction that year, and the result included the Firm's termination of two male Shareholders whose performance had dropped, along with two to three non-equity partners, and three to four associates

Under the "forward-looking" system the Firm had put in place and, considering the Firm's continuing financial constraints as well as Craddock's financial metrics and projections for collections in 2015, the Firm's proposal of a compensation package that would have increased her guaranteed income and allowed for a flexible upside was reasonable. We, thus, find that the Firm's mixed compensation system in which Craddock would share both the risks and the benefits of her evolving practice was not an act of intentional gender discrimination.

We also find that Craddock proved that she suffered emotional distress as a result of the intentional gender discrimination she experienced in her employment in 2014.  Expert witnesses for both parties agreed that her emotional distress was the effect of her employment. Craddock's expert, Scott W Sauter, a licensed Clinical Psychologist, described her condition as a "temporary adjustment disorder with anxious mood." In his report, Dr. Sautter concludes that Craddock had "few, if any, psychological concerns before the conflict at work began in early fall of 2014 with substantial increase in generalized anxiety, sleep disturbances and cognitive compromise through spring of 2015 . . ." At the time of his evaluation, he noted "a decrease in severity, but with remaining intrusive thoughts and defensive avoidance."  Accordingly, an Award for the emotional distress Craddock experienced as a result of the Firm's gender discrimination in compensation will be made.


### III.

### PAY DISCRIMINATION UNDER THE EQUAL PAY ACT
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under the Equal Pay Act,

"[n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment within which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of

the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production or (iv) a differential based on any other factor other than sex …."
29 U.S.C. § 206(d)(1).

The EPA is a 1963 amendment to the Fair Labor Standards Act, prohibiting unequal pay for equal work, that is, work requiring substantially equal skill, effort and responsibility. *Corning Glass Works v. Brennan*, 417 U.S. 188, 203 fn. 24 (jobs must be "substantially" similar to fall within the EPA). Proof of EPA violations requires that (1) different wages are paid to employees of the opposite sex; (2) the employees perform substantially equal work on jobs requiring equal skill, effort and responsibility and (3) the jobs are performed under similar working conditions. See B*rinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir. 1999). At the EPA's enactment, Congress announced its "concern for the weaker bargaining position of women" in addressing pay structures that reflect an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman. See 29 CFR § 1620.1. The EPA must be "broadly construed" to achieve Congress' goal of remedying sexual discrimination in pay. *Corning Glass Works v. Brennan,* 417 U.S. 188, 208 (1974) The EPA has no intent requirement. It is a strict liability statute.[6] ).

Comparator analysis utilized to prove an EPA claim, is confined to comparisons between male and female employees in a single establishment, unless "unusual circumstances" require otherwise. 29 C.F.R. § 1620.9(b). *Strag v. Board of Trs.,* 55 F.3d 943, 948,950 (4th Cir. 1995)(citing *Soble v. Univ. of Maryland*, 778 F.2d 164 (4th Cir. 1985)). Substantially equal skill,

---

[6] By comparison, Title VII requires proof of gender-based intent, but not the level of showing of substantial equality or the identification of a specific male comparator. See Gunther, 452 U.S. at 168. As such, an EPA plaintiff need not prove that the employer's asserted non-gender reasons are pretext, as that is a Title VII analysis and the EPA is a strict liability law

effort and responsibility should be an inquiry into the overall job content. The comparison is whether the jobs require equal skills, not whether the employees possess equal skills. See 29 C.F.R. § 1620.15(a). With respect to professionals, substantially equal skill, effort and responsibility can include professional certifications, but more importantly reviews the job requirements and performance." See 29 C.F.R. § 1620.13(e); *King v. University Healthcare Sys.,* 645 F.3d 713, 724 (5th Cir. 2011) (hospital violated EPA by failing to pay female anesthesiologist bonus similar to that paid to male colleague, where jobs required substantially equal skill, effort and responsibility, despite differing certifications and qualifications – relevant issue is "actual job requirements and performance"); see also *Brinkley v. Randolph Cent. Sch. Dist.,* 180 F.3d 598, 620 (4th Cir. 1999).

An employer may avoid EPA liability by proving one of the four statutory affirmative defenses, payments made pursuant to (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex […]. But the affirmative defenses of a bona fide incentive system based on quantity or quality of work and 'factors other than sex' must be actually and consistently applied for the defenses to apply – they must be proven to be gender neutral and require showings of substance over form. See 29 U.S.C. § 206(d)(1). Merit systems that rely heavily on subjective factors require closer scrutiny of the gender-neutral application of the system's provisions. See *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579 (8th Cir. 2006) (rejecting employer's explanation that male bank officer's higher salary was justified by concern that he would be recruited by other employers); *Brock v. Georgia Southwest Col.,* 765 F.2d 1026, 1036 (11th Cir. 1985) (college's affirmative defense failed where merit system operated in unsystematic manner and allowed factors such as personal opinion and ill-informed views of experience to affect pay setting process); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827-29 (6th Cir. 2000) (rejecting

27

employer's merit system defense where evidence showed that, rather than being based on a neutral system of merit based pay on anonymous peer evaluations, it was "driven largely by an opaque, decision making process at the administrative level that did not necessarily reflect peers' assessment of performance and rewarded men disproportionately to women

On her Equal Pay Act claim, Michele Craddock bears the burden to claims that she has been subjected to unequal pay based on her sex, within an establishment, compared to male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility. These male employees are referred to as "comparators." *Strag v. Board of Trs., at* 948. It is well settled that, to meet her burden under the Equal Pay Act, Ms. Craddock "must identify a particular male 'comparator' for purposes of the inquiry and may not compare herself to a hypothetical or 'composite' male." *Id.* at 948; *see also Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004), *cert. denied,* 544 U.S. 1032 (2005) ("[t]he comparison to the male employee…cannot be made to a hypothetical male with a composite average of a group's skill, effort, and responsibility'); *Ford v. E-Systems, Melpar Div.*, No. 94-1013, 1994 U.S. App. LEXIS 25532, at *2 (4th Cir. Sep. 14, 1994) (the plaintiff must identify a particular male comparator; she may not compare herself to a hypothetical male); *Houck v. Virginia Polytechnic Inst.*, 10 F.3d 204, 206 (4th Cir. 1993) ("[t]he plaintiff may not compare herself to a hypothetical male with a composite average of a group's skill, effort, and responsibility, but must identify a particular male for the inquiry"); *EEOC v. Liggett & Myers, Inc.*, 690 F.2d 1072, 1076-78 (4th Cir. 1982). "In interpreting the EPA, 'equal means substantially equal.' In enacting the EPA, Congress chose the word 'equal' over the word 'comparable' in order to show that the jobs involved should be virtually identical …." *Wheatley,* 390 F.3d at 333 (4th Cir. 2004). Any disparity must be demonstrated by a "factor-by-factor" comparison to the specific male comparator. *Houck,* 10 F.3d at 206. Thus,

when assessing comparators, job titles or positions are not dispositive. 29 C.F.R. § 1620.13(e). Even where jobs may have the same core responsibilities, they are not equal if the higher-paid job "require[s] extra effort, consumes a significant amount of time … and [is] of an economic value commensurate with the pay differential." *Wheatley,* 390 F.3d at 333. Further, in interpreting the Equal Pay Act, "[s]kill includes such considerations as experience, training, education and ability." *EEOC v. Universal Underwriters Ins.,* 653 F.2d 1243, 1245 (8th Cir. 1981); 29 C.F.R § 1620.15(a). "Effort" includes such factors as the number of hours worked, and the total requirements of the job. 29 C.F.R. § 1620.16(a); *Collins v. Landmark Military Newspapers,* 2007 U.S. Dist. LEXIS 57572 (E.D. Va. Aug. 6, 2007). Additionally, the "relative supervisory responsibilities of the comparator and the Plaintiff affect whether the work performed is substantially equal." *Id.* In short, to be considered a proper comparator under the Equal Pay Act, the jobs must be "virtually identical." *Spencer v. Virginia State Univ.,* 2017 U.S. Dist. LEXIS 51673 (E.D. Va. April 4, 2017) Fringe benefits are to be considered as part of wages for Title VII wage comparison purposes. *Arizona Governing Comm'n v. Norris*, 463 U.S. 1073, 1079 ("There is no question that the opportunity to participate in a deferred compensation plan constitutes a '[condition] or [privilege] of employment.") As such, imposing a glass ceiling over which only males, and not females, may attain levels of compensation entitling shareholders to certain fringe benefits is unlawful.

Michele Craddock's claim under the Equal Pay Act is denied. Craddock relied on composite data of male shareholders' compensation to establish the comparison of unequal compensation she sought to make. She did not "identify a particular male 'comparator' for purposes of the inquiry," *Strag v. Board of Trs., supra* at 948; see also *Wheatley v. Wicomico Cty.*, *supra* at 333 ("[t]he comparison to the male employee…cannot be made to a hypothetical male

with a composite average of a group's skill, effort, and responsibility'"').   As a matter of law, such evidence is insufficient to support a claim under the Equal Pay Act.

Furthermore, to the extent Craddock contends that Charlie Meyer and Doug Sbertoli are sufficiently identified to meet the legal definition of "comparators," we disagree.   There is no evidence in the record from which we can determine that their skills, efforts or responsibilities were "substantially equal," as defined and required by the relevant law, to those that characterized Craddock's work as a lawyer in LR's firm. Moreover, "[i]solated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a *prima facie* inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." *Houck v. Virginia Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206–07 (4th Cir. 1993) ("As this court has recently pointed out in the Title VII context, isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a *prima facie* inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees, citing *Cook v. CSX Transportation Corp.,* 988 F.2d 507, 511-512 (4th Cir.1993).   In short, we find that Michele Craddock has not established she was discriminated against in violation of the Equal Pay Act.

## IV.

### CRADDOCK'S RETALIATION/CONSTRUCTIVE DISCHARGE CLAIM FINDINGS OF FACT AND CONCLUSIONS OF LAW

Craddock claims LeClair Ryan retaliated against her and unlawfully constructively discharged her from employment premised on the following sequence of events.   On November 7, 2014, Craddock sent an email to Eric Gustafson, the head of her department and Freinberg, the

firm's CEO, asserting claims of gender-based discrimination resulting from a proposed reduction in her base pay.   Craddock's email was in response to ongoing discussions regarding her compensation and the firm's acceptance of a new contingency case she brought to the Firm (the Meuse contingency case). Thereafter, Craddock contends Gustafson, and Freinberg ceased contact with her, although she remained an employee and had pending issues requiring firm response. Craddock submitted her resignation on February 2, 2015, (effective March 4, 2015) and contends the resignation was not voluntary and that she was constructively discharged because the circumstances of her work had become intolerable.

Title VII makes it unlawful for an employer to retaliate against an employee because she has "opposed" any practice made an unlawful employment practice by Title VII or "participated" in the EEOC process by filing a Charge of Discrimination with the EEOC. See 42 U.S.C. § 2000e-3(a). The EPA, likewise, prohibits an employer from retaliating against an employee because they have made a complaint related to the EPA. See 29 U.S.C. § 215(a)(3).[7] Craddock's burden of proof is to show that but/for her protected activity, she would not have suffered adverse action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2515, 2528-29 (2013).   An internal complaint of gender discrimination made by an employee to an employer is "protected activity" within the meaning of Title VII and the EPA. *See Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009), *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 432 (4th Cir. 2012) (analyzing under FLSA, same retaliation section as EPA).

---

[7]The doctrine of constructive discharge does not exist under the Equal Pay Act. *See Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1082 (8th Cir. 1999) (noting that "[u]nder the Equal Pact an employee may recover for…constructive discharge only when it is in retaliation for the employee's filing of a complaint); *Shields v. United States Postal Serv.*, No. 16-cv-02517-CBS, 2017 U.S. Dist. LEXIS 132384, at *5-6 (D. Colo. Aug. 18, 2017) (finding that a claim of constructive discharge "alone would…not justify relief under the Equal Pay Act).

A *prima facie* case of retaliation may be established by showing: (i) that claimant engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the adverse employment activity. *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015).     Retaliation under Title VII is not limited to ultimate employment actions and includes any action a reasonable employee would find as materially adverse, that is, "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination…. Context matters…" *Burlington Northern and Santa Fe RR Co. v. White*, 548 U.S. 53, 68 (2006).   Under Title VII, a resignation may be treated as a termination of employment if the resignation is not "voluntary" – where an employer's intentional discriminatory conduct resulted in an employee being "subjected to circumstances 'so intolerable that a reasonable person would resign.'" *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 143-44 (4th Cir. 2017) (citing *Green v. Brennan*, 136 S. Ct. 1769, 1779, 195 L. Ed. 2d 44, 54 (2016)); see also *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004).

The standard is one of "objective intolerability." *Consol Energy, Inc.*, 860 F.3d at 143-45; *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006); *Matvia v. Bald Head Management*, 259 F.3d 261, 272 (4th Cir. 2001); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). Thus, a constructive discharge, if proved, satisfies the "adverse action" prong of the claim and is a critical element of proof in Craddock's claim of retaliation under Title VII s*ee Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995). Although a claim of constructive discharge no longer requires that an employee show the employer intended to force a resignation, the employer's actions must still have been intentional and deliberately discriminatory. *See Stennis v. Bowie State Univ.*, No. 17-1345, 2017 U.S. App. LEXIS 26672, at *4-5 (4th Cir. Dec. 27, 2017) (requiring employee to show deliberateness of employer's actions);

*Melendez v. Bd. of Educ.*, No. 17-1116, 2017 U.S. App. LEXIS 19773, at *5 (4th Cir. Oct. 10, 2017) (same); *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 753 (11th Cir. Apr. 26, 2017) (requiring that "an employer deliberately make [] an employee's working conditions…unbearable).

In analyzing intolerability, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

Based on this record, Craddock's claims of being isolated from the firm's business and excluded from internal firm communications on matters she was engaged in are not sufficient to support a conclusion of "intolerability." "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (citations omitted) *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68, 126 S. Ct. 2405, 2414–15, 165 L. Ed. 2d 345 (2006). "[C]o-worker ostracism, denial of a management position," "dissatisfaction with work assignments, a feeling of being unfairly criticized," and "difficult or unpleasant working conditions" insufficient to establish objective intolerability. *Matvia*, 259 F.3d at 273; *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

We also do not find the evidence regarding how the Firm addressed what Craddock viewed as an "unwaivable conflict in the Yawkey matter" or the Firm's proposed reduction in compensation that followed her internal report of discrimination is sufficient to establish constructive discharge.

The ethical dilemma that arose in the Yawkey case was in the process of being resolved, both by Craddock and the Firm, when Craddock resigned. No evidence showed that LR's Chief Legal Officer Bruce Matson's actions in addressing the ethical issues in Yawkey that Craddock raised and her concerns about the risks she might be facing were intentionally discriminatory. Further, we find the steps Matson took to determine the necessity and propriety of withdrawing from the Yawkey matter were reasonable and related to solving the ethics claim Craddock raised and do not reflect discriminatory animus against her.  He retained ethics counsel to conduct an independent investigation of the matter and acted to withdraw the firm and Craddock from representation in the matter when the legal examination of the matter was concluded. Craddock had also retained ethics counsel with whom Respondent's ethics counsel conferred, but Craddock resigned before both ethics attorneys reached a conclusion on the Yawkey ethics issue.

Further, Craddock's contention that the 2015 compensation proposal the Firm offered made her continuing employment by the Respondent intolerable is also unavailing. The compensation proposal was never finalized.  Craddock refused Respondent's November 2014 invitation to discuss the plan, which guaranteed Craddock a substantially higher total compensation than she received in 2014, was performance based, and in the process of being reviewed on appeal by one of LR's senior partners, whom Craddock described as a "neutral decision maker" and whom she had no reason to believe bore discriminatory animus based on gender.  Craddock resigned on February 2, 2015, three days after she submitted her appeal of the plan.[8]

---

[8] *See also Cooper v. Smithfield Packing Co.,* No. 17-1002, 2018 U.S. App. LEXIS 5572 (4th Cir. March 5, 2018) at 13-14 (resignation just days after complaint, before employer "could provide any meaningful redress;" no hostile environment claim, constructive discharge claim dismissed on other grounds).

We find that the evidence submitted to establish that LR intentionally made Craddock's working conditions intolerable does not support the conclusion that a reasonable person in Craddock's employment position would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004). We find that the evidence submitted in this issue does not establish the Respondent's conduct in responding to the ethical issues raised in Yawkey were "intentional and deliberately discriminatory." See *Melendez v. Bd. of Educ.*, No. 17-1116, 2017 U.S. App. LEXIS 19773, at *5 (4th Cir. Oct. 10, 2017); Zarza *v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 753 (11th Cir. Apr. 26, 2017) (requiring that "an employer deliberately make [] an employee's working conditions…unbearable").

Craddock's claims of retaliation and constructive discharge are, therefore denied.

**ACCORDINGLY,** LeClair Ryan's Request for DECLARATORY JUDGMENT seeking Declaration that the provisions of Title VII  to the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. including the   Lilly Ledbetter Fair Pay Act of 2009) and the Equal Pay Act of 1963, 29 U.S.C. § 209(d), et seq ("EPA"), as well as the retaliation claim, are not applicable to Respondent Michele Burke Craddock  was denied in part and granted in part, as further reflected in the INTERIM AWARDS made and entered herein.

An **INTERIM AWARD** in favor of Michele Burke Craddock with respect to her claim of intentional discrimination in her 2014 compensation in violation of Title VII was entered on June 15, 2018, in the amount of TWO HUNDRED SEVENTY-FOUR THOUSAND, SEVEN HUNDRED FORTY-EIGHT DOLLARS ($274,748.00,)[9] plus interest, attorney's fees, and the costs incurred in this arbitration.

---

[9] The AWARD for this claim in the amount of $274,748.00 is the difference between the loss Craddock's expert calculated she suffered for both the 2014 and 2015 fiscal years and the loss calculated for fiscal year 2015 alone, viz., ($325, 929.00 minus $51,183.00).

An **INTERIM AWARD** was entered in favor of LeClair Ryan, LLP with respect to Michele Burke Craddock's claim of intentional gender discrimination in her 2015 compensation claim.

An **INTERIM AWARD** in favor of Michele Burke Craddock based on her claim of emotional distress suffered as a result of the intentional gender discrimination by LeClair Ryan, LLP was entered in the amount of TWENTY THOUSAND DOLLARS ($20,000.00).

Further determinations regarding attorneys' fees, costs, and interest, contained in this Final Award, are based on the parties' written submissions.

## V. FEES, COSTS, AND INTEREST

The parties have filed, and the Panel has considered, Michelle Burk Craddock's Brief In Support Of an Award of Attorney's Fees And Costs; LeClairRyan's Opposition To Craddock's Request For Award Of Attorney's Fees And Costs; and Michelle Burke Craddock's Reply Brief In Support Of An Award Of Attorney's Fees And Costs. The Panel also considered the exhibits, including time sheets, declarations, and attachments to these pleadings.

Asserting that she is the "prevailing party" in this matter, Craddock grounds her claim on the provisions of 42 U.S.C. Section 2000e-5(k): "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee (including expert fees) as part of the costs …. Craddock also claims that she is entitled to interest at a rate of six percent pursuant to Virginia Code Section 6.2-302. Craddock finds support for this rate in case law: *Brown v. Mountainview Cutters*, *LLC*, 222 F. Supp. 3d 504, 511 (W.D. Va. 2016; *and Reed v. Dep't of Corrections*, 2014 U.S. Dist. LEXIS 157822*9 (W.D. Va. Nov. 7, 2014). LeClair does not challenge Craddock's claim that this Panel may exercise its discretion to award the Virginia statutory rate of interest.

### A.  The Standard To Be Applied To Determine The Award Of Attorneys' Fees

The U.S. Supreme Court has held that an award of attorneys' fees and costs shall be determined using a "lodestar" analysis. The lodestar amount representing the proper attorneys' fee award made pursuant to statute is the product of the reasonable number of hours expended times the reasonable attorneys' hourly rates. *Perdue v. Kenny*, 559 U.S. 542, 130 S.Ct. 1662 (2010).  In *Perdue*, the Supreme Court adopted the so called "lodestar method," or "lodestar approach," for determining an award of legal fees in cases involving fee-shifting statutes, counseling that it "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 550-552, 130 S.Ct. at 1671-72 (*italics in original*).

In a fee-shifting context, the lodestar method requires an analysis of both the number of hours spent by an attorney in representing a client as well as the hourly rate charged for each hour of time. It is determined by multiplying the hourly rate by the number of hours, after it has been determined that the hourly rate and the number of hours spent are reasonable. *Blum v. Stenson*, 456 U.S. 886, 897, 104 S.Ct. 1541 (1984).

Until *Perdue* was decided, many courts applied twelve factors to evaluate the reasonableness of awards of attorneys' fee. *Johnson v. Georgia Highway Express Inc.*, 488 F2d 714 (5th Cir. 1974). The Fourth Circuit was among them. *See Barber v. Kimbrell's Inc.*, 577 F.2[nd] 216 (4th Cir. 1978).  The *Johnson* factors include the following: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation: (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the

results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber*, 577 F.2nd at 226, n. 28.

In *Perdue*, the Supreme Court seemed to undermine the use of the so-called *Johnson* factors, as they were applied by the courts to determine the reasonableness of awards of legal fees in fee-shifting cases. The Court asserted that the *Johnson* factors "gave very little guidance to district courts" in awarding legal fees, "placed unlimited discretion in trial judges," and "produced disparate results." *Perdue*, 559 U.S. at 550-52, 130 S.Ct. at 1671-72.  The Court went on to state its intention to seek to "cabin" the discretion of the district courts that often followed upon the application of the "sometimes subjective" *Johnson* factors, by embracing the "lodestar approach," used by the Third Circuit in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 478 F. 2nd 161 (1973), appeal after remand, 540 F.2d 102 (1976). The Court noted that the "lodestar approach" achieved dominance after it decided *Hensley Gisbrecht v. Barnhard*, 535 U.S. 789. 801, 122 S.Ct. 1817 (2002). *Id.* at 559 U.S. 550-52, 130 S.Ct. at 1671-72.  As the Court put it in *Perdue*, since *Gisbrecht*, the lodestar has become "the guiding light of our fee-shifting jurisprudence." *Id.* at 559 U.S. 550-52, 130 S.Ct. at 1671-72. When it adopted the lodestar approach, the Court announced a strong presumption that the lodestar figure is reasonable in fee shifting jurisprudence, but it went on to state that the presumption may be overcome in rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee. *Id.* at 559 U.S. 554, 130 S.Ct. at 1673.

The 4th Circuit follows the "lodestar approach," while continuing to apply the *Johnson* factors to determinations regarding the reasonableness of the hourly rates claimed and the number

38

of hours spent by attorneys in cases involving fee-shifting inquiries. *McAfee v. Boczar,* 738 F.3d

81 (4th Cir. 2013), as amended (Jan. 23, 2014).  The *McAfee* court has identified the basis for a

proper calculation of an attorney's fee as a three-step process:

> "First, the court must 'determine the lodestar figure by multiplying the number of
> reasonable hours expended times a reasonable rate.' *Robinson v. Equifax Info.
> Servs., LC,* 560 F.3d 235, 243 (4th Cir. 2009). To ascertain what is reasonable in
> terms of hours expended and the rate charged, the court is bound to apply the factors
> set for the in *Johnson v. Georgia Highway Express Inc..* 488 F.2d 714, 717-19 (5th
> Cir. 1974) Id. at 243-44. Next, the court must "subtract fees for hours spent on
> unsuccessful claims unrelated to successful ones." *Id.* at 244. Finally, the court
> should award "some percentage of the remaining amount, depending on the degree
> of success enjoyed by the plaintiff." *McAfee v. Boczar*, 738 F.3d at 88.

With the foregoing analysis in mind, we conclude that the "lodestar approach," announced

in *Perdue v. Kenny*, 559 U.S. 542, 130 S.Ct. 1662 (2010), must be applied in a manner consistent

with the three-step process set out in *McAfee,* 738 F.3d at 81. This conclusion necessarily requires

consideration of the *Johnson* factors in order to determine the "lodestar." Guided by these

precedents, the inquiry that follows is calculated to lead to a proper award of attorneys' fees and

costs.

### B.   The Lodestar Analysis

Craddock's legal team in this matter included the following time keepers, with hourly rates

times number of hours spent included: Harris D. Butler III ($500.00 per hour times 1,055 hours

for a fee total of $527,000.00); Paul M. Falabella ($315.00 per hour times 529.40 hours for a fee

total of $166,761.00); Paralegals ($135.00 per hour times 280.70 hours for a fee total of

$37,894.50); and Law Clerks ($100.00 per hour times 208 hours for a fee total of $20,800.00).

Litigation costs total $56,846.63. In addition, in her Brief In Support, Craddock's legal team

anticipated that additional legal fees and costs related to the preparation and filing of her Reply

would amount to $15,995.00 and $180.00 respectively.

Craddock contends that the sums of $753,055.50, plus $15,995.00, for a total of $769,050.50, represent the lodestar amount to which she is entitled. However, Craddock proposes a voluntary 10% reduction of this amount, which reduces her claim by $76,905.05, or to $692,145.45.

Craddock goes on to claim that she is entitled to an enhancement of 25% of the lodestar amount, or $173,036.00. Applying the percentage enhancement to the claimed lodestar amount, Craddock reaches her final amount of attorneys' fees claimed: $865,181.00.

Craddock's costs are $56,846.63, plus $180.00, for a total of $57,026. Craddock reduces her claim for costs by $6,089.50, the amount of costs associated with her legal ethics expert. Thus, her final claim for costs amounts to $50,937.13.

LeClair does not seriously contest the reasonableness of the hourly rates of the attorneys, legal assistants, and law clerks who represented Craddock. Nor does LeClair dispute the staffing decisions made by Craddock's attorneys, including the number of time keepers (attorneys, legal assistants, and law clerks), and the number of hours spent by each time keeper who logged billable hours while working on this matter.

Craddock has also offered, for the Panel's consideration, the Declaration of her attorney, Harris D. Butler III, as well as the Declarations of attorneys David E. Nagle, Carla D. Brown, and Thomas M. Lucas. These declarants support a finding that the hourly rates of Craddock's attorneys, legal assistants, and law clerks are reasonable, that the number of hours spent by these time keepers is reasonable, and that the staffing of Craddock's legal team, that is, the number of time keepers, is reasonable. Craddock also offers that her legal team made contemporaneous time entries and took care not to record time that was deemed excessive at the time of entry. Craddock's attorneys

have provided excellent documentation in the form of time sheets that identify each timekeeper, his or her hourly rate, the task performed for each time entry, and the time spent on each task.

LeClair has not provided declarations in response to the declarations offered by Craddock. Thus, the unrebutted declarations offered by Craddock demonstrate the following Johnson factors have been satisfied: her attorneys have substantial experience, enjoy excellent reputations within the legal community, and are possessed of exceptional ability; the time and labor expended by them are appropriate and reasonable; and they have the skill required to properly perform the legal services they have rendered.

Accordingly, the lodestar analysis leads to the conclusion that Craddock is entitled to an award of attorneys' fees in the amount of $769,050.50 (without application of her proposed 10% deduction).

C.  Consideration of Unsuccessful Claim

Next, we turn to the subtraction of fees spent on unsuccessful claims unrelated to successful ones. At the outset, certain claims have been identified which should be deducted for lack of success. These include two matters that Craddock prosecuted in federal court before the Panel was appointed: first, her efforts to preserve the testimony of Marion J. Colgate by taking his pre-suit deposition; and second, her attempt to defeat the arbitration clause in the partnership agreement after filing suit in the U.S. District Court for the Eastern District of Virginia.

These two matters are outside the scope of the matters to which this Panel's attention was directed by the partnership's arbitration clause. Also, Marion J. Colgate's deposition proved to be unnecessary to Craddock's case because she was able to use the testimony of his son, Curtis Colgate, at the arbitration hearing. Finally, Craddock was unsuccessful, both in her efforts to obtain

a court order permitting her to take the proposed deposition as well as in her attempt to prosecute the claims, ultimately decided here, in the district court.

Accordingly, after applying the applicable *Johnson* factors, especially the results obtained, the Panel deducts from the lodestar amount the sum of $3,875.00 in fees and $65.22 in costs, all incurred in connection with Craddock's unsuccessful effort to perpetuate the testimony of Mr. Colgate; and the Panel also deducts from the lodestar amount the sum of $87,024.00 in fees and $2,379.27 in costs, all incurred in connection with Craddock's attempt to defeat the arbitration clause that ultimately led to proceedings before this Panel.

At this point in our analysis, we find that Craddock's attorneys' fees claim, without recognizing her voluntary 10% reduction and her requested enhancement, amounts to $769,050. After deducting the attorneys' fees spent in her pursuit of the Marion Colgate deposition as well as the attorneys' fees spent in her effort to have this dispute determined in the district court, her attorneys' fees claim comes to $678,899.50 ($769,050.50 minus $90,899.00). Also, accepting Craddock's offer to deduct that portion of her claim for costs related to her legal ethics expert ($6,089.50), we observe that her claim for costs amounts to $50,937.13. Deducting those costs associated with both the Colgate deposition and federal court proceedings, her costs come to $48,492.64 ($50,937.13 minus $2,444.49).

At this point in our analysis, we apply two *Johnson* factors: the amount in controversy and the results obtained; and the novelty and difficulty of the questions raised. These factors bear on the claims pleaded by Craddock and the damages awarded on those claims.

It is clear that Craddock was not successful in a number of respects. She pleaded claims of gender discrimination in violation of Title VII; gender discrimination in violation of the Equal Pay Act; retaliation in violation of Title VII; and retaliation in violation of the Equal Pay Act. The

Panel awarded damages for gender discrimination with respect to her compensation at her law firm in 2014. Craddock sought both compensatory and punitive damages as well as last wages in an amount in excess of $4,000,000. The Panel awarded $274,748.00 in back pay for the year 2014 and compensatory damages of $20,000.

Craddock's limited success on the claims asserted and the damages awarded justify a reduction in claimed attorneys' fees. However, this reduction must be tempered by the novelty of case, which involved her challenge to entrenched gender-based discrimination in the compensation practices of a well-known and long-established law firm. Accordingly, the Panel concludes that a reduction in attorneys' fees of 20% lack of success is appropriate. Applying this factor to the lodestar amount adjusted above, the amount of attorneys' fees is $543,099.60 ($678,899.50 minus 135,779.90).

## D. Incentive Adjustment

Finally, the Panel considers awarding some percentage of the above calculated amount ($543,099.60) to reflect the degree of success Craddock achieved in this matter. In its analysis, the Panel looks to the *Johnson* factors that relate to the skill required of the attorneys who prosecuted this case, their opportunity costs in pressing the instant litigation, and the undesirability of this case within the legal community. Craddock chose to prosecute gender discrimination claims against the law firm where she was a female partner. Her case was unique, presenting difficult challenges. A favorable outcome was not at all certain. Craddock's success depended on securing highly skilled and experienced counsel who were willing to forgo other opportunities in order to represent her. A case involving gender-based discrimination claims against a highly competent law firm is clearly an undesirable undertaking within the legal community.

The fee shifting provisions to which Craddock resorted in this case are intended to encourage counsel to accept cases that advance the public policy that underscores the remedial purpose of the federal statutory scheme. It is appropriate to reward counsel in such a case not only for the risk undertaken, but also to encourage other attorneys to take on like cases.

The Panel finds, after due consideration, that the appropriate degree of success percentage to award here is 25%. Thus, the final award of attorneys' fees in this matter is $701,076.41 ($543,099.60 plus $257,976.81). The Panel also awards the sum of $48,492.64 in costs.

Taking into account the Interim Award previously published in this matter and, in consideration of the foregoing analysis, our Final Award is as follows:

1). Damages in the sum of $274,748.00, representing an award of back pay, and compensatory damages in the sum of $20,000, plus interest on these sums compounded at a rate of 6% from January 1, 2015.

2. Attorneys' fees in the sum of $701,076.41, and costs in the sum of $48,492.64, with interest at a rate of 6% from the date of this award.

DATE: September 24, 2018

Hon. Rosemarie Annunziata (ret.)
Chair

Linda R. Singer, Esq.

Hon. F. Bradford Stillman (ret.)

## PROOF OF SERVICE BY E-Mail

Re: LeClairRyan, A Professional Corporation vs. Craddock, Michele Burke (AAA)
Reference No. 1410007364

I, Erika Holland, not a party to the within action, hereby declare that on September 26, 2018, I served the attached Final Award on the parties in the within action by electronic mail at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Ms. Tanisha Mitchell
American Arbitration Association
2200 Century Parkway
Suite 300
Atlanta, GA   30345-3203
Phone: 404-325-0101
tanishamitchell@adr.org

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on September 26, 2018.

Erika Holland
JAMS
EHolland@jamsadr.com