IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MICHELE BURKE CRADDOCK,

    Plaintiff,

v.                              Civil Action No. 3:16-cv-11

LECLAIRRYAN,
A PROFESSIONAL CORPORATION

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court is PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 25), LECLAIRRYAN'S MOTION TO CORRECT AND VACATE PORTION OF ARBITRATION AWARD (ECF No. 27), and LECLAIRRYAN'S MOTION TO SEAL ARBITRATION AWARDS (ECF No. 29).[1] For the following reasons, the arbitration panel's Revised Final Award (ECF No. 26-1) will be vacated, the case will be remanded to the arbitration panel to properly apply the Supreme Court's clear precedent on fee enhancements, and the Initial Final Award (ECF No. 22-1) and the Revised Final Award (ECF No. 26-1) (collectively, the "Awards") will be unsealed.

---

[1] LeClairRyan challenges only Craddock's attorneys' fees award; there is no dispute about the arbitration panel's award to Craddock requiring LeClairRyan to pay her $274,748.00 in back pay for the year 2014 and compensatory damages of $20,000.

1

## BACKGROUND

Michele Burke Craddock ("Craddock") was a shareholder at LeClairRyan, P.C. ("LeClairRyan"). She brought the current action against LeClairRyan for sex-based employment discrimination and retaliation in response to reporting that discrimination, in violation of Title VII of the Civil Rights Act of 1964, of the Lilly Ledbetter Fair Pay Act, and of the Equal Pay Act. She alleged that LeClairRyan systemically discriminates against women by failing to give them equal compensation or the same promotion opportunities as men and that LeClairRyan discriminated against her specifically by not equally compensating or promoting her. See generally Complaint (ECF No. 1).

In a previous MEMORANDUM OPINION and ORDER (ECF Nos. 14 and 15), the Court denied Craddock's MOTION TO STAY ARBITRATION (ECF No. 3) and granted LeClairRyan's MOTION TO DISMISS AND TO COMPEL ARBITRATION (ECF No. 7). Afterward, the United States Court of Appeals for the Fourth Circuit dismissed an appeal of that decision for lack of appellate jurisdiction. Per Curiam Opinion (ECF No. 18).

The parties proceeded to arbitration on Craddock's claims. The arbitration hearing occurred from January 15, 2018 to January 26, 2018, and the panel issued its interim award on June 15, 2018. Following briefing on the issues of attorney's fees and costs, the

2

arbitration panel issued the Initial Final Award (ECF No. 22-1) on September 28, 2018.

In the Initial Final Award, the arbitration panel held that Craddock had not shown a violation of the Equal Pay Act; that LeClairRyan intentionally discriminated against Craddock based on her sex in her 2014 compensation, in violation of Title VII; and that LeClairRyan did not intentionally discriminate against Craddock in her 2015 compensation. The panel awarded Craddock $274,748.00 for LeClairRyan's Title VII violation. Further, it held that Craddock suffered emotional distress as a result of the intentional sex discrimination in the amount of $20,000. The panel also awarded Craddock's attorney's fees in the amount of $701,076.41 plus interest at a rate of 6% from the date of the Initial Final Award until the amount was paid in full. To come to that amount, the arbitration panel said that: (1) the lodestar analysis—which is determined by multiplying the number of reasonable hours expended by the attorneys times a reasonable rate—dictated an amount of $769,050.50 in attorneys' fees; (2) Craddock's attorneys' fees should be reduced to $678,899.50 because Craddock unnecessarily pursued a deposition of a witness and unsuccessfully tried to have her dispute determined in federal court; (3) the attorneys' fees should be reduced by a further 20% to $543,099.60 due to their lack of success on Craddock's Equal Pay Act claims and her Title VII retaliation claim; and (4) an

increase to the attorneys' fee award of 25% to $701,076.41 was appropriate due to Craddock's attorneys' success.

Craddock filed PLAINTIFF'S MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 21). Afterward, the parties discovered certain calculation errors in the final award that needed correction, so Craddock filed a motion to correct the final award before the arbitration panel and PLAINTIFF'S NOTICE OF PANEL MOTION TO CORRECT FINAL AWARD (ECF No. 23) in this Court to advise the Court of the potential change to the final award. LeClairRyan joined Craddock's motion before the arbitration panel, and it filed a motion with the arbitration panel to modify the form of the final award so that some of the factual and legal analysis of the arbitration panel remained confidential.    See generally LECLAIRRYAN'S CONFIDENTIAL MOTION TO MODIFY FORM OF FINAL AWARD (ECF No. 26-8).

On October 18, 2018, the arbitration panel issued a unanimous Revised Final Award (ECF No. 26-1), which awarded Craddock: (1) damages in the sum of $274,746.00 for backpay plus interest at a rate of 6% from January 1, 2015 until payment; (2) compensatory damages in the amount of $20,000 plus interest at a rate of 6% from January 1, 2015 until payment; (3) attorneys' fees in the sum of $678,151.50 plus interest at a rate of 6% from the date of the Revised Final Award until payment; and (4) costs in the amount of $48,492.64 plus interest at a rate of 6% from the date of the Revised Final Award until payment.    The panel also denied

4

LECLAIRRYAN'S CONFIDENTIAL MOTION TO MODIFY FORM OF FINAL AWARD
(ECF No. 26-8), thereby holding that the final award would not be
redacted or otherwise deemed confidential.

## DISCUSSION

### A. The Revised Final Award Shall Be Modified to Reflect the Correct Calculations.

LeClairRyan's first argument is that the arbitration panel's
revised award should be modified to correct certain calculations.
LeClairRyan alleges that, although the arbitration panel came to
the correct final mathematical calculation for attorneys' fees
($678,151.50) based on the approach used (which LeClairRyan says
was wrong), the arbitration panel's calculations leading up to
that final award were incorrect. Specifically, the arbitration
panel miscalculated by stating: (1) $769.050.50 minus $90,899.00
equaled a lodestar amount of $678,899.50, rather than the correct
amount of $678,151.50 (a difference of $748); (2) a 20% reduction
of the lodestar amount equaled $543,099.60 instead of $542.521.20;
and (3) a 25% increase of that reduced lodestar amount equaled
$701,076.31.

Craddock argues that the parties have already addressed the
issue with the arbitration panel, that the parties have agreed to
the revised calculations and total award amounts, and that the
panel clearly adopted the parties revised calculations and total
award amounts in the Revised Final Award. LECLAIRRYAN'S MEMORANDUM

5

IN SUPPORT OF MOTION TO SEAL ARBITRATION AWARDS (ECF No. 30) at 3.
LeClairRyan joined in Craddock's previous motion to correct
computational errors. Id. at 4. But, Craddock acknowledges that
the panel did not correctly calculate the various equations based
on the arbitration panel's adjustments even though it changed the
backpay and attorney's fee awards. Id.

Under 9 U.S.C. § 11, a court "may make an order modifying or
correcting the award upon the application of any party to the
arbitration . . . [w]here there was an evident material
miscalculation of figures." Here, although the final amount is
correct, the arbitration panel's award contains multiple
miscalculations. The Court will order that the above-stated
calculations will be modified to the correct amounts listed above,
as to which there is no dispute.

**B. The Arbitration Panel's Enhancement Manifestly Disregarded
Clear Supreme Court Precedent.**

LeClairRyan's next argument is that the Revised Final Award
(ECF No. 26-1) should be vacated because the arbitration panel
manifestly disregarded the applicable law that controls an award
of attorney's fees. The Court holds that the Revised Final Award
must be vacated because the arbitration panel disregarded clear
Supreme Court precedent.

To vacate a panel award for manifest disregard of the law, a
reviewing court must find "(1) the applicable legal principle is

6

clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed that legal principle." Wachovia Sec., LLC v. Brand, 671 F.3d 472, 481 (4th Cir. 2012) (alteration in original) (quoting Long John Silver's Rests., Inc. v. Cole, 514 F.3d 345, 349-50 (4th Cir. 2008)). Because, "[t]he scope of judicial review of an arbitration award 'is among the narrowest known at law,'" UBS Fin. Servs., Inc. v. Padussis, 842 F.3d 336, 339 (4th Cir. 2016) (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc., 142 F.3d 188, 193 (4th Cir. 1998)), proving manifest disregard requires something more than "showing that the arbitrators misconstrued the law, especially given that arbitrators are not required to explain their reasoning." Brand, 671 F.3d at 481. "[I]t is not an invitation to review the merits of the underlying arbitration." Id. at 483. Nor is it used to establish that an arbitrator either misconstrued or misapplied the applicable law. Jones v. Dancel, 792 F.3d 395, 402 (4th Cir. 2015). The scope of review means that a court "is limited to determine whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." Three S Del., Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007) (quoting Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994)).

LeClairRyan argues that this case presents an arbitration panel that has manifestly disregarded the law because the panel

7

enhanced Craddock's attorney's fee by 25% when she lost on multiple claims. The panel said,

> In its analysis, the Panel looks to the [Johnson v. Georgia Highway Express Inc., 488 F.2d 714 (5th Cir. 1974)] factors that relate to the skill required of the attorneys who prosecuted this case, their opportunity costs in pressing the instant litigation, and the undesirability of this case within the legal community. Craddock chose to prosecute gender discrimination claims against the law firm where she was a female partner. Her case was unique, presenting difficult challenges. A favorable outcome was not at all certain. Craddock's success depended on securing highly skilled and experienced counsel who were willing to forgo other opportunities in order to represent her. A case involving gender-based discrimination claims against a highly competent law firm is clearly an undesirable undertaking within the legal community.

Revised Final Award (ECF No. 26-1) at 45. Considering these factors, the arbitration panel found that Craddock's attorneys' "appropriate degree of success percentage" should include an increase of 25% to their attorneys' fees. Id.

LeClairRyan points to several Supreme Court decisions holding that enhancements are permitted only "in some cases of exceptional success," Hensley v. Eckerhart, 461 U.S. 424, 435 (1983),[2] or in "'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings" by the district court as to why the attorneys deserve an increase in fees for

---

[2] The Supreme Court in Hensley explicitly adopted the Johnson factors as the appropriate way for federal courts to calculate attorneys' fees. See Hensley, 461 U.S. at 449 n.8 ("[T]he Court expressly approves consideration of the full range of Johnson v. Georgia Highway Express factors.").

factors not considered by the lodestar analysis. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986) (Delaware Valley I) (quoting Blum v. Stenson, 465 U.S. 886, 898-901 (1984)). LeClairRyan argues that in each Supreme Court case it cites, the Court rejected the applicants' requests for enhancement because the attorneys' circumstances did not justify an enhancement to the lodestar.

As to the circumstances of this case, LeClairRyan argues that the arbitration panel made contradictory findings. For example, at the end of its opinion, the panel said that Craddock's case was "unique, presenting difficult challenges" and "depended on securing highly skilled and experienced counsel." Revised Final Award (ECF No. 26-1) at 45. But, earlier in the opinion, the panel said that "Craddock was not successful in a number of respects" because she failed to prove multiple claims and receiving much less than her sought compensatory and punitive damages in excess of $4,000,000. This lack of success, in turn, led the arbitration panel to reduce Craddock's attorneys' fees by 20%. Id. at 44. LeClairRyan argues that this decrease followed by an increase in the exact same amount manifestly disregarded the Supreme Court's decisions in Hensley and Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542 (2010).

Craddock notes that LeClairRyan challenges only Craddock's attorney's fees. And, Craddock argues that there were factors

9

here that were not adequately compensated by the lodestar analysis, namely, the undesirability of litigating a gender pay equity case against a prominent law firm. Craddock further points to cases from other circuits in which enhancements have been allowed for what she says are similar reasons. See Daggitt v. United Food & Commercial Workers Int'l Union, Local 304A, 245 F.3d 981, 990 (8th Cir. 2001); Barnes v. City of Cincinnati, 401 F.3d 729, 746 (6th Cir. 2005); Bass v. Dellagicoma, Civ. No. 10-1195, 2013 WL 3336760, at *12 (D.N.J. June 28, 2013); Cole v. City of Memphis, No. 2:13-cv-02117, 2015 WL 5076974, at *8-*9 (W.D. Tenn. Aug. 27, 2015). Based on these cases, Craddock argues that the panel acted within its legal authority in awarding the fee enhancement. Further, in Craddock's view, by discussing Perdue and Johnson, the panel showed that it understood the applicable law, and the panel's decision shows that Craddock's Title VII recovery was an exceptional success. Craddock points to the arbitration panel's finding that LeClairRyan's practices had a disparate impact on women lawyers, even with its appearance of commitment to gender diversity; that Craddock should have received a substantial raise in 2014 based on its stated compensation policy; that LeClairRyan's subjective application of its compensation policy historically impacted female shareholders; and that Craddock experienced emotional distress due to her discrimination. See generally Revised Final Award (ECF No. 26-1). These findings, in Craddock's view, show an

extraordinary level of success obtained by Craddock's counsel. Finally, Craddock argues that her attorneys' success on her Title VII claim have no logical relation to her Equal Protection Act or retaliation claims.

Title VII allows a court—or, in this case, an arbitration panel—to "allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs." 42 U.S.C. § 2000e-5(k). In a long line of cases, the Supreme Court has held (1) that the lodestar method—in which a court calculates the "lodestar" figure, determined by multiplying the hours spent on a case by a reasonable hourly rate of compensation for each attorney involved—is the proper method to determine attorneys' fees; and (2) that, even though permissible, enhancements to the lodestar figure for attorneys' fees "are proper only in certain 'rare' and 'exceptional' cases." Delaware Valley I, 478 U.S. at 563-65 (quoting Blum, 465 U.S. at 896). For example, in Blum v. Stenson, the Supreme Court held that courts applying statutes that allow an award of "reasonable attorneys' fees" must follow the above-stated approach. 465 U.S at 896-99. The Supreme Court found that the district court abused its discretion by accepting the fee applicants' contentions, made in a conclusory fashion, that an upward adjustment to the fee of 50% was necessary "because the issues were novel, the litigation was complex, and the results were of far-reaching significance to a large class of people."

11

Id. at 898. That was because there was no evidence to show the need for an upward adjustment and that "[t]he novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel." Id. Thus, "[n]either complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award." Id. at 898-99. Further, the Court said that "quality of representation" would also be a part of the hourly rate and that, "[a]bsent specific evidence to the contrary," the lodestar rate adequately accounted this factor. Id. at 899-900. Finally, the Court held that the "results obtained" by counsel will generally "be subsumed within other factors used to calculate a reasonable fee" and "should not provide an independent basis for increasing the fee award." Id. at 900. In Delaware Valley I, the Court made quite clear that fee enhancements are proper only when there is "both 'specific evidence' on the record and detailed findings by the lower courts." 478 U.S. at 565. And, in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air II, 483 U.S. 711 (1987) (Delaware Valley II), the Court held that "the risk of losing a lawsuit" is not "an independent basis for increasing the amount of any otherwise reasonable fee for the time and effort expended in prevailing." Id. at 725. And, the Supreme Court upheld the lodestar analysis again recently in Perdue, in which it stated that the lodestar method, while not perfect, is

12

the best measure to accomplish the goals of fee-shifting statutes because (1) it "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," and (2) it is "objective" and "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." 559 U.S. at 551-52. Further, in Perdue, the Court provided illustrative circumstances that could warrant enhancement: (1) when the method used in determining the hourly rate does not adequately measure an attorney's true market value; (2) when the attorney's performance includes an "extraordinary" outlay of expenses and the litigation is exceptionally protracted; and (3) when there are extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees. Id. at 554-56.

The Supreme Court has also repeatedly reversed district courts that have enhanced attorneys' fees awards above the lodestar figure. See Perdue, 559 U.S. at 557-58 (reversing a district court's 75% enhancement because there was no evidence of why the amount was chosen or whether the amount was reasonable in the relevant market, and because the district court's comparison of the performance to counsel in unnamed prior cases did not permit meaningful appellate review); Delaware Valley II, 483 U.S. at 730-31 (reversing the district court's 50% enhancement because there

was no evidence that a plaintiff would have found counsel because of the risk assumption involved); Blum, 465 U.S. at 898 (reversing a district court's 50% increase to the lodestar figure because the record contained no evidence justifying an enhancement and because the district court's conclusory references to "the complexity of the litigation, the novelty of the issues, the high quality of representation, the 'great benefit' to the class, and the 'riskiness' of the law suit" were not enough to uphold the enhancement). Indeed, it does not appear that the Supreme Court has affirmed an enhancement of attorneys' fees under a statute like this one since Blum was decided in 1984.

Because the arbitration panel ignored this clear precedent (even though the panel mentioned it) when it gave Craddock's attorneys an enhancement to the lodestar figure, and because there is no evidence that the lodestar figure was improper, the Court finds that the arbitration panel manifestly disregarded the law. As explained above, the arbitration panel provided Craddock's attorneys with an enhancement for three reasons. First, it thought the lodestar figure did not account for the "difficult challenges" of the case. Revised Final Award (ECF No. 26-1) at 45. Second, the panel noted that "Craddock's success depended on securing highly skilled and experienced counsel who were willing to forgo other opportunities in order to represent her." Id. Third, it stated, without evidence, that "[a] case involving gender-based

14

discrimination claims against a highly competent law firm is clearly an undesirable undertaking within the legal community." Id. None of these reasons stand up to the standards established by Supreme Court precedent. There is no "specific evidence" or "detailed findings" as to why the lodestar figure did not adequately compensates Craddock's counsel nor is there evidence that this case is "rare" or "exceptional." See Delaware Valley I, 478 U.S. at 565 (quoting Blum, 465 U.S. at 898-901).

Further, all the cases cited by Craddock are out-of-circuit and have not been approved by the Supreme Court, the Fourth Circuit, or this Court. And, even assuming that those courts correctly followed Supreme Court precedent, each is easily distinguishable. In Daggitt, the Eighth Circuit affirmed an enhancement of 25% because the case was complex and because the lodestar figure was "modest," equaling only $33,547.13 (much lower than the amount of $678,151.50 that the lodestar figure equaled here). 245 F.3d at 990. In Barnes, the Sixth Circuit—in a case about "a pre-operative male-to-female transsexual" who alleged that the city demoted him for failing to conform to sexual stereotypes—said that a district court did not abuse its enhancement by increasing the award by 75% because the district court found that "the result achieved was extraordinary and the case was highly controversial, based on the affidavits of two Cincinnati attorneys who stated that few lawyers locally or

nationally would take such a case." 401 F.3d at 746. In Cole, the district court gave a 15% enhancement to the lodestar was because "the results achieved by Plaintiffs' counsel go beyond the interests of the parties in the instant case" and "preserv[ed] the fundamental constitutional rights of the multitude of persons who visit[ed]" the targeted area. 2015 WL 5076974 at *8-*9. Finally, in Bass, the district court held that the plaintiff's attorneys' efforts "vindicated the fourth amendment as not yet extinct in a high crime area" through "extraordinary effort and skill," and the court stated that the victory "inure[d] not just to [the plaintiff] but to any citizen living in cities like [the city at issue]." 2013 WL 3336760 at *12. For all these benefits, the court granted a lodestar enhancement of 15%. Id. Each case was supported by specific evidence that the win for the client was extraordinary, which Craddock has not done here.

**C. The Initial Final Award And The Revised Final Award Will Not Be Sealed**

LeClairRyan also seeks to seal portions of the Awards. See LECLAIRRYAN'S MOTION TO SEAL ARBITRATION AWARDS (ECF No. 29). The Court holds that sealing the Awards is improper, and, even if it were proper to seal the Awards, LeClairRyan waived that sealing by waiting 36 days to file a motion to seal once the Initial Final Award (ECF No. 21-1) (which contained all the information that LeClairRyan wishes the Court to seal) was public.

16

LeClairRyan asks the Court to seal portions of the Awards, specifically asking the Court to seal details relating to

confidential Firm personnel decisions; confidential financial information about Craddock's former colleagues; confidential information about the careers of a number of non-party witnesses; and a plethora of confidential and—other than in the context of between Craddock and the Firm—legally privileged information, embodying client confidences about at least two significant clients of the Firm and Craddock and one potential client.

LECLAIRRYAN'S MEMORANDUM IN SUPPORT OF MOTION TO SEAL ARBITRATION AWARDS (ECF No. 30) at 1-2. LeClairRyan argues that it asked the arbitration panel to provide a summary of its rulings to protect client information, and it says that Craddock then again filed a copy of the award with all the confidential and privileged information. Id. at 2.

The burden is on LeClairRyan to show that sealing is proper. Benedict v. Hankook Tire Co. Ltd., 323 F. Supp. 3d 747, 754 (E.D. Va. 2018). And, LeClairRyan faces a high burden because "[m]otions to file documents under seal are disfavored and discouraged." E.D. Va. Loc. Civ. R. 5(C). Indeed, "even where . . . all of the litigants support the motion to seal, and even where a public hearing on the question does not bring forth anyone to assert the right of access, a court must still engage in a careful deliberation on the issue." Benedict, 323 F. Supp. 3d at 754 (quoting Miles v. Ruby Tuesday, Inc., 799 F. Supp. 2d 618, 622 (E.D. Va. 2011)). And, failing to file a timely motion to seal

17

may result in the document being placed in the public record. E.D. Va. Loc. Civ. R. 5(C).

The Fourth Circuit has held that there is a presumption that the public can inspect and copy all materials that are judicial records and that documents filed with the district court should be public. Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004); Stone v. Univ. of Maryland Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988). This is so because public access to judicial records is a societal interest (not just one related to the litigants), which is why the Court is not bound by the litigants' wishes. GEA Group AG v. Flex-N-Gate Corp., 740 F.3d 411, 419 (7th Cir. 2014). The right to inspect judicial records comes from two sources: (1) the common law and (2) the First Amendment.

## 1. Judicial Records

The first issue that the Court must address is whether the Awards are in fact "judicial records and documents" to which the presumption applies. See Washington Post, 386 F.3d at 575 (quoting Stone, 855 F.2d at 180). LeClairRyan, without explicitly making the argument, seems to argue that the Awards are not covered by the presumption, arguing that it is entitled to privacy and confidentiality because the case was litigated in front of an arbitration panel, rather than a federal court, and that the American Arbitration Association's rules (specifically, AAA

Employment Rule 23). LECLAIRRYAN'S MEMORANDUM IN SUPPORT OF MOTION TO SEAL ARBITRATION AWARDS (ECF No. 30) at 4. So, in LeClairRyan's view, the information contained in the Awards should not have been filed with the Court, and the right of public access to judicial records does not apply to the right of access to arbitration proceedings. Id. at 5-6.

Craddock disagrees, asserting that, because LeClairRyan's arbitration contract fails to mention confidentiality, and because the contract says that "[j]udgment may be entered on the arbitrator's decision in any court having jurisdiction," (ECF No. 26-2) at 13, the Court should find that the documents should be unsealed. MEMORANDUM IN OPPOSITION TO MOTION TO SEAL (ECF No. 35) at 2-3. As further support for its position, Craddock points to a stipulation the parties had related to the confidentiality of discovery materials (ECF No. 30-2), which does not say anything about pleadings, proceedings, or arbitration awards. MEMORANDUM IN OPPOSITION TO MOTION TO SEAL (ECF No. 35) at 3. And, the arbitration panel, relying on Benedict, denied LeClairRyan's request to seal the order, saying that "[n]o order governing the Confidentiality of the Award had been entered and the parties' Stipulation on Confidentiality of Discovery Materials does not extend to confidentiality of evidence presented in a judicial forum, absent a timely motion by the party seeking a confidential hearing or seeking confidentiality of the decision after the close

19

of the evidence and prior to the entry of any Award." Revised
Final Award (ECF No. 26-1) at 6. So, in Craddock's view, the
Awards are now part of the judicial records in the case, and the
public has a right to examine such records. MEMORANDUM IN
OPPOSITION TO MOTION TO SEAL (ECF No. 35) at 4.

In reply, LeClairRyan argues that, because the confidential
material came from discovery that was covered by the stipulation,
the parts of the arbitration award discussing those confidential
materials must be covered by the stipulation as well.
LECLAIRRYAN'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO SEAL
ARBITRATION AWARDS (ECF No. 37), at 5.

There does not appear to be much authority on what qualifies
as a "judicial record." The United States Court of Appeals for
the Fourth Circuit has "never explicitly defined 'judicial
records,'" although, of course, all "judicially authored or
created documents are judicial records." In re U.S. for an Order
Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir.
2013). And, motions for summary judgment and the documents
attached to those motions are judicial records, even if the
attached documents were discovery documents previously covered by
a protective order. Rushford v. New Yorker Magazine, Inc., 846
F.2d 249, 252 (4th Cir. 1988).

Further, in arbitration jurisprudence, the duty of federal
courts under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, is

"to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989). Otherwise, "parties are generally free to structure their arbitration agreements as they see fit," and they may "specify by contract the rules under which that arbitration will be conducted." Id. at 479.

Here, LeClairRyan did not include a provision in either its arbitration agreement with Craddock (ECF No. 26-2) or in the parties' agreed STIPULATION ON CONFIDENTIALITY OF DISCOVERY MATERIALS (ECF No. 30-2) to keep all arbitration proceedings confidential. Instead, the arbitration agreement allows "[t]he parties [to] apply to any court of competent jurisdiction for . . . conservatory relief, as necessary, without breach of this arbitration agreement." (ECF No. 26-2) at 14, 16. And, the STIPULATION ON CONFIDENTIALITY OF DISCOVERY MATERIALS does not cover any materials attached to motions to confirm an award. See (ECF No. 30-2) at 2-3. Further, Craddock attached the Awards to PLAINTIFF'S MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 21) and PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 25), thus making them part of the judicial record in the same way as a discovery document attached to a motion for summary judgment. See Rushford, 846 F.2d at 252. Thus, the Awards are part of the judicial record.

### 2. Sealing Requirements

Whether the public has a right to access particular judicial records and documents is within "the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978). But, there are certain requirements to seal court documents. First, the proponent of sealing must docket a motion to seal reasonably in advance to allow other interested parties to object to sealing. In re Knight Pub. Co., 743 F.2d 231, 235 (4th Cir. 1984) (citing In re Knoxville News-Sentinel Co., Inc., 723 F.2d 470, 474-76 (6th Cir. 1983)). Second, the Court must determine whether the right of access to these particular documents comes from the common law or the First Amendment, which is a question of law. Washington Post, 386 F.3d at 575; In re U.S., 707 F.3d at 290. Third, "[a] district court should state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review." In re Knight Pub. Co., 743 F.2d at 235.

### a. Docketing A Motion to Seal

There is no contention that LeClairRyan failed to satisfy the first requirement by docketing the motion to seal here. By filing the motion to seal, LeClairRyan allowed all interested parties to

22

object as Craddock has. See MEMORANDUM IN OPPOSITION TO MOTION TO SEAL (ECF No. 35).

### b. First Amendment or Common Law Right to Access and Specific Factual Findings Regarding Whether Sealing Is Appropriate

There is some question as to whether the Awards are protected by the First Amendment or only the common law right of access. The distinction between the rights of access afforded by the common law and the First Amendment is "significant," Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir. 1989), because the common law "does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." Washington Post, 386 F.3d at 575 (quoting Rushford, 846 F.2d at 253). To determine whether the First Amendment provides a right to access to orders and proceedings, the Fourth Circuit uses the "experience and logic" test, which asks "(1) 'whether the place and process have historically been open to the press and general public,' and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" In re U.S., 707 F.3d at 291 (quoting Goetz, 886 F.2d at 64). Still, no matter its source, the right of public access "may be abrogated only in unusual circumstances." Washington Post, 386 F.3d at 576 (quoting Stone, 855 F.2d at 180).

The common law presumes a right of the public to inspect and copy "all 'judicial records and documents.'" Id. at 575. But,

this right is not absolute, and a district court may seal documents where the public's right of access is heavily outweighed by competing interests. Id. These factors "include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." In re Knight Pub. Co., 743 at 235; Washington Post, 386 F.3d at 575.

The First Amendment right to judicial records is stronger in that there must be a compelling governmental interest, not just a competing one, that outweighs the right to public access, and the denial of access must be "narrowly tailored to serve that interest." Washington Post, 386 F.3d at 575 (quoting Stone, 855 F.2d at 180). But, the First Amendment right also is narrower than the common law right in that the First Amendment covers only "particular judicial records and documents." Id. All "judicially authored or created documents are judicial records" are covered by the First Amendment. See In re U.S., 707 F.3d at 290. And, certain other documents submitted by the parties (or at least involving them) are protected by the First Amendment as well. These judicial records include: (1) motions for summary judgment and the documents attached to those motions, even if the documents attached to the summary judgment motion were discovery documents

previously covered by a protective order, Rushford, 855 F.2d at 252; (2) trial transcripts and documents in evidence at a public jury trial, Benedict, 323 F. Supp. 3d at 755; (3) some pre-trial criminal hearings, such as plea and sentencing hearings (but not documents related to investigations before a grand jury has been called), In re Washington Post Co., 807 F.2d 383, 390 (4th Cir. 1986); In re U.S., 707 F.3d at 286; and (4) post-trial briefing that refers to documents and statements in unredacted filings. Certusview Techs., LLC v. S&N Locating Servs., LLC, 198 F. Supp. 3d 568, 588 n.12 (E.D. Va. 2016).[3]

Other courts, including a district court in the Fourth Circuit and Circuit courts outside this circuit, have given examples of kinds of documents that have been sealed when reviewed under the more lenient common law standard. These include confidential communications about settlement negotiations, RegScan, Inc. v. Bureau of Nat. Affairs, Inc., No. 1:11-CV-1129, 2012 WL 2994075, at *8 (E.D. Va. 2012); certain cases involving trade secrets, GEA Group, 740 F.3d at 420; certain cases involving settlement agreements, id.; most cases in which the plaintiff is a child victim of sexual abuse, id.; cases involving foreign arbitration

---

[3] Judicial records not covered by the First Amendment include orders under 18 U.S.C. § 2703(d), which covers certain orders related to electronic communications and wire transfers, because the public does not play a significant role in functioning of investigations and those documents have not historically been open to the press. In re U.S., 707 F.3d at 291-92.

(but not necessarily U.S. arbitration), id.; and bank records. Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co., 834 F.3d 589, 594 (6th Cir. 2016) (citing In re Knoxville News-Sentinel, 723 F.2d at 476-77). But, the Sixth Circuit held that some harm to a company's reputation alone is not a reason to seal documents. Id.

The Court holds, first, that the common law standard, rather than the First Amendment, applies to the Awards that were attached to PLAINTIFF'S MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 21) and PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 25). As stated earlier, the Fourth Circuit uses the "experience and logic" test to determine whether the First Amendment applies. That test asks "(1) 'whether the place and process have historically been open to the press and general public,' and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" In re U.S., 707 F.3d at 291 (quoting Goetz, 886 F.2d at 64).

Arbitration proceedings have not historically been open to the press or the public, and public access does not play a significant role in arbitration proceedings. Further, unlike judicial opinions, arbitration panel awards and opinions are often not public if the parties agree to keep them secret. Although attaching an arbitration award to a motion to confirm such an award

might be similar to attaching a document to a motion for summary judgment, which is afforded First Amendment protection, Rushford, 855 F.2d at 252, the Court's role in confirming an arbitration award that has already been decided by an arbitration panel is vastly different from its role at summary judgment, when the Court must evaluate the facts and applicable legal standards to determine whether there is a genuine dispute of any material fact. Fed. R. Civ. P. 56. Thus, in the Court's view, the common law standard, rather than the First Amendment standard, applies to the Awards.

Still, even under the common law standard, LeClairRyan has not met its burden of showing that the public's right of access is "heavily outweigh[ed]" by competing interests or that "unusual circumstances" require abrogating the public's right to access. Washington Post, 386 F.3d at 575 (emphasis added) (quoting Rushford, 846 F.2d at 253; Stone, 855 F.2d at 180). From examining LeClairRyan's proposed changes, the information that it seeks to redact was critical to the arbitration panel's analysis in the Awards. For example, even though Craddock succeeded on her Title VII claim for sex-based discrimination based on her compensation, LeClairRyan seeks to redact all discussion about the differences between men and women's compensation at the firm and the underlying events (namely, Craddock's work on a particular matter) that resulted in the arbitration panel finding in her favor. Because the information is clearly important to the

arbitration panel's analysis, LeClairRyan has not shown that its privacy interest or any other factor heavily outweighs the public's access to it. Thus, LeClairRyan's request to seal the Awards will be denied.

### 3. Waiver

Even if LeClairRyan had a meritorious claim for sealing the Awards, it waived the argument by failing to object to the docketing of the Revised Final Award by Craddock for over a month (36 days to be exact).

In a different context, the Supreme Court has said, "[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Waiver happens when a party fails to object to information initially disclosed by the other party, and it files a motion that provided its own account of events without asserting privilege. See RegScan, Inc., 2012 WL 2994075, at *6.

The Court recently addressed the issue of waiver in a separate context. In Benedict, the defendants moved to have certain trial exhibits, portions of the trial transcript, and part of the jury instructions sealed. 323 F. Supp. 3d at 753. Neither the defendants nor the plaintiff moved to seal any trial exhibits, testimony, or other materials before or during the jury trial. Id. at 752. The Court ruled that waiver applied to documents that

were documents previously sealed because the proponent of sealing failed to seek protections at or before trial. Id. at 758. The defendants did not request for the courtroom to be closed on the day of trial, nor did they request that observers not reveal what they heard, nor did they avoid discussing confidential topics, nor did they request to seal anything during the final stages of the trial. Id. at 761. The defendants took no immediate measures to limit dissemination of the information during the public trial. Id. at 762.

There are very few decisions that relate to sealing and waiver in the arbitration context. In one case before a district court in the Fourth Circuit, a court denied a motion to seal three exhibits offered in support of a motion to compel arbitration when those exhibits were already lodged on the docket (although the opinion does not mention waiver). Erichsen v. RBC Capital Markets, LLC, 883 F. Supp. 2d 562, 75 (E.D.N.C. 2012).

Here, LeClairRyan states that Craddock "wast[ed] no time" in attaching an unredacted and unsealed copy of the Initial Final Award (ECF No. 22-1) as an exhibit of public record on October 1, 2018. LECLAIRRYAN'S MEMORANDUM IN SUPPORT OF MOTION TO SEAL ARBITRATION AWARDS (ECF No. 30) at 2. But, LeClairRyan waited 36 days, until November 6, 2018, to complain about this filing, see id. at 8, even though it filed LECLAIRRYAN'S OPPOSITION TO PLAINTIFF'S MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 24) on

October 15, 2018. Craddock them filed the Revised Final Award (ECF No. 26-1) on October 23, 2018. LeClairRyan did not ask for this award to be sealed until November 6, 2018 (14 days). LECLAIRRYAN'S MEMORANDUM IN SUPPORT OF MOTION TO SEAL ARBITRATION AWARDS (ECF No. 30) at 2. And, from reviewing both the Initial Final Award and the Revised Final Award, it appears all the information that LeClairRyan wants sealed was present in the Initial Final Award.

On this record, the Court finds that LeClairRyan waived its right to ask for the documents to be sealed by failing to take immediate measures and by failing to ask the Court to seal the Awards while having the opportunity to provide its own account of the events and why the Awards should remain sealed. See RegScan, Inc., 2012 WL 2994075, at *6; Benedict 323 F. Supp. 3d at 762. Further, as stated in E.D. Va. Loc. Civ. R. 5(C), "[f]ailure to file a timely motion to seal may result in the document being placed in the public record." Id. Here, that failure did place the Awards in the public record. Thus, because LeClairRyan had notice that the information it sought to remain sealed was public as early as October 1, 2018, and because it failed to object to that information remaining public until November 6, 2018, LeClairRyan waived any right it might have had to have the documents sealed.

**CONCLUSION**

For the foregoing reasons, PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 25) will denied, LECLAIRRYAN'S MOTION TO CORRECT AND VACATE PORTION OF ARBITRATION AWARD (ECF No. 27) will be granted, and LECLAIRRYAN'S MOTION TO SEAL ARBITRATION AWARDS (ECF No. 29) will be denied. The case is remanded to the arbitration panel to correct the attorneys' fees award.

/s/  
Robert E. Payne  
Senior United States District Judge

Richmond, Virginia  
Date: June ___, 2019